No. 23-60494

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

23-60494

WILL MCRANEY,

*Plaintiff-Appellant*,

*v.*

THE NORTH AMERICAN MISSION BOARD OF THE SOUTHERN BAPTIST CONVENTION, INCORPORATED,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of Mississippi in Case No. 1:17-cv-00080 (Davidson, J.)

## BRIEF OF DEFENDANT-APPELLEE

KELLY SHACKELFORD
HIRAM S. SASSER, III
DAVID J. HACKER
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, TX 75075
(972) 941-4444

KATHLEEN I. CARRINGTON
JOSHUA J. WIENER
BUTLER SNOW LLP
1020 Highland Colony Parkway
Ridgeland, MS 39157
(601) 948-5711

MATTHEW T. MARTENS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, DC 20037
(202) 663-6000
matthew.martens@wilmerhale.com

TIMOTHY J. PERLA
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02019
(617) 526-6000
timothy.perla@wilmerhale.com

JOSHUA A. VITTOR
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
joshua.vittor@wilmerhale.com

November 30, 2023

**No. 23-60494**

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

23-60494

WILL MCRANEY,

*Plaintiff-Appellant,*

*v.*

THE NORTH AMERICAN MISSION BOARD OF THE SOUTHERN BAPTIST CONVENTION, INCORPORATED,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of Mississippi in Case No. 1:17-cv-00080 (Davidson, J.)

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Will McRaney, Plaintiff-Appellant

2. Sandy McRaney

3. William Harvey Barton, II, Counsel for Plaintiff-Appellant

4. Barton Law Firm, PLLC, Counsel for Plaintiff-Appellant

5. Scott E. Gant, Counsel for Plaintiff-Appellant

6.  Boies Schiller Flexner LLP, Counsel for Plaintiff-Appellant

7.  The North American Mission Board of the Southern Baptist Convention, Inc., Defendant-Appellee

8.  Kathleen Ingram Carrington, Counsel for Defendant-Appellee

9.  Joshua J. Wiener, Counsel for Defendant-Appellee

10. Butler Snow LLP, Counsel for Defendant-Appellee

11. Matthew T. Martens, Counsel for Defendant-Appellee

12. Timothy J. Perla, Counsel for Defendant-Appellee

13. Joshua A. Vittor, Counsel for Defendant-Appellee

14. Wilmer Cutler Pickering Hale and Dorr LLP, Counsel for Defendant-Appellee

15. Kelly Shackelford, Counsel for Defendant-Appellee

16. Hiram S. Sasser, III, Counsel for Defendant-Appellee

17. David J. Hacker, Counsel for Defendant-Appellee

18. First Liberty Institute, Counsel for Defendant-Appellee

19. Baptist Convention of Maryland/Delaware, Inc., Third Party

20. Adam Stone, Counsel for Third Party Baptist Convention of Maryland/Delaware, Inc.

21. Jones Walker, LLP, Counsel for Third Party Baptist Convention of Maryland/Delaware, Inc.

22. Eric Gunderson, Counsel for Third Party Baptist Convention of

Maryland/Delaware, Inc.

23. Davis, Agnor, Rapaport & Skalny, LLC, Counsel for Third Party Baptist

Convention of Maryland/Delaware, Inc.


/s/  Matthew T. Martens
ATTORNEY OF RECORD FOR DEFENDANT-
APPELLEE THE NORTH AMERICAN MISSION
BOARD OF THE SOUTHERN BAPTIST
CONVENTION, INC.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee The North American Mission Board of the Southern Baptist Convention, Inc. respectfully requests oral argument for this matter. Oral argument is warranted here because it would assist the Court in resolving the legal questions presented by this appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ...................................................i

STATEMENT REGARDING ORAL ARGUMENT ..........................................iv

TABLE OF AUTHORITIES ........................................................................ vii

STATEMENT OF ISSUES ............................................................................1

STATEMENT OF THE CASE.........................................................................1

    A.    Southern Baptist Ecclesiology ..........................................................1

    B.    Facts Concerning Plaintiff.................................................................4

    C.    Procedural Background.......................................................................9

SUMMARY OF THE ARGUMENT .................................................................13

ARGUMENT .............................................................................................15

I.    THE FIRST AMENDMENT PRECLUDES ADJUDICATION OF
    PLAINTIFF'S CLAIMS..........................................................................15

    A.    Ecclesiastical Abstention Precludes Adjudication of
        Plaintiff's Claims............................................................................15

        1.    The Court Need Not Decide Whether Ecclesiastical
            Abstention Is Jurisdictional or an Affirmative Defense ..........17

        2.    Ecclesiastical Abstention Applies Because Resolving
            Plaintiff's Claims Would Impermissibly Require a Court to
            Adjudicate Matters of Faith, Doctrine, Church
            Governance, and Other Ecclesiastical Questions ....................22

            a)    Plaintiff's Claims Concerning His
                Termination...................................................................22

            b)    Plaintiff's Post Termination Claims ................................27

        3.    None of Plaintiff's Rejoinders Salvages His Claims...............30

            a)    Ecclesiastical Abstention Is Not Limited to
                Intra-Church Disputes....................................................31

            b)    The Religious Neutrality of Tort Law Does
                Not Save the Claims .......................................................38

    B.    The Ministerial Exception Precludes Adjudication of
        Plaintiff's Claims............................................................................39

II.    PLAINTIFF'S CLAIMS FAIL EVEN APART FROM FIRST
       AMENDMENT CONSIDERATIONS..........................................................49

       A.    Plaintiff Released His Claims ..............................................49

       B.    Plaintiff Offered No Evidence to Support His Claims.......................51

CONCLUSION ......................................................................................58

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc.*,
650 A.2d 260 (Md. 1994) .........................................................53, 56

*AmSouth Bank v. Gupta*, 838 So. 2d 205 (Miss. 2002) ..........................................56

*Batson v. Shiflett*, 602 A.2d 1191 (Md. 1992) ........................................................55

*Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir.
1997) ............................................................. 12, 14, 30, 32, 33, 43

*Borchers v. Hyrchuk*, 727 A.2d 388 (Md. Ct. Spec. App. 1999) ............................55

*Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286
(Ind. 2003) .......................................................................35, 40

*Brethren Mutual Insurance Co. v. Buckley*, 86 A.3d 665 (Md. 2014) ....................50

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648
(10th Cir. 2002) ...............................................................19, 44, 48

*Campos v. Steves & Sons, Inc.*, 10 F.4th 515 (5th Cir. 2021) ....................14, 28, 49

*Catholic Diocese of Jackson v. De Lange*, 341 So. 3d 887 (Miss.
2022) .........................................................................20, 26

*Cha v. Korean Presbyterian Church of Washington*, 553 S.E.2d 511
(Va. 2001) ..................................................................41

*DeBruin v. St. Patrick Congregation*, 816 N.W.2d 878 (Wis. 2012).....................40

*Decker ex rel. Decker v. Tschetter Hutterian Brethren, Inc.*, 594
N.W.2d 357 (S.D. 1999).................................................................18

*Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th
968 (7th Cir. 2021) ........................................................41

*Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W. 3d 467 (Ky.
2017) ...................................................................40

*Doe v. First Presbyterian Church U.S.A. of Tulsa*, 421 P.3d 284 (Okla. 2017) ................................................................18

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Florida*, 824 F. App'x 680 (11th Cir. 2020).............................23, 24

*El-Farra v. Sayyed*, 226 S.W.3d 792 (Ark. 2006) ....................................40

*Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d 357 (Wash. 2012) (en banc) ..............................................................40

*Ex parte Bole*, 103 So. 3d 40 (Ala. 2012) .................................................40

*Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. 2017).........................42

*Galbreath v. Burlington Coat Factory Warehouse of Arundel, Inc.*, 2003 WL 22955704 (D. Md. Dec. 2, 2003) ...................................56

*Gay Student Services v. Texas A & M University*, 737 F.2d 1317 (5th Cir. 1984) ..............................................................47

*Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970) .................54

*Gulf Coast Hospice LLC v. LHC Group Inc.*, 273 So. 3d 721 (Miss. 2019) ..............................................................53

*Hammer v. United States*, 989 F.3d 1 (D.C. Cir. 2021)...........................................21

*Heard v. Johnson*, 810 A.2d 871 (D.C. 2002) .........................................40

*Hickey v. St. Martin's Press, Inc.*, 978 F. Supp. 230 (D. Md. 1997).......................57

*Hiles v. Episcopal Diocese of Massachusetts*, 773 N.E.2d 929 (Mass. 2002) ..............................................................40

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012)...................................... 39, 40, 41, 42, 43, 45, 46, 47, 48

*Howard v. Gonzales*, 658 F.2d 352 (5th Cir. 1981) ...............................................19

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995)........................................................47

*In re Lubbock*, 624 S.W.3d 506 (Tex. 2021) ....................................18, 40

*In re Shell Oil Co.*, 932 F.2d 1518 (5th Cir. 1991) ................................... 19

*Kaser v. Financial Protection Marketing, Inc.*, 831 A.2d 49 (Md. 2003) ............................................................................................. 53

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952) ................................ 15, 16, 41

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113 (3d Cir. 2018) .................................................................... 24, 41

*Lee v. Weisman*, 505 U.S. 577 (1992) .................................................... 15

*Mallette v. Church of God International*, 789 So. 2d 120 (Miss. Ct. App. 2001) ................................................................................. 20

*McRaney* v. *North American Mission Board of Southern Baptist Convention*, 966 F.3d 346 (5th Cir. 2020) ................................ 13, 16

*Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990) ................................ 41, 46, 47, 48

*Montgomery v. St. John's United Church of Christ*, 2023 WL 2820472 (Ohio Ct. App. Apr. 6, 2023) ........................................... 40

*Nation Ford Baptist Church Inc. v. Davis*, 876 S.E.2d 742 (N.C. 2022) .......................................................................................... 18, 40

*Nayak v. MCA, Inc.*, 911 F.2d 1082 (5th Cir. 1990) .................... 26, 32, 46

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) ................... 20

*O'Connor v. Diocese of Honolulu*, 885 P.2d 361 (Haw. 1994) ............... 26

*Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008) ................................. 16

*Oklahoma Annual Conference of United Methodist Church v. Timmons*, --- P.3d ---, 2023 WL 6984831 (Okla. Oct. 24, 2023) ............ 25, 46

*Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) ........................................ 15, 16, 31, 35, 40, 42, 44, 46, 48

*Palmer v. Liberty University, Inc.*, 72 F.4th 52 (4th Cir. 2023) ............... 38

*Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
   193 N.E.3d 1009 (Ind. 2022) ...........................................................35

*Perna v. Health One Credit Union*, 983 F.3d 258 (6th Cir. 2020) ....................19, 21

*Petruska v. Gannon University*, 462 F.3d 294 (3d Cir. 2006) ................................47

*Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179 (9th Cir.
   2022) ...........................................................................................21

*Seaway Bank & Trust Co. v. J&A Series I, LLC*, 962 F.3d 926 (7th
   Cir. 2020) ....................................................................................21

*Serbian Eastern Orthodox Diocese for U.S. & Canada v.
   Milivojevich*, 426 U.S. 696 (1976) ...........................................15, 16

*Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir. 1974) ........................18, 30

*Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628 (Md. Ct. Spec. App.
   2005) ...........................................................................................53

*Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444 (5th Cir. 2023) ................20

*St. Joseph Catholic Orphan Society v. Edwards*, 449 S.W.3d 727 (Ky.
   2014) ...........................................................................................18

*State Farm Mutual Automobile Insurance Co. v. Slade Healthcare,
   Inc.*, 381 F. Supp. 3d 536 (D. Md. 2019) .......................................54

*Tucker v. Faith Bible Chapel International*, 36 F.4th 1021 (10th Cir.
   2022) .....................................................................................18, 19

*Unintrin Auto & Home Insurance Co. v. Karp*, 481 F. Supp. 3d 514
   (D. Md. 2020) ...............................................................................51

*Van Osdol v. Vogt*, 908 P.2d 1122 (Colo. 1996) .....................................................41

*Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871) ...........................29, 34, 37, 42, 43

*Williams v. Liberty Mutual Insurance Co.*, 741 F.3d 617 (5th Cir.
   2014) ...........................................................................................54

*Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, 901 N.W.2d
   566 (Mich. 2017) ..........................................................................18

*Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church in America*, 860 F. Supp. 1194 (W.D. Ky. 1994).............................................26

## STATUTORY PROVISIONS

28 U.S.C.
     § 1447 ...............................................................................19, 20, 21
     § 2106 ...................................................................................19
     § 2111 ...................................................................................21

Fed. R. Civ. P.
     Rule 8.....................................................................................18
     Rule 12...............................................................................9, 18

Miss. Code Ann. § 15-1-35......................................................................54

## BIBLICAL PASSAGES

Acts 1:8 .................................................................................................25

Col. 1:18.................................................................................................6

1 Corin. 12:27 ........................................................................................5

Eph. 1:22-23 ...........................................................................................6

Matthew 28:19-20 ..................................................................................25

Philippians 2:5-8 ...................................................................................23

Rom.
     7:24 .....................................................................................23
     12:4-5 ....................................................................................5

## OTHER AUTHORITIES

Archdiocese of Los Angeles, *Administrative Handbook* § 2.2.2,
     https://handbook.la-archdiocese.org/chapter-2/section-2-
     2/topic-2-2-2 (last visited Nov. 27, 2023) ......................................36

Catholic Diocese of Madison, *Parish Corporations*,
     https://madisondicese.org/parish-corporations (last visited Nov.
     27, 2023) ...........................................................................36

Kidd, Thomas C. & Barry Hankins, *Baptists in America: A History* (2015)....................................................................................................1, 36

Newton, John, *Amazing Grace* (1779)....................................................................23

Smith, Eric C., *John Leland: A Jeffersonian Baptist in Early America* (2022)........................................................................................................36

Southern Baptist Convention, *Baptist Faith & Message* (2000), https://bfm.sbc.net/bfm2000/..........................................................2, 3, 5, 36

## STATEMENT OF ISSUES

(1)  Whether the district court properly determined that ecclesiastical abstention bars adjudication of this case because, on the evidentiary record presented, adjudication would impermissibly require a secular court to inquire into matters of faith, doctrine, church government, or other ecclesiastical questions.

(2)  Whether secular courts are constitutionally permitted to adjudicate state law tort claims that require the determination of a religious organization's reasons for terminating a minister and excluding him from certain religious activities.

(3)  Whether this Court should affirm the grant of summary judgment on the alternative grounds that the undisputed evidence shows that Plaintiff: (a) released his claims, and (b) cannot prove required elements of his claims.

## STATEMENT OF THE CASE

### A.    Southern Baptist Ecclesiology

Baptists are non-hierarchical.  *See generally* ROA.669-674 (Expert Report of Barry Hankins).  This means that individual Baptist churches are autonomous and voluntarily cooperate with other churches as each sees fit to advance gospel work.  As Baptists are known to say, "There is no Baptist church, only Baptist churches."  ROA.669; *see also* Kidd & Hankins, *Baptists in America: A History* 248 (2015).

This voluntary cooperation among Baptist churches can manifest itself in various ways.  Baptist churches in a geographic area may voluntarily cooperate with a local association of Baptist churches.  At the state level, Baptist churches often voluntarily cooperate with state or regional conventions of Baptist churches.  At the national level, a Baptist church might decide to cooperate voluntarily with a national convention of Baptist churches, such as the Southern Baptist Convention ("SBC").  *See* ROA.669; *see also* ROA.2446-2451 (deposition of Plaintiff's expert, Barry Hankins).

Typically, this voluntary cooperation among autonomous Baptist churches is to promote certain ministry objectives, such as evangelism and church planting.  *See* ROA.2479.  And it is often the case that Baptist churches cooperating with an association or convention share some doctrinal similarities, as reflected in a statement of faith.  For example, the SBC adopted the current version of the Baptist Faith and Message ("BFM") in 2000, and churches in cooperation with the SBC profess faith and doctrinal practices that closely identify with the BFM.  ROA.669-670.[1]

A church's decision to cooperate with a local association, state convention, or national convention does not subject the church to any oversight by the

---

[1] *See* SBC*, Baptist Faith & Message* (2000), https://bfm.sbc.net/bfm2000/ (last visited Nov. 30, 2023).

association or convention.  *See* ROA.669-670.  Nor is the church, association, or convention obligated to continue its respective cooperation if one finds itself at odds with the other.  *See* ROA.2412-2421; ROA.2430-2436.

This commitment to individual church autonomy is doctrinally distinctive of Baptists.  *See* ROA.669-671; ROA.2397-2401.  Thus, the SBC's BFM defines a Baptist "church" as "an autonomous local congregation of baptized believers," associated by covenant in the faith and fellowship of the gospel.  ROA.670 (report of Plaintiff's expert, quoting BFM); *see also* ROA.1763.  While Baptist churches organize and cooperate to advance the gospel, such cooperative organizations "have no authority over one another or over the churches.  They are voluntary and advisory bodies designed to elicit, combine, and direct the energies of [Baptists] in the most effective manner."[2]  As Plaintiff's expert, Dr. Barry Hankins, explains, "[t]he organizational impetus among Baptists has always been strong, but it has also been from the ground up, never from the top down."  ROA.669.[3]

---

[2] *Id.*, Article XIV ("Cooperation").

[3] NAMB understands its description of Baptist polity, both herein and in other instances throughout this litigation, to be consistent with that set forth in the amicus brief filed by a variety of Southern Baptist ministers.  However, those ministers also argue that religious organizations cooperating and organized as are Southern Baptists are not entitled to the same First Amendment protections as others which organize hierarchically.  For the reasons set forth below, that argument is deeply flawed as a constitutional matter.

### B.    Facts Concerning Plaintiff

With respect to Plaintiff, the undisputed evidentiary record presented at summary judgment shows:

Defendant-Appellee The North American Mission Board of the Southern Baptist Convention, Inc. ("NAMB") is among the constituent entities of the SBC. Consistent with the principles of autonomy and cooperation discussed above, NAMB assists—but neither directs nor has agency over—Baptist churches, associations, and conventions of churches in missionary work and church planting. ROA.1701.  NAMB's ministry includes strategic cooperative partnerships with 42 state or regional conventions, including with the Baptist Convention of Maryland/Delaware ("BCMD").  ROA.1711-1712.

In 2012, NAMB and BCMD entered into a joint ministry agreement called a Strategic Partnership Agreement ("SPA"), which memorialized the parties' cooperation and defined their agreement to "jointly develop, administer and evaluate a strategic plan for penetrating lostness through church planting and evangelism."  ROA.1702.  The SPA could be discontinued by either party. ROA.1704.

The SPA is a religious agreement, inexorably tied to Baptist faith and doctrine, and invokes both the Holy Bible and the BFM.  ROA.1702-1703.  As former BCMD President William Warren (a ministerial leader of BCMD at the

time) testified, to interpret the SPA requires an understanding of Baptist theology and the BFM.  ROA.1801.

Plaintiff Will McRaney served as BCMD's Executive Director between September 2013 and June 2015.  The Executive Director position—sometimes referred to as "Executive Missional Strategist" (ROA.2213)—is, as the district court confirmed below, unquestionably ministerial.  ROA.155.  Plaintiff was a trained minister of the gospel when BCMD appointed him Executive Director, he held himself out as a minister during his tenure, and his job responsibilities included evangelism, conveying the Baptist message, and the oversight of BCMD's church planting strategy.  *See* ROA.1781-1791.

Over time, Plaintiff and NAMB developed a spiritual dispute "concerning Dr. McRaney's … performance of the cooperative evangelistic mission" articulated in the SPA.  ROA.1834-1835.  As such, this was a dispute between "two members within the Body of Christ," ROA.1835, because "[r]egardless of what local congregation Drs. McRaney and [NAMB President Kevin] Ezell are members of," they are "both members of the church, meaning Body of Christ," ROA.1834.[4]  NAMB tried to mend the relationship with Plaintiff and BCMD,

---

[4] Indeed, "[t]he New Testament speaks also of the church as the Body of Christ which includes all of the redeemed."  SBC, *Baptist Faith & Message* (2000), Article VI (The Church), https://bfm.sbc.net/bfm2000/; *see also* Rom. 12:4-5 ("For just as each of us has one body with many members, … , so in Christ we, though many, form one body"); 1 Corin. 12:27 ("Now you are the body of Christ and

including by outlining ministerial objectives in the SPA that NAMB believed

Plaintiff was "disregard[ing]."  ROA.2228.  Ultimately, in December 2014, "[a]fter

careful and prayerful consideration," NAMB provided BCMD with one-year

notice of its intent to terminate the SPA due to Plaintiff's disregard of the SPA's

missional requirements.  ROA.2232.

Over the ensuing months, BCMD and NAMB tried to "find a way to partner

and move forward" by "[c]ommit[ting] all this to prayer for the Holy Spirit's

guidance toward positive resolutions for a more healthy relationship and

partnership to reach the lost and plant churches in Maryland/Delaware."

ROA.2236.  But on June 8, 2015, BCMD's General Mission Board ("GMB")

voted unanimously to terminate Plaintiff's employment as Executive Director.

ROA.4100.  In response, Plaintiff resigned and willingly—with the assistance of

counsel—signed a Separation Agreement, releasing all claims against BCMD and

its "supporting organizations."  ROA.2254-2261.

The contemporaneous written record and deposition testimony is consistent

that BCMD terminated Plaintiff due to spiritual concerns about his performance as

Executive Director and not because of any alleged defamation by NAMB.

ROA.1818-1821.  BCMD President Warren explained to a colleague that BCMD

---

individually members of it"); Eph. 1:22-23 (the Father "gave him [the Son] as head
over all things to the church, which is his body"); Col. 1:18 ("And he [Christ] is
the head of the body, the church.").

voted to terminate Plaintiff because of "his wretched leadership not because of a possible loss of NAMB funds."  ROA.2239; *see also* ROA.2250 ("[C]ategorically I can say Kevin Ezell never bullied us or badgered us or asked us to fire Will McRaney.").  Warren testified to the same effect at his deposition.  ROA.1814 (testifying that BCMD terminated Plaintiff because he "betrayed a spirit of unwillingness to make the changes from his heart that needed to be made in his leadership").  Minutes from the meeting that culminated in the GMB's vote to terminate Plaintiff reveal that Plaintiff's poor leadership was the driving force behind that decision.  *See, e.g.*, ROA.4096 ("My problem is that I don't believe [Plaintiff] can lead us out of this.…  The narcissism is choking."); ROA.4097 ("We need a good captain that can navigate tumultuous waters in a storm. [Plaintiff] is not that guy.").

In the eight years since Plaintiff separated from BCMD, he has pursued an aggressive and strident public campaign to disseminate his belief—without any factual support—that NAMB and its officials defamed him and caused his termination.  For example, Plaintiff published a "Letter of Concern," which he sent to many SBC leaders, attacking NAMB and accusing it of influencing BCMD's decision to terminate him.  ROA.2266-2270.  He followed that with another "open letter" containing similar allegations.  ROA.2274-2279.  He has also posted—and continues to post—extensively on social media platforms about his dispute with

NAMB.  ROA.2322-2326.[5]  Plaintiff's public rebukes of NAMB, while

unsupported by fact, confirm the religious nature of the dispute.  ROA.2270

(arguing NAMB's conduct has affected "SBC Mission Effectiveness" and quoting

Proverbs 18:17); ROA.2277 (attaching list of "Select Related Scriptures");

ROA.2325 (accusing NAMB's President of "damag[ing] servants of Christ").

Plaintiff's public obsession with NAMB and its President, Kevin Ezell,

persuaded NAMB to take unprecedented steps to ensure the safety of Dr. Ezell and

other NAMB personnel.  NAMB hired personal security for Dr. Ezell during

certain events and installed a home security system.  ROA.1721-1728.  NAMB

also affixed a picture of Plaintiff to the interior-facing side of the reception desk at

NAMB's headquarters to identify Plaintiff if he entered the building.  ROA.2281-

2282, 2322.

Plaintiff alleges that, in October 2016, NAMB caused his disinvitation from

speaking at a church event in Mississippi.  But Pastor Rob Paul, who organized

that church event, testified unequivocally that he rescinded Plaintiff's invitation

and that NAMB had nothing to do with it.  ROA.2299-2303, 2306-2309.  Pastor

Paul's contemporaneous correspondence with Plaintiff confirms this.  ROA.2312-

2316.  There is no record evidence that NAMB played any role in the disinvitation.

---

[5] NAMB attached a representative sample of Plaintiff's voluminous and ongoing
Facebook and Twitter posts to its motion for summary judgment.  ROA.2321-
2326.

### C.    Procedural Background

Plaintiff sued NAMB in Mississippi state court in April 2017, advancing six causes of action for tortious interference with business relationships, defamation, and intentional infliction of emotional distress ("IIED").  ROA.40; ROA.1316-1328 (operative pleading); ROA.1325-1328.  He alleges that NAMB defamed him by claiming he breached the SPA, and this supposedly "led to Plaintiff's ouster by BCMD."  ROA.1318.  Plaintiff further alleges that, after his termination, NAMB "engaged in additional tortious conduct" by (a) telling people that Plaintiff "lies, and that he is 'delusional,'" (b) affixing a "no-entry photo" of Plaintiff at NAMB's headquarters, and (c) causing Plaintiff to be disinvited from the Mississippi church speaking event.  ROA.1320-1322.

In 2019, the district court dismissed Plaintiff's claims for lack of subject matter jurisdiction based on the court's determination that "this case would delve into church matters" in violation of the First Amendment's ecclesiastical abstention doctrine.  ROA.351.  Plaintiff appealed, and this Court reversed and remanded for further evidentiary development.  ROA.395-401.  Procedurally, the panel noted it was unclear whether ecclesiastical abstention was "a jurisdictional bar requiring dismissal under Fed. R. Civ. P. 12(b)(1) or an affirmative defense requiring dismissal under Fed. R. Civ. P. 12(b)(6)."  ROA.396 n.1.  The panel concluded it "need not resolve this uncertainty because dismissal was improper,

regardless." *Id.* But the panel acknowledged that "[t]he First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." ROA.401 (internal quotation marks omitted). A determination of the applicability of that defense was "premature," however, because, "[a]t this time, it is not certain that resolution of McRaney's claims will require the court to interfere with matters of church government, matters of faith, or matter of doctrine." *Id.* The panel noted that "[i]f further proceedings and factual development reveal that McRaney's claims cannot be resolved without deciding purely ecclesiastical questions, the [district] court is free to reconsider whether it is appropriate to dismiss some or all of McRaney's claims." ROA.400.[6]

On remand, the parties completed discovery, which included production of internal ministry records from both NAMB and BCMD, as well as the deposition testimony of pastors and ministry leaders, all of which made clear that resolving Plaintiff's claims would require the district court to do what this Court previously confirmed the First Amendment did not permit: "interfere with matters of church government, matters of faith, [and] matters of doctrine." ROA.401. NAMB therefore moved for summary judgment, arguing that Plaintiff's claims were precluded by both ecclesiastical abstention and the ministerial exception of the

---

[6] The ministerial exception defense was not presented on appeal. ROA.400 n.3.

First Amendment. NAMB also moved for summary judgment on alternative grounds, including that: (a) Plaintiff's claims were released via his separation agreement, (b) the allegedly defamatory statements were true, (c) some of Plaintiff's claims were time-barred, and (d) there is no evidence that NAMB's challenged statement caused BCMD to terminate Plaintiff's employment or that Plaintiff was disinvited from any speaking engagement because of NAMB's conduct.

The district court granted summary judgment to NAMB, ruling only on ecclesiastical abstention. ROA.3982-3993. After reviewing the factual record, the district court determined that "it cannot adjudicate the Plaintiff's claims in this case without impermissibly delving into church matters in violation of the ecclesiastical abstention doctrine." ROA.3987. With respect to claims relating to Plaintiff's termination from BCMD, the Court concluded that, to rule on those claims, it "would be required to interpret the SPA, which is an agreement steeped in religious doctrine[,] and weigh in on the Plaintiff's job performance as BCMD's Executive Missional Strategist, a position which by its very terms invokes the Church's religious mission and a position in which the Plaintiff clearly served in a ministerial role and which he had a primary role in conveying the Baptist Church's message and carrying out its religious mission." ROA.3987-3988.

With respect to Plaintiff's claims relating to his disinvitation from the Mississippi church speaking engagement, the district court noted that it would have to "determine if the event canceled the Plaintiff's speech for a valid religious reason" and if NAMB's alleged "efforts to stop the speech were tortious or if they were a valid exercise of religious belief." ROA.3990. Regarding Plaintiff's claims relating to the posting of his photograph at NAMB's headquarters, the district court reasoned that it would need to inquire into why NAMB wanted to prevent Plaintiff from entering the building, "and because NAMB is a religious institution, the question will touch on matters of religious belief." *Id.* Overall, the district court, relying on the "analogous" case of *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997), concluded that "[a]djudication of the Plaintiff's claims in this lawsuit will clearly require the Court to inquire into religious matters and decision-making to a degree that is simply impermissible under the Constitution and the ecclesiastical abstention doctrine." ROA.3991-3992.

Although NAMB had not framed its ecclesiastical abstention argument in terms of the district court's subject matter jurisdiction, the district court did so. *See* ROA.3991-3992. Because of ecclesiastical abstention, the district court concluded that it lacked jurisdiction to hear the case and that remand to state court was inappropriate because ecclesiastical abstention would also bar state court adjudication of Plaintiff's claims. ROA.3992-3993.

Plaintiff now contends that ecclesiastical abstention is an affirmative defense (Br. 20-22), which means it is an issue on which the district court could grant summary judgment. But Plaintiff also contends that the district court, having concluded that it lacked subject matter jurisdiction because of ecclesiastical abstention, should have remanded the case to state court rather than have granted summary judgment. Plaintiff made no such argument below, however. He did not argue in opposing summary judgment that ecclesiastical abstention, if applicable, would necessitate remand to state court; and he filed no motion for reconsideration of the district court's decision not to remand. *See* ROA.29.

## SUMMARY OF THE ARGUMENT

The First Amendment's Religion Clauses preclude adjudication of this case because Plaintiff's claims would require determination of matters of faith, doctrine, ministerial employment, and/or church governance. *See McRaney* v. *North Am. Mission Bd. of S. Baptist Convention*, 966 F.3d 346, 350-51 (5th Cir. 2020). BCMD's former President testified that Plaintiff, a minister, was terminated by BCMD, a religious employer, for lack of Christ-like character and "wretched leadership," and thus adjudication of Plaintiff's termination claims—which all turn on the reason for his termination—would require resolution of inherently religious issues. Similarly, Plaintiff claims that he was defamed by NAMB's assertion that he breached the SPA—a religious ministry agreement that invokes Scripture and

that BCMD's former President testified cannot be interpreted without an understanding of the SBC's BFM—would require the district court to resolve religious questions. And Plaintiff's claim that he was disinvited from speaking at a church would require examination of whether the church's religious reasons for doing so were valid or involved NAMB. At bottom, a secular court cannot adjudicate Plaintiff's claims "relating to how and by whom [BCMD, NAMB, or any religious institution] spread[s] their message." *Bell*, 126 F.3d at 332.

Apart from the First Amendment, summary judgment was appropriate for multiple alternative reasons. ***First***, Plaintiff signed a Separation Agreement when he left BCMD, which contained a broad release of claims against all "supporting organizations" of BCMD. The undisputed record—including testimony by Plaintiff's own expert, ROA.2562-2563—evidences that NAMB is such an organization. ***Second***, Plaintiff adduced no evidence that he was terminated from his employment with BCMD, disinvited from speaking roles, or otherwise injured as a result of NAMB's actions. The evidence is unanimously to the contrary. For these alternative reasons, which were presented as part of NAMB's motion for summary judgment, the Court can affirm the judgment below. *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021) ("We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." (internal quotation marks omitted)).

## ARGUMENT

### I.    THE FIRST AMENDMENT PRECLUDES ADJUDICATION OF PLAINTIFF'S CLAIMS

"The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee v. Weisman*, 505 U.S. 577, 590 (1992).  Consistent with this fundamental principle, the Religion Clauses—which protect the free exercise and prohibit the establishment of religion—together preclude secular courts from resolving religious disputes.  Specifically, secular courts may not resolve disputes that would require courts to render judgment on matters of faith, doctrine, church governance, or other ecclesiastical questions.  *See, e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 713 (1976).  The Religion Clauses similarly preclude secular courts from adjudicating disputes concerning a religious organization's employment of ministers.  *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("*OLG*").  These principles prohibit a secular court, whether federal or state, from adjudicating Plaintiff's claims here.

### A.    Ecclesiastical Abstention Precludes Adjudication of Plaintiff's Claims

The Supreme Court has long recognized that the First Amendment affords

religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116; *see also OLG*, 140 S. Ct. at 2060. Thus, as this Court recognized in the prior appeal in this case, ecclesiastical abstention[7] "precludes judicial review of claims that require resolution of 'strictly and purely ecclesiastical' questions." *McRaney*, 966 F.3d at 348 (quoting *Serbian E. Orthodox Diocese*, 426 U.S. at 713).

These principles dispose of this case. Resolving Plaintiff's claims would mire the court in questions of faith, doctrine, and church governance. Indeed, these very appellate proceedings prove the point. Plaintiff's opening brief criticizes the district court for issuing an opinion containing *misstatements about Baptist doctrine and polity*. Br. 23-24. A group of Baptist ministers has submitted an amicus brief making the same point. *See generally* Brief of *Amici Curiae* Current and Former Baptist Leaders in Support of Appellant and Vacatur ("Amicus Br."). In other words, the district court could not even render a decision dismissing the case without tiptoeing— albeit inaccurately[8]—into matters of

---

[7] Courts have used the terms "church autonomy doctrine" or "religious autonomy doctrine" and "ecclesiastical abstention" interchangeably. *See, e.g.*, *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008); *McRaney*, 966 F.3d at 347 (noting that ecclesiastical abstention is "also known as the religious autonomy doctrine").

[8] Although the error was legally inconsequential, the district court was incorrect to the extent it posited the existence of a singular Baptist church.

church doctrine. And this is not the first time in this case criticism has arisen for allegedly inaccurate statements about church doctrine. Br. 6-8. Imagine the perilous religious territory the courts would have to navigate to go beyond a dismissal on First Amendment grounds and instead delve into the merits. Ecclesiastical abstention exists precisely because secular courts are not competent to adjudicate religious matters, and doing so invades religious liberty. But that is what adjudicating this case would require.

It is obvious why this case has repeatedly veered into questions of religion—such questions lie at the heart of Plaintiff's claims. An analysis of each claim (set forth below) confirms this. None of Plaintiff's rejoinders salvages the ability of a secular court to adjudicate this inherently religious dispute.

### 1.    The Court Need Not Decide Whether Ecclesiastical Abstention Is Jurisdictional or an Affirmative Defense

Before addressing the merits of the district court's ecclesiastical abstention ruling, Plaintiff focuses heavily on whether ecclesiastical abstention presents a defect in subject matter jurisdiction and whether, in turn, the district court was required to remand this case to state court. Br. 18-22. In the prior appeal in this matter, the Court noted that the law is unclear whether ecclesiastical abstention is jurisdictional but found it unnecessary to decide the issue. ROA.396 n.1. The Court can do the same here because the outcome is the same (*i.e.*, affirmance) regardless. To illustrate this, consider the three possible outcomes depending on

whether ecclesiastical abstention presents a defect in subject matter jurisdiction or an affirmative defense:

The *first* possibility is that ecclesiastical abstention is jurisdictional. Although there are cases for and against this view,[9] the conclusion that ecclesiastical abstention is jurisdictional is more doctrinally sound.[10]  If ecclesiastical abstention is jurisdictional, then the proper result was dismissal for

---

[9] Examples of cases suggesting that ecclesiastical abstention is a matter of subject matter jurisdiction: *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 492 (5th Cir. 1974) ("The people of the United States conveyed no power to Congress to vest its courts with jurisdiction to settle purely ecclesiastical disputes."); *Nation Ford Baptist Church Inc. v. Davis*, 876 S.E.2d 742, 753 n.4 (N.C. 2022); *In re Lubbock*, 624 S.W.3d 506 (Tex. 2021); *Decker ex rel. Decker v. Tschetter Hutterian Brethren, Inc.*, 594 N.W.2d 357 (S.D. 1999).  Examples of cases suggesting that ecclesiastical abstention is an affirmative defense:  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1029 (10th Cir. 2022) ("Like the church autonomy doctrine, the ministerial exception operates as an affirmative defense to an otherwise cognizable claim." (internal quotation marks omitted)); *Doe v. First Presbyterian Church U.S.A. of Tulsa*, 421 P.3d 284, 290-91 (Okla. 2017) (concluding church autonomy is an affirmative defense); *St. Joseph Catholic Orphan Society v. Edwards*, 449 S.W.3d 727, 737 (Ky. 2014) ("[W]e conclude that the ecclesiastical-abstention doctrine is an affirmative defense."); *Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, 901 N.W.2d 566, 573 (Mich. 2017) ("[T]he ecclesiastical abstention doctrine … does not deprive [civil] courts of subject matter jurisdiction.").

[10] Affirmative defenses are waivable (*see* Fed. R. Civ. P. Rule 8(c)) whereas defects in jurisdiction may be raised at any time (Fed. R. Civ. P. Rule 12(h)(3)).  It cannot be that a secular court may—or must—adjudicate a religious issue simply because a litigant failed (perhaps unintentionally) to timely assert an affirmative defense.  Ecclesiastical abstention must be a jurisdictional defect so that courts will *never* intrude on religious liberty.  Because that matter remains unsettled, however, NAMB herein demonstrates why the issue need not be resolved here.

lack of subject matter jurisdiction.  In that instance, the district court at most made a labeling error in "granting" summary judgment rather than dismissing the case, but the error is harmless.  *See Tucker*, 36 F.4th at 1027-29; *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002); *Perna v. Health One Credit Union*, 983 F.3d 258, 274 (6th Cir. 2020) ("[T]he district court's labelling error was harmless, and [this Court] may modify the judgment to clarify its nature." (citing 28 U.S.C. § 2106)); *Howard v. Gonzales*, 658 F.2d 352, 357 (5th Cir. 1981) ("When no substantive prejudice results from an erroneous ruling, the error is harmless.").

Plaintiff tries to conjure harm by asserting that the district court would have needed, in the face of a jurisdictional defect, to remand the case to the state court from which the case was removed.  Br. 37 (citing 28 U.S.C. § 1447(c)).  As a threshold matter, Plaintiff did not request remand in the district court and thus waived the issue.  *See In re Shell Oil Co.*, 932 F.2d 1518, 1523 (5th Cir. 1991) (plaintiff waived remand under 28 U.S.C. § 1447(c) by not timely requesting such in district court); *cf. Perna*, 983 F.3d at 273 ("Given … Perna's failure to object to a dismissal, we will dismiss (not remand) this case.").

Regardless, Section 1447(c) does not require remand in this specialized circumstance.  This Court recently held that remand to state court is required if a federal court concludes that jurisdiction is lacking, even if that remand would be

futile. *Spivey v. Chitimacha Tribe of La.*, 79 F.4th 444, 448 (5th Cir. 2023). But here, issuing an order of remand would not merely be futile but would be *unconstitutional*. The ecclesiastical abstention doctrine, being of constitutional origin, applies in state courts too, *Mallette v. Church of God Int'l*, 789 So. 2d 120, 123-24 (Miss. Ct. App. 2001), and thus a Mississippi state court can no more hear this case than can a Mississippi federal court, *Catholic Diocese of Jackson v. De Lange*, 341 So. 3d 887 (Miss. 2022) (holding that Mississippi courts lacked jurisdiction to hear church employee's defamation claim). Thus, were this Court to conclude that ecclesiastical abstention precludes secular court adjudication of this matter, the act of remanding this case to state court for further adjudication would subject religious institutions to further rounds of secular litigation over a matter of faith—precisely what the ecclesiastical abstention doctrine forbids. *Cf. NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979) (noting that "the very process of inquiry leading to findings and conclusions" "may impinge on rights guaranteed by the Religion Clauses"). Accordingly, this Court should hold that *Spivey* does not require remand where, as here, remand would not merely be futile but would itself inflict constitutional harm. Stated another way, the statute governing remand (28 U.S.C. § 1447) should be read in a manner that renders it constitutional, *i.e.*, not requiring remand where an order of remand would itself inflict constitutional harm.

Alternatively, this Court, sitting *en banc*, should overrule *Spivey* and recognize a futility exception to Section 1447(c) consistent with the decisions of three other circuits. *See Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179, 1189-90 (9th Cir. 2022); *Seaway Bank & Trust Co. v. J&A Series I, LLC*, 962 F.3d 926, 932 (7th Cir. 2020); *Hammer v. United States*, 989 F.3d 1, 3 (D.C. Cir. 2021). The *Spivey* panel failed to consider that, "even if § 1447(c) required a remand rather than a dismissal, the district court's error would be harmless" when, as here, "federal law would have required th[e] [state] court to dismiss." *Hammer*, 989 F.3d at 3 (Randolph, J., concurring in the judgment) (citing 28 U.S.C. § 2111).[11]

The **second** possibility is that ecclesiastical abstention is not jurisdictional and is instead an affirmative defense, as Plaintiff argues. Br. 20-22. This would mean (assuming ecclesiastical abstention applies) the district court got the substance right but mislabeled the dismissal as jurisdictional. Such a labeling error would be harmless. *See, e.g.*, *Perna*, 983 F.3d at 274.

---

[11] If this Court finds that remand is required despite its futility, the Court should make clear that remand is a formality given collateral estoppel on the ecclesiastical abstention question.

*Finally*, this Court could conclude that the alternative grounds for affirmance presented in Section III herein are correct, in which case the proper result would, once again, be summary judgment.

Thus, acceptance of any ground presented in this Brief leads to the same outcome—affirmance.  As a result, this Court can affirm the judgment below without deciding whether ecclesiastical abstention presents a jurisdictional defect or an affirmative defense.

> **2. Ecclesiastical Abstention Applies Because Resolving Plaintiff's Claims Would Impermissibly Require a Court to Adjudicate Matters of Faith, Doctrine, Church Governance, and Other Ecclesiastical Questions**

Plaintiff's claims concern the termination of his BCMD employment (Counts I-III) and certain events following his termination (Counts IV-VI).  The district court correctly found that all these claims would require it to adjudicate matters of faith, doctrine, church governance, and/or other ecclesiastical questions, such that ecclesiastical abstention bars adjudication.

> *a) Plaintiff's Claims Concerning His Termination*

Plaintiff's first three claims (tortious interference, defamation, IIED) stem from NAMB's conduct supposedly "leading to [Plaintiff's] termination from BCMD."  ROA.1325-1326.  The record evidence not only refutes Plaintiff's allegation but highlights how the cause of his termination is inexorably tied to faith and doctrine.

When BCMD leadership voted to terminate Plaintiff, BCMD's President wrote contemporaneously that BCMD "fired [Plaintiff] because of his wretched leadership," ROA.2239, a description loaded with Christian and spiritual connotations. *See* Newton, *Amazing Grace* (1779) ("…that saved a wretch like me…"); Rom. 7:24 ("Wretched man that I am!"). BCMD's President confirmed this under oath, testifying in his deposition that Plaintiff's lack of a "humble spirit," an element of Christ-like character, was the primary reason for his termination. ROA.1814-1817. BCMD's President further testified that the Christ-like spirit of humility that should be present in the life of a ministry leader like Plaintiff is defined by Philippians 2:5-8:

> Have this mind among yourselves, which is yours in Christ Jesus, who, though he was in the form of God, did not count equality with God a thing to be grasped, but emptied himself, by taking the form of a servant, being born in the likeness of men.  And being found in human form, he humbled himself by becoming obedient to the point of death, even death on a cross.

*See id.*

Thus, adjudication of Plaintiff's claims concerning his termination would necessarily require him to contest this testimony by BCMD's President, resulting in a factual dispute at trial about whether his leadership of BCMD was "wretched" and/or whether he lacked the Christ-like character necessary to lead that ministry organization.  These are inherently religious questions beyond the ken and competence of a secular court.  *See, e.g., Eglise Baptiste Bethanie De Ft.*

*Lauderdale, Inc. v. Seminole Tribe of Florida*, 824 F. App'x 680, 683 (11th Cir. 2020) (noting that courts are required to "refrain from adjudicating matters involving … theological controversy, church discipline, ecclesiastical government, *or the conformity of the members of the church to the standard of morals required of them*." (internal quotation marks omitted) (emphasis added)).  Resolving Plaintiff's claim here would require the district court to do just that: evaluate whether, in fact, he conformed "to the standard of morals required of" him.  *Id.*; *see also Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 121 (3d Cir. 2018) (holding that "a determination of what constitutes adequate spiritual leadership" is a "question[] that would impermissibly entangle the court in religious governance and doctrine prohibited by the Establishment Clause.").

Likewise, Plaintiff's claim that NAMB's supposed defamation of him led to his termination would impermissibly require the court to resolve questions of religious doctrine.  Plaintiff claims that NAMB defamed him by stating that he breached the SPA.  *See* ROA.1318 (quoting December 2, 2014 letter from NAMB to BCMD regarding Plaintiff's alleged breach of the SPA).  As the district court rightly concluded on the undisputed evidentiary record, whether Plaintiff breached the SPA would require religious determinations.  The SPA sets forth the respective ministry obligations of BCMD and NAMB entailed by their religious partnership.  ROA.1701-1704.  The SPA recites NAMB's desire to partner with BCMD

"according to its ministry priorities described above" and "sets forth mutual guidelines for … providing missionaries to help [BCMD] penetrate lostness" so that NAMB and BCMD "together … can accomplish the Great Commission as given to us by our Lord in Matthew 28:19-20 and Acts 1:8."  ROA.1701-1702. The SPA goes on to state that the document is "driven by shared values," including "Biblical Authority," "Kingdom Advancement," and "Evangelism and Missions." ROA.1702.  Still further, the SPA provides that "[a]ll elements of this document shall be consistent with the most recently adopted version of the Southern Baptist Convention Baptist Faith and Message."  ROA.1703.  Accordingly, BCMD's president testified that one could not interpret the SPA without understanding the Southern Baptist Convention's doctrinal statement, which is expressly incorporated into the SPA.  ROA.1801.

Where, as here, a defamation claim is premised on a statement that someone in a ministerial leadership role like Plaintiff's failed to live up to religious ministry obligations in a governing religious document like the SPA, adjudication of that claim will necessarily entangle the court in religious questions beyond its competence.  The First Amendment precludes a secular court from adjudicating such claims.  *See Oklahoma Annual Conference of United Methodist Church v. Timmons*, --- P.3d ---, 2023 WL 6984831, at *3 (Okla. Oct. 24, 2023) (dismissing case that "require[d] the courts to interpret the Book of Discipline," which is the

United Methodist Church's "governing … document," because "a court may not, under the neutral principles approach, decide for itself what any governing church provisions mean"); *Catholic Diocese of Jackson*, 341 So. 3d at 895 (holding that ecclesiastical abstention barred adjudication of defamation claim because whether "cause" existed for plaintiff's termination "would require an impermissible interpretation by a civil court of the Diocese's Code of Canon Law"); *O'Connor v. Diocese of Honolulu*, 885 P.2d 361, 368 (Haw. 1994) (dismissing defamation claim on ecclesiastical abstention grounds because claim required "determining doctrinal correctness or … analyzing church law"); *Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church in Am.*, 860 F. Supp. 1194, 1199-1200 (W.D. Ky. 1994) ("If truth were a defense to the defamation claim, we presumably could face inquiry into determination of the minister's effectiveness," "precisely what the First Amendment prohibits."); *cf. Nayak v. MCA, Inc.*, 911 F.2d 1082, 1083 (5th Cir. 1990) (affirming dismissal of defamation claim that would require "the court to decide the 'correct' interpretation of the life of Christ").

Plaintiff contends that ecclesiastical abstention does not apply because "the lawsuit challenges NAMB's conduct" and "[n]o court is being asked to pass judgment on actions taken by BCMD." Br. 32. But the conduct by NAMB that Plaintiff challenges allegedly caused his termination from a ministerial position with BCMD. ROA.1319 (Supplemental Pleading ¶16, alleging that "[a]lthough

BCMD made the final decision to terminate Plaintiff as its Executive Director, that decision was heavily influenced by NAMB's tortious conduct"). BCMD contends that, in fact, Plaintiff's employment was terminated because of his "wretched leadership," including his lack of Christ-like character. ROA.2239; *see also* ROA.4100-4101 (BCMD's GMB board minutes offering numerous other justifications for Plaintiff's termination, including strained relationships with BCMD's staff, churches, and associations). Thus, resolution of Plaintiff's claims require that the district court, on this evidentiary record, determine the veracity of BCMD's claimed religious reasons for terminating Plaintiff. If BCMD terminated Plaintiff for its stated religious reasons rather than because of interference by NAMB, then Plaintiff's claim will fail. But a secular court is not permitted by the First Amendment to adjudicate whether BCMD's asserted religious reasons for terminating Plaintiff from his ministerial position were the true reasons.

### b)     *Plaintiff's Post Termination Claims*

Plaintiff's claims four through six (tortious interference, defamation, IIED) relate to NAMB's supposed interference with Plaintiff's church speaking engagement in Mississippi, from which he was disinvited, and the posting of his photograph at NAMB headquarters. As the district court correctly found, resolving these claims would impermissibly require a secular court to adjudicate matters of religion.

With respect to the claim concerning the church speaking engagement, for Plaintiff to avoid summary judgment he was required, even apart from First Amendment concerns, to proffer admissible evidence that NAMB interfered with his invitation to speak at the church conference.  He offered no such evidence.  The *only* cognizable record evidence is from Pastor Rob Paul, the event organizer, who testified unequivocally that he alone made the decision to rescind the invitation for Plaintiff to speak at his church, and that he did so not due to any influence from NAMB but because of his own concerns about Plaintiff's aforementioned public campaign against NAMB.  *See* ROA.2298-2299 ("[Plaintiff] was declaring war on [NAMB], and significant numbers of our ministry partners were [NAMB] ministers, and those two things are incompatible."); ROA.2299-2300 (testifying that he made the decision to disinvite Plaintiff from the event, and that nobody— from NAMB or otherwise—directed him to do so).  Given Plaintiff's failure of proof, summary judgment against him on these claims was appropriate.  *See Campos*, 10 F.4th at 520.

In any event, adjudicating Plaintiff's claims regarding his church conference speaking engagement would require a court to adjudicate a question regarding the governance of a local church and, on the facts of this case, would require adjudication of a religious issue.  As an initial matter, questions regarding the governance by a church or other religious organization (whether or not that

organization is technically a "church") are entirely beyond the bounds of secular court adjudication. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728-29 (1871) ("The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine … is unquestioned…. [I]t would … lead to a total subversion of such religious bodies if anyone aggrieved by one of their decisions could appeal to secular courts and have them reversed."). Here, Plaintiff is asking the federal courts to adjudicate a question regarding why a religious conference was governed in a particular way. This is constitutionally impermissible as a categorical matter.

What is more, adjudication of Plaintiff's conference speaker claims would require adjudication of religious questions. Plaintiff alleges that he was "uninvited" from speaking at the church conference in Mississippi "after interference by a member of NAMB's Board of Trustees." ROA.1322 (Supplemental Pleading ¶ 28). The church conference's organizer testified, however, that the disinvitation was because of the organizer's belief that having a conference speaker who is "declaring war" on a "ministry partner" like NAMB would be "incompatible" with the conference's mission. ROA.2298-2299. This is a plainly religious reason. Plaintiff seeks to contest that testimony and have a secular court determine the reason he was not allowed to speak at a church conference. There is no way for a secular court to resolve that question apart from

passing judgment on the conference organizer's stated religious reason. But secular courts have no authority to do so.

Finally, Plaintiff alleges that he suffered emotional harm because NAMB affixed a photograph of him to the interior of a reception desk at NAMB's headquarters. *See* ROA.1321. As explained in NAMB's summary judgment brief, *see* ROA.4123-4127, and below, *see infra* pp. 56-58 this argument has no basis in law or fact. But before even reaching its merits, the district court correctly concluded that, to evaluate the claim, it would need to evaluate *why* NAMB felt the need to prevent Plaintiff from entering its ministry offices, which, as "a religious institution," would "touch on matters of religious belief." ROA.3990. The causal relationship between NAMB's decision to post Plaintiff's photograph and Plaintiff's vitriolic and public reaction to being terminated from BCMD, *see* ROA.1721-1728, confirms the district court's conclusion. NAMB's decision to post Plaintiff's photograph, and the reasons underpinning that decision, constitute a paradigmatic governance decision of a ministry that secular courts are prohibited from adjudicating. *Simpson*, 494 F.2d at 493; *see also Bell*, 126 F.3d at 332-333.

### 3.    None of Plaintiff's Rejoinders Salvages His Claims

Plaintiff advances two flawed arguments to attempt to dodge ecclesiastical abstention. They do not alter the result.

### a)     *Ecclesiastical Abstention Is Not Limited to Intra-Church Disputes*

Plaintiff first makes much of the fact that the district court opinion erroneously referred to "the Baptist Church," Br. 23, which is doctrinally inaccurate because, as explained above, there is no single Baptist church. Plaintiff then contends that the ecclesiastical abstention doctrine applies only to "an intra-church dispute," *id.* at 24, which he suggests is a concept that does not apply to Baptist church polity. Amici go further, proposing that this Court re-write the ecclesiastical abstention doctrine to apply only to a "religious institution's internal dispute about church government, faith, and doctrine." Amicus Br. 8. Were Plaintiff's and his amici's argument accepted, a secular court could decide questions of faith and doctrine so long as the dispute did not fall within the walls of a single religious institution. This argument is legally meritless.

The ecclesiastical abstention doctrine is not limited to entities that formally qualify as "churches" or to employees who are officially denominated as "ministers." The doctrine protects "religious institutions," however structured, and their employment of people "holding certain important positions," whatever their titles, from governmental regulation. *See OLG*, 140 S. Ct. at 2060. As the Supreme Court put it, "the Religion Clauses protect the right of churches *and other religious institutions* to decide matters of faith and doctrine without government intrusion." *Id.* (internal quotation marks omitted) (emphasis added). What is

- 31 -

more, the law is clear in this circuit that the First Amendment precludes civil litigation among wholly secular entities if adjudication of their dispute would require resolution of an issue of faith or doctrine.  *See Nayak*, 911 F.2d at 1083 (holding that First Amendment precluded federal court from hearing defamation claim against filmmaker that would require "court to decide the 'correct' interpretation of the life of Christ").

Plaintiff's and amici's claim that ecclesiastical abstention bars disputes concerning faith and doctrine only when they are "internal" to a single religious institution is simply not the law.  Neither this circuit nor the Supreme Court have cabined the prohibition against resolving matters of faith and doctrine to disputes arising "internal" to a religious organization.  To the contrary, the Fourth Circuit held that religious disputes among separate but voluntarily cooperating religious organizations, *even when they are from different faith traditions*, are protected by the ecclesiastical abstention doctrine from secular court review.  In *Bell v. Presbyterian Church (U.S.A.)*, the plaintiff served as the Executive Director of an inter-faith organization known as Interfaith Impact, which was funded by "[m]ore than twenty religious groups, including as principal contributors four national religious organizations"—namely, the Presbyterian Church (U.S.A.), the United Methodist Church, and the American Baptist Churches in the U.S.A.  126 F.3d at 329 & n.1.  When the plaintiff was terminated by his employer, Interfaith Impact,

after the national religious organizations discontinued their financial support, he

sued the national religious organizations for IIED and tortious interference with his

employment by Interfaith Impact.  *See id.* at 330.  The Fourth Circuit affirmed

dismissal of the plaintiff's suit under the ecclesiastical abstention doctrine,

rejecting his argument that the doctrine applied only to "internal decisions of the

national churches" and not "their external conduct in interfering with his

relationship with Interfaith Impact."  *Id.* at 332.  As the court explained, resolution

of that plaintiff's claims "would interpose the judiciary into the Presbyterian

Church's decisions, as well as the decisions of the other constituent churches,

relating to how and by whom they spread their message and specifically their

decision to select their outreach ministry through the granting or withholding of

funds."  *Id.*  This, the First Amendment did not permit.

Likewise, that there is no singular "Baptist Church" makes no difference to

the application of the ecclesiastical abstention doctrine to Plaintiff's claims arising

out of NAMB's partnership with Plaintiff's employer, BCMD.  As the *Bell*

decision demonstrates, the protections that the First Amendment affords a faith

tradition do not turn either on the legal structure by which that faith operates as a

matter of prudence or on the ecclesiastical structure by which the faith operates as

a matter of doctrine.  The church autonomy doctrine applies broadly to religious

associations, however organized.  As the Supreme Court explained more than one

hundred fifty years ago,

> The right to organize *voluntary religious associations* to assist in the
> expression and dissemination of any religious doctrine … and for the
> ecclesiastical government of all the individual members,
> congregations, and officers within the general association, is
> unquestioned.  All who unite themselves to such a body do so with an
> implied consent to this government, and are bound to submit to it.
> But it would be a vain consent and would lead to a total subversion of
> such religious bodies, if anyone aggrieved by one of their decisions
> could appeal to the secular courts and have them reversed.

*Watson*, 80 U.S. at 728-29.  Nothing about the *Watson* Court's explanation of the

autonomy of voluntary religious associations turned on their legal or ecclesiastical

structure.

Ecclesiastical abstention protects Southern Baptists in their wide variety of

voluntary religious associations to assist in the expression and dissemination of the

Christian gospel.  Autonomous Baptist churches voluntarily cooperate with local

associations, state or regional conventions (like BCMD), or national conventions

(like the SBC) or other national ministries (like NAMB).  Local associations and

state conventions voluntarily cooperate with the SBC and its ministries (like

NAMB), and vice versa.  Individual members of Baptist churches (like Plaintiff)

might choose to work for churches, associations, conventions, or other ministries

to advance their religious mission.  *See* ROA.2448-2459 (Plaintiff's expert

testifying about various examples of Baptist cooperation and the theological

foundation of such cooperation).  All these voluntary religious associations,
whatever their structure, are protected by the First Amendment from governmental
adjudication of disputes that may arise between the participants.  *See Payne-Elliott
v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 193 N.E.3d 1009 (Ind. 2022)
(dismissing on church autonomy grounds tortious interference claim against
diocese and bishop who pressured Catholic school to fire plaintiff); *Brazauskas v.
Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003) (dismissing on
church autonomy grounds tortious interference claim against diocese and bishop
who discouraged Catholic school from employing plaintiff).

Plaintiff seizes on the *OLG* Court's reference to "internal management
decisions," 140 S. Ct. at 2060, and argues that ecclesiastical abstention only
applies to decisions or statements made within a hierarchical denominational
structure of a different sort than the voluntary cooperative or congregational
structure by which Baptists operate.  Br. 13-14.  In support of his argument,
Plaintiff (correctly) notes that BCMD and NAMB are separate legal entities.  Br.
13, 23, 26-27, 32-33.  But Plaintiff's attempt to limit ecclesiastical abstention to
protect only decisions within a single legal entity would eviscerate the doctrine.
Not only may diverse religious groups or denominations structure their constituent
entities differently, but the legal structure of a single faith tradition may also vary
internally.  To take one example, the legal structure of the Roman Catholic church

differs by state.  In the Diocese of Madison, Wisconsin, each parish is a separate legal entity.[12]  In the Diocese of Los Angeles, California, the only legal entity is the diocese.[13]  It cannot be that the church autonomy doctrine allows a defrocked priest in Madison to bring an employment-related suit against the diocese (a separate legal entity from his parish), while a defrocked priest in Los Angeles cannot bring suit because there is only one legal entity (*i.e.*, the diocese).  Yet that is the result under Plaintiff's position.

Furthermore, Plaintiff's theory of ecclesiastical abstention would disadvantage religious traditions, like Baptists, that as a matter of doctrine eschew a single hierarchical organization in favor of voluntary cooperation.  This would be ironic, to say the least, since it was the Baptists who were the most vocal and persistent proponents of religious liberty in early America.  *See, e.g.*, Smith, *John Leland: A Jeffersonian Baptist in Early America* 67-72 (2022); Kidd & Hankins, *Baptists in America: A History* 45-79 (2015).[14]  There is no sound reason that the constitutional principle of church autonomy should be limited to the "internal"

---

[12] Catholic Diocese of Madison, *Parish Corporations*, https://madisondiocese.org/parish-corporations (last visited Nov. 27, 2023).

[13] Archdiocese of Los Angeles, *Administrative Handbook* § 2.2.2, https://handbook.la-archdiocese.org/chapter-2/section-2-2/topic-2-2-2 (last visited Nov. 27, 2023).

[14] *See* SBC*, Baptist Faith & Message* (2000), Article XVII (Religious Liberty), https://bfm.sbc.net/bfm2000/.

functioning of hierarchical denominations and not apply to actions taken within the voluntary associational bounds of faith traditions like Baptists.  In either instance, secular courts are impermissibly being called upon to adjudicate inherently religious issues, namely the ministry operation of "religious associations." *Watson*, 80 U.S. at 728.[15]

Finally, Plaintiff and amici protest that, if Plaintiff's claim is precluded by the church autonomy doctrine, he will be left without legal redress.  Br. 34-35; Amicus Br. 14-15.  But that was true of the ministers in *Hosanna-Tabor* and *OLG* as well.  Ultimately, the relevant First Amendment question is not whether a minister can obtain relief for wrongs he purportedly suffered at the hands of a voluntary religious association (like those formed between Plaintiff and BCMD, and between BCMD and NAMB).  The question is what forum can provide that relief.  For example, Plaintiff can—indeed, has[16]—raise his concerns with NAMB and SBC leadership or, in the Baptist tradition and in the age of the internet, he can—as he has[17]—take his case directly to the SBC messengers.  *See Watson*, 80 U.S. at 729 (noting that those who "unite themselves to" a religious association are

---

[15] To the extent Plaintiff and amici are correct that the ecclesiastical abstention doctrine applies only to "intra-church" disputes, the dispute here is a dispute between "two members within the Body of Christ."  *See supra* p. 5 & n.4.

[16] ROA.2263-2270; ROA.2272-2279.

[17] ROA.2322-2325.

bound by its decisions, "subject only to such appeals as the organism itself

provides for").  Plaintiff's apparent dissatisfaction with the responses of those

religious constituencies is not determinative.  What the First Amendment does not

permit him to do is force this religious dispute into a secular court.

### b)        *The Religious Neutrality of Tort Law Does Not Save the Claims*

Plaintiff also contends that his claims are not barred from adjudication

because they can be resolved by application of "neutral principles of tort law."

*See* Br. 29.  The Supreme Court's reasoning in *OLG* and *Hosanna-Tabor* evinces

that the neutrality of the law does not necessarily overcome the First Amendment

bar.  The statutes at issue in those cases—Title VII of the Civil Rights Act of 1964

("Title VII") or the Americans with Disabilities Act ("ADA")—were on their face

religiously neutral, and yet the Supreme Court concluded that those laws could

not, consistent with the First Amendment, be applied by secular courts to a legal

dispute over ministerial employment regardless of whether the reason the

minister's employment was terminated was a religious one.  *See Palmer v. Liberty*

*Univ., Inc.*, 72 F.4th 52, 77 (4th Cir. 2023) (Richardson, J., concurring in the

judgment) ("Once a court decides that the ministerial exception applies, its inquiry

ends.  The employer need not show that it had a 'religious reason' for firing the

minister.  Instead, the employer may fire the minister for *any* reason—including

one that, on its face, has no connection to religion and would otherwise be illegal." (internal citation omitted)).

Indeed, tort laws are never framed in religious terms and are necessarily textually "neutral" as to religion. Thus, Plaintiff's position has no limiting principle and would by logical extension open secular courts to all disputes of a religious nature so long as Plaintiff cites a tort law or principle. Regardless of whether the tort laws invoked by Plaintiff are religiously neutral by their text, their application to Plaintiff's claims will, for reasons explained above, entangle the courts in religious questions. The First Amendment forbids this.

### B.     The Ministerial Exception Precludes Adjudication of Plaintiff's Claims[18]

Because Plaintiff's claims relate to his ministerial employment (both as the Executive Director of BCMD and as a speaker at a church conference), those claims are also precluded by the so-called "ministerial exception." In two relatively recent cases, the Supreme Court held that the ministerial exception bars secular courts from adjudicating, as a categorical matter, claims brought by ministers against religious organizations challenging their termination under either

---

[18] The Supreme Court has ruled that the ministerial exception is an affirmative defense, *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 195 n.4 (2012), and thus is appropriate for consideration on a motion for summary judgment.

Title VII or the ADA. *See OLG*, 140 S. Ct. at 2069; *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 196 (2012).

Because this ministerial exception is rooted not in statutory text but rather in the Religion Clauses of the First Amendment, *see OLG*, 140 S. Ct. at 2061; *Hosanna-Tabor*, 565 U.S. at 182-83, numerous courts have recognized the applicability of the ministerial exception to state law claims, *see, e.g.*, *Montgomery v. St. John's United Church of Christ*, 2023 WL 2820472, at *7 (Ohio Ct. App. Apr. 6, 2023) (state employment law); *Nation Ford Baptist Church*, 876 S.E.2d at 754 (tortious interference); *In re Lubbock*, 624 S.W. 3d at 519 (defamation and tortious interference); *Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W. 3d 467, 475 (Ky. 2017) (libel and slander); *DeBruin v. St. Patrick Congregation*, 816 N.W.2d 878, 888-89 (Wis. 2012) (breach of contract); *Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d 357, 370-71 (Wash. 2012) (en banc) (negligent retention and supervision); *Ex parte Bole*, 103 So. 3d 40, 72 (Ala. 2012) (defamation, invasion of privacy, IIED); *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 936 (Mass. 2002) (defamation, interference with contractual relations, IIED, loss of consortium); *El-Farra v. Sayyed*, 226 S.W.3d 792, 795-97 (Ark. 2006) (defamation, tortious interference, breach of contract); *Brazauskas*, 796 N.E.2d at 294 (tortious interference); *Heard v. Johnson*, 810 A.2d 871, 880 & n.5 (D.C. 2002) (defamation, invasion of privacy, breach of

contract, intentional and negligent IIED); *Cha v. Korean Presbyterian Church of Wash.*, 553 S.E.2d 511, 515-16 (Va. 2001) (wrongful termination); *Van Osdol v. Vogt*, 908 P.2d 1122, 1134 (Colo. 1996) (breach of fiduciary duty, intentional interference with contract, breach of contract, negligence).

If the Religion Clauses protect anything, it is the right of religious organizations to decide for themselves who will be their leaders.  *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 194-95 ("The [ministerial] exception ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' *Kedroff*, 344 U.S. at 119 … is the church's alone."); *see also id.* at 196 ("The church must be free to choose those who will guide it on its way."); *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) ("Supreme Court precedent … teaches that avoidance, rather than intervention, should be a court's proper role when adjudicating disputes involving religious governance."); *Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990) ("[D]etermination of whose voice speaks for the church is *per se* a religious matter." (internal quotation marks omitted)).  Religious organizations need not demonstrate that their basis for hiring, firing, or retaining a leader was a religious one; the right to select a leader is absolute and unreviewable by secular courts.  *See Hosanna-Tabor*, 565 U.S. at 194-95; *Lee*, 903 F.3d at 121-22.  Consistent with these foundational principles,

the Supreme Court held in *OLG* and *Hosanna-Tabor* that religious organizations could not be sued under either Title VII or the ADA for the termination of the employment of ministers. *See Hosanna-Tabor*, 565 U.S. at 196; *OLG*, 140 S. Ct. at 2055. In other words, even though both Title VII and the ADA are "neutral principles of law" that neither target nor discriminate against religious organizations on their face, the Supreme Court held that the First Amendment precludes the application of those laws to a religious organization's ministerial employment decisions. When it comes to ministerial employment, religious organizations are excepted from otherwise applicable legal doctrines that would govern their employment decisions. Thus, "the Supreme Court in *Hosanna-Tabor* made clear that the First Amendment does not tolerate a judicial remedy for any minister claiming employment discrimination against his or her religious group, regardless of the group's asserted reason (if any) for the adverse employment action." *Fratello v. Archdiocese of New York*, 863 F.3d 190, 203-04 (2d Cir. 2017).

This absolute right to select ministerial leaders is not limited to churches. The right applies to any "voluntary religious association," *Watson*, 80 U.S. at 728, or any other "religious group," *Hosanna-Tabor*, 565 U.S. at 181. Again, Plaintiff makes much of the fact that BCMD and NAMB are separate legal entities. Br. 13, 23, 26-27, 32-33. And they are legally separate. But that legal reality is not

determinative of the First Amendment question.  The protection from secular

court interference applies to ministerial decisions made by unincorporated entities,

by religious hierarchies that involve multiple legal entities, or by any other type of

religious association—including decisions made by cooperating autonomous

religious entities like BCMD and NAMB.  *See Watson*, 80 U.S. at 728; *cf.*

*Hosanna-Tabor*, 565 U.S. at 189 ("The right to freedom of association … should

be the same, whether the association in question is the Lutheran Church, a labor

union, or a social club.").

There is no doubt that NAMB was constitutionally entitled to discontinue its

religious association with BCMD—as NAMB advised it intended to do—because

of NAMB's displeasure with Plaintiff's performance as a religious leader of

BCMD.  *See Bell*, 126 F.3d at 332-33.  And Plaintiff concedes that employment

decisions by religious traditions (like Roman Catholics or Presbyterians) that

organize themselves in a hierarchical manner would be protected by the

ministerial exception.  *See* Br. 13-14.  But Plaintiff takes the position that

ministerial decisions and communications involving voluntarily cooperating

Baptist organizations regarding the employment of one of the legal entity's

religious leaders are not entitled to the protection of the ministerial exception.  Br.

26-28.  Plaintiff's argument finds no refuge in *Hosanna-Tabor* or *OLG*, neither of

which say anything about limiting the ministerial exception to claims by an

employee against his or her employer. Plaintiff's argument is contrary to the

holding in *Bell*, which involved disparate religious organizations voluntarily

cooperating, and runs afoul of *Watson*'s acknowledgment of the autonomy of any

"voluntary religious association." And Plaintiff offers no reason why the

ministerial exception should be fashioned so as to disadvantage Baptists—the

architects of American religious freedom—in their religious exercise. *See, e.g.*,

*Bryce*, 289 F.3d at 658 ("The applicability of the [ecclesiastical abstention]

doctrine does not focus upon the relationship between the church and [the plaintiff

minister]. It focuses instead on the right of the church to engage freely in

ecclesiastical discussions with members and non-members.").[19]

Dr. McRaney's work on behalf of BCMD, in partnership with NAMB, was

clearly that of a "minister." "In determining whether a particular position falls

within the *Hosanna-Tabor* exception, a variety of factors may be important," but

"[w]hat matters, at bottom, is what an employee does." *OLG*, 140 S.Ct. at 2063-

64. According to Dr. McRaney's complaint, his "*duties included ministry*

*direction* and priorities of the organization and the screening and managing of all

staff members" for BCMD. ROA.41 (emphasis added); *see also* ROA.41-43

(noting religious leadership and ministry duties of the Executive Director under the

---

[19] Notably, when asked about this at deposition, Plaintiff's expert witness agreed that it would be incongruous to limit a religious organization's First Amendment rights based on its organizational structure. ROA.2594-2600.

SPA).  In opposing summary judgment, Plaintiff did not contest that he met the definition of a "minister" for First Amendment purposes.  *See* ROA.3302-3336.

If the Complaint is to be believed, notwithstanding the lack of any factual support in the record, NAMB refused to partner with and finance BCMD if Plaintiff remained BCMD's Executive Director.  There would be no reason why NAMB's constitutional right[20] to "control … the selection of those who will personify its beliefs," *Hosanna-Tabor*, 565 U.S. at 188, and "who will minister to the faithful," *id.* at 195, should extend only to those ministers with whom NAMB directly contracts for employment and not to those with whom NAMB indirectly partners through an SPA.  An ecclesiastical dispute is no less ecclesiastical, and would require no fewer spiritual and religious determinations of a fact-finder, simply because it involves multiple incorporated religious entities voluntarily associating with each other regarding a staffing issue that implicates how those entities, in partnership, advance gospel ministry.  Quite simply, the autonomy of a religious organization to select religious leaders with whom it will partner free from legal interference cannot turn on ecclesiastical structure or technicalities of state incorporation law.

---

[20] As explained in more detail below, NAMB was also well within its *contractual* rights under the SPA to terminate the SPA for any reason.  *See infra* pp. 49-51.

The same reasoning applies to Plaintiff's claims concerning his disinvitation from speaking at a church conference. Litigation over the selection of speakers for a religious conference hosted by a church, whether or not that conference is an "employer" as a technical legal matter, raises the same issues as litigation concerning a religious organization's selection of a minister. If anything, the First Amendment issues are even more profound in the church or religious conference context, as they implicate the First Amendment's Free Speech clause in addition to its Religion Clauses. *Cf. Nayak*, 911 F.2d at 1083 (affirming dismissal of a defamation claim that turned on truth of religious speech). A church or religious conference is entitled to select—or not select—people to speak to its gathering of believers without government interference. *See OLG*, 140 S. Ct. at 2060 (explaining that authority to select a minister "without interference by secular authorities" is critical because otherwise "a wayward minister's preaching, teaching, and counseling could … lead the congregation away from the faith"); *Oklahoma Annual Conference*, 2023 WL 6984831, at *3 (noting that the freedom the ecclesiastical abstention doctrine affords "is considerably broader than questions of who may preach, the content of sermons, or how services are conducted"); *Minker*, 894 F.2d at 1356 ("[D]etermination of whose voice speaks for the church is *per se* a religious matter." (internal quotation marks omitted)); *Hosanna-Tabor*, 565 U.S. at 201 ("[A] religious body's right to self-governance

must include the ability to select, and to be selective about, those who will serve as the very 'embodiment of its message' and 'its voice to the faithful.'") (Alito, J., concurring) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006)).

To hold, instead, that the selection of speakers is subject to state (or federal) law would be to confer on the government the authority to regulate who speaks for and to a private group of citizens—something that the First Amendment flatly prohibits, and especially so when the conference is a religious one. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 192 (stressing that the First Amendment protects a religious institution's purview over those who have a "role in conveying the Church's message and carrying out its mission"); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (holding that because "every participating unit affects the message conveyed by [a parade's] private organizers," requiring the inclusion of a particular group "alter[s] the expressive content of [the parade]" in violation of the First Amendment); *Gay Student Servs. v. Texas A & M Univ.*, 737 F.2d 1317, 1329 (5th Cir. 1984) (holding that public university violated First Amendment by denying students the ability to form and lead a group of their choosing); *Minker*, 894 F.2d at 1356. Thus, as in the formal employment context, the ministerial exception precludes a secular court from adjudicating disputes over who is selected to speak at a church conference.

To allow Plaintiff's claims four through six to proceed would be to require a secular court to adjudicate the reasons Plaintiff was disinvited as a religious speaker at a religious conference. The conference organizer testified that Plaintiff was disinvited for a religious reason—namely, because his public conduct subsequent to his termination as BCMD's Executive Director was such that his selection as a speaker could create tension between the conference organizer and its ministry partners. ROA.2296-2299. Plaintiff contends—without any evidence—that he was disinvited at NAMB's insistence. *See* ROA.1322. Even were that true—and there is no record evidence that it is—NAMB has an unqualified First Amendment right to express its *views* about who should deliver religious speeches to Southern Baptist pastors and congregants, *see Bryce* 289 F.3d at 658, and Pastor Paul's church has an unqualified right to select or de-select its speakers. *See Minker*, 894 F.2d at 1356. Neither of those actions is subject to legal or court supervision. But adjudication of Plaintiff's claims four through six would require a court to delve into the reasons behind the selection of religious conference speakers. The First Amendment—both the Religion Clauses and the Free Speech clause—preclude secular courts from adjudicating such questions. *See Hosanna-Tabor*, 565 U.S. at 191-92 (secular courts may not evaluate who is selected for "a role in conveying [a religious organization's] message"); *OLG*, 140 S. Ct. at 2060 ("the selection of the individuals who play certain key roles" within

a church is among issues into which the First Amendment forbids intrusion by secular courts).

## II. PLAINTIFF'S CLAIMS FAIL EVEN APART FROM FIRST AMENDMENT CONSIDERATIONS

Plaintiff's meritless litigation against NAMB has been dragging on for nearly seven years. It is time for it to end. Thus, regardless of whether the Court believes the First Amendment precludes Plaintiff's claims, the summary judgment record makes clear that, on the merits, the claims are without factual basis and the grant of summary judgment by the district court should be affirmed. That the district court did not reach the merits does not preclude this Court from affirming its grant of summary judgment on other grounds. *See Campos*, 10 F.4th at 520.

### A.    Plaintiff Released His Claims

In 2015, in connection with his termination from BCMD, Plaintiff signed a contract with BCMD entitled "Separation Agreement and Release." ROA.2254-2261 (the "Separation Agreement"). Through the Separation Agreement, Plaintiff agreed, in exchange for valuable severance benefits, to release certain rights and claims. Specifically, he released "any rights or claims for any tort that Dr. McRaney may allege, including any claim of negligence (including negligent infliction of emotional distress …) and any claim of intentional tort (including libel, slander … and intentional infliction of emotional distress)." ROA.2257. The release extended not only to BCMD, but to BCMD's "supporting

organizations" (among other released parties) as well.  ROA.2256.  It is black-letter law that a release "must be read to release claims against parties who gave no consideration for, had no knowledge of, and were not parties to the contract." *Brethren Mut. Ins. Co. v. Buckley*, 86 A.3d 665, 670 (Md. 2014).[21]  Indeed, this litigation is unfortunate evidence of why BCMD—which has been forced to participate in extensive third-party discovery—would (and did, in fact) require, as part of its release with Plaintiff, the release to extend not only to BCMD itself but to NAMB as well.  *See* ROA.238 (BCMD describing this case as "exactly the type of end-around that was foreclosed and released by Dr. McRaney's settlement agreement with BCMD").

Moreover, the record indisputably establishes that NAMB is a "supporting organization" of BCMD, and is therefore a released party under the Separation Agreement.  One need look no further than Plaintiff's own contemporaneous writings, which confirmed that "NAMB's role" was to "provid[e] support" to BCMD.  ROA.2698.  BCMD—the counterparty to the Separation Agreement—concurs, clearly demonstrating that it intended the Separation Agreement to release NAMB.  *See* ROA.238 ("Dr. McRaney has brought suit instead against one of the Convention's primary supporting organizations.").

---

[21] Maryland law applies to the interpretation of the Separation Agreement. ROA.2260 ("This Agreement shall be construed and governed in accordance with the laws of the State of Maryland.").

In his summary judgment papers, Plaintiff tried to sidestep the uncontroverted factual record by arguing that the term "supporting organization" has a specialized meaning under the Internal Revenue Code, which would not describe NAMB.  *See* ROA.2887-2906; ROA.3312-3317.  But Plaintiff fails to point to a shred of evidence that the parties intended to invoke the Internal Revenue Code definition.  That is because no such evidence exists.  "[C]ourts must accord words their ordinary and accepted meanings, or that meaning which a reasonable person would attach to the term, absent evidence that the parties intended to employ the term in question in a special or technical sense." *Unintrin Auto & Home Ins. Co. v. Karp*, 481 F. Supp. 3d 514, 520 (D. Md. 2020) (internal quotation marks and citations omitted).  There is no reason whatsoever to believe that either Plaintiff or BCMD intended to ascribe to the term "supporting organization" an IRC definition rather than its plain, ordinary meaning.  Plaintiff released his claims against NAMB; summary judgment in NAMB's favor is therefore warranted.

## B.    Plaintiff Offered No Evidence to Support His Claims

Plaintiff's first three claims turn on the allegation that BCMD terminated him because NAMB stated—falsely, in Plaintiff's view—that Plaintiff had breached the SPA between BCMD and NAMB.  Assuming that a secular court is competent to adjudicate whether Plaintiff breached a religious document like the

SPA, the uncontroverted record evidence is that he did so breach. BCMD's President testified that Plaintiff's conduct was in breach. ROA.1952. Plaintiff offered no evidence to the contrary at summary judgment.

Furthermore, assuming a secular court is competent to adjudicate the reasons for Plaintiff's termination as Executive Director of BCMD, the uncontroverted evidence is that Plaintiff was *not* terminated because of NAMB's statement that Plaintiff breached the SPA. *See, e.g.*, ROA.2723 ("[T]his was not / is not about NAMB"); ROA.1817 ("No, [Plaintiff] was not terminated because of the funding issue."); ROA.2250 ("[C]ategorically I can say Kevin Ezell never bullied us or badgered us or asked us to fire Will McRaney…. Anyone who says we wanted him (McRaney) to resign because we wanted more money is out of their mind. The loss of NAMB funding was never a consideration."). Rather, as BCMD's President stated in writing contemporaneously and testified in this litigation, Plaintiff was terminated because of his "wretched leadership not because of a possible loss of NAMB funds." ROA.2239; *see also* ROA.4116-4117 (collecting evidence identifying reasons for BCMD's termination of Plaintiff that had nothing to do with NAMB). Plaintiff offered no evidence that he was terminated, in whole or in part, because of any statement by NAMB about Plaintiff's breach of the SPA.

Therefore, each of Plaintiff's pre-termination claims fails for lack of evidence. ***First***, with respect to interference with economic relations (Count I), the summary judgment record reveals that no genuine issue of material fact exists as to a necessary element of that claim: whether NAMB *caused* Plaintiff to be terminated from BCMD. *See Kaser v. Financial Prot. Mktg., Inc.*, 831 A.2d 49, 54 (Md. 2003) (requiring proof that "defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference"); *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 745 (Miss. 2019) ("It must also be proven that the contract would have been performed but for the alleged interference.").[22]  Similarly, Plaintiff failed to identify any evidence that NAMB acted with "specific purpose to interfere" rather than to advance its own missional goals by ensuring its relationship with BCMD operated as intended under the SPA. *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 270 (Md. 1994).  Finally, Plaintiff failed to identify any evidence that NAMB's purported interference was "improper" or "independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628, 642 (Md. Ct. Spec. App. 2005).  Far from it: NAMB was entitled, under the SPA, to

---

[22] To vitiate any dispute as to choice of law, NAMB's summary judgment papers demonstrated that Plaintiff's claims failed as a matter of both Maryland and Mississippi law.  *See* ROA.4115 n.7.

terminate its cooperative agreement with BCMD for any reason, including its (legitimate) concern that Plaintiff had breached the agreement.  ROA.1704.

*Second*, Plaintiff's pre-termination defamation claim (Count II) initially fails because it is time-barred by Mississippi's one-year statute of limitations.  *See* Miss. Code Ann. § 15-1-35.[23]  Moreover, Plaintiff failed to proffer any evidence that the allegedly defamatory statements—*i.e.*, that he breached the SPA—were false.  *See State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 565 (D. Md. 2019).  Indeed, they were true: Plaintiff *did* breach the SPA by, among other things, hiring jointly funded missionaries without consulting NAMB.  *See* ROA.1703 ("Jointly funded missionaries must go through the approval process of both the convention and NAMB."); *see also* ROA.2035-2047 (BCMD President Warren testifying that Plaintiff's hiring practices violated the SPA).  To the extent Plaintiff's defamation claims turn on other, nonspecific allegations that NAMB employees described Plaintiff in an unflattering way, *see* ROA.1319, the law is clear that such "rhetorical hyperbole" cannot provide the basis for a defamation claim, *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6,

---

[23] Mississippi law treats statutes of limitations as procedural rules; they therefore govern.  *See Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 621 (5th Cir. 2014).

14 (1970).[24]  And as with the interference claims, Plaintiff offered no causal nexus

between any allegedly defamatory statement and his claimed harm.

   ***Third***, regarding his pre-termination emotional distress claim (Count III),

Plaintiff came nowhere close to establishing that NAMB's conduct while he was

employed at BCMD was "so outrageous that it goes beyond all possible bounds of

decency." *Borchers v. Hyrchuk*, 727 A.2d 388, 392 (Md. Ct. Spec. App. 1999);

*see also Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992) (noting that IIED

claims are limited to "truly egregious acts").  This high bar is designed precisely

to "screen out" claims like Plaintiff's, which are based on conduct "amounting to

mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities that simply must be endured as part of life." *Batson*, 602 A.2d at 1216

(internal quotation marks omitted).

   Plaintiff's post-termination claims turn on allegations that (i) he was

disinvited from speaking at a religious conference because of some unidentified

statement by NAMB to the conference organizer, and (ii) NAMB posted his

photograph at its headquarters.  As noted above, the conference organizer testified

that he (not NAMB) disinvited Plaintiff because of Plaintiff's social media

comments, and that no statement by any NAMB employee had any bearing on the

---

[24] Courts routinely reject defamation claims based on some of the same specific
words Plaintiff alleges NAMB used to describe him.  ROA.4123 n.12.

decision to disinvite Plaintiff. ROA.2299-2303, 2306-2309. Plaintiff offered no evidence to the contrary. With respect to the photograph, the undisputed facts show that the photo was placed, without text or other substance, behind a reception desk and out of public view. *See* ROA.2282; ROA.2322. One witness who frequented NAMB's headquarters testified that he never even saw it. ROA.2757-2758. And there is no evidence to establish that NAMB's decision to post the photograph was motivated by anything other than a reasonable concern that Plaintiff's presence at NAMB's offices presented security concerns. *See* ROA.4124.

Plaintiff's post-termination claims fare no better on these facts than his pre-termination claims. ***First***, as discussed above, *see supra* pp. 51-53, Plaintiff's post-termination tortious interference claim fails for lack of evidence that NAMB caused him to lose the church speaking opportunity. Nor has Plaintiff offered any evidence that the disinvitation caused him harm. *See Alexander*, 660 A.2d at 269 ("actual damage" necessary element of tortious interference claim).[25]

---

[25] Plaintiff's Supplemental Pleading also makes vague reference to two alleged job opportunities he did not secure. *See* ROA.1321-1322. But Plaintiff introduced no evidence to suggest that NAMB was even aware of these alleged job opportunities, making it impossible for NAMB to have intentionally interfered with them. *See Galbreath v. Burlington Coat Factory Warehouse of Arundel, Inc.*, 2003 WL 22955704, at *4 (D. Md. Dec. 2, 2003); *AmSouth Bank v. Gupta*, 838 So. 2d 205, 214 (Miss. 2002).

***Second***, Plaintiff's post-termination defamation claim fails for lack of any statement. The photograph was neither a communication nor is there anything false about it—it was simply a photograph of Plaintiff's face, with no accompanying text. ROA.2282. Moreover, Plaintiff repeatedly re-posted the image of the photograph on his social media pages, *see* ROA.2322, thereby vitiating any claim to defamation liability. *See, e.g., Hickey v. St. Martin's Press, Inc.*, 978 F. Supp. 230, 237 (D. Md. 1997) ("[I]f a person claiming to be defamed communicates the allegedly defamatory statements to another, no liability for any resulting damages is incurred by the originator of the statements."). And to the extent the post-termination defamation claim is premised on the "rhetorical hyperbole" discussed above, such statements fail as a matter of law for the same reasons. *See supra* pp. 54-55.

***Third***, Plaintiff failed to establish that NAMB's posting of his photograph at NAMB's headquarters can be a predicate for an emotional distress claim, either as a matter of law or as a matter of fact. *See* ROA.4123-4127.

## CONCLUSION

The Court should affirm the district court's judgment in favor of NAMB.


November 30, 2023

Respectfully submitted,

/s/ Matthew Martens

KELLY SHACKELFORD
HIRAM S. SASSER, III
DAVID J. HACKER
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, TX 75075
(972) 941-4444

KATHLEEN I. CARRINGTON
JOSHUA J. WIENER
BUTLER SNOW LLP
1020 Highland Colony Parkway
Ridgeland, MS 39157
(601) 948-5711

MATTHEW T. MARTENS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, DC 20037
(202) 663-6000
matthew.martens@wilmerhale.com

TIMOTHY J. PERLA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02019
(617) 526-6000
timothy.perla@wilmerhale.com

JOSHUA A. VITTOR
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
joshua.vittor@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,954 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 30th day of November, 2023

/s/ Matthew T. Martens
MATTHEW T. MARTENS

## CERTIFICATE OF SERVICE

On this 30th day of November, 2023, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ Matthew T. Martens
MATTHEW T. MARTENS