No. 23-60494

# In the United States Court of Appeals for the Fifth Circuit

WILL MCRANEY,

Plaintiff-Appellant,

v.

THE NORTH AMERICAN MISSION BOARD OF THE
SOUTHERN BAPTIST CONVENTION, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Mississippi
(1:17-cv-00080-GHD-DAS)

**BRIEF FOR THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS;
THE NATIONAL ASSOCIATION OF EVANGELICALS; THE LUTHERAN
CHURCH–MISSOURI SYNOD; THE GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS; CATHOLIC DIOCESE OF BILOXI;
CATHOLIC DIOCESE OF JACKSON; JEWISH COALITION FOR
RELIGIOUS LIBERTY; AND THE ISLAM AND RELIGIOUS FREEDOM
ACTION TEAM OF THE RELIGIOUS FREEDOM INSTITUTE AS
*AMICI CURIAE* SUPPORTING APPELLEE AND AFFIRMANCE**

R. Shawn Gunnarson
Jarom Harrison
Donald N. Lundwall
KIRTON | McCONKIE
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
sgunnarson@kmclaw.com

*Counsel for Amici Curiae*

No. 23-60494

# In the United States Court of Appeals for the Fifth Circuit

WILL MCRANEY,
Plaintiff-Appellant,

v.

THE NORTH AMERICAN MISSION BOARD OF THE
SOUTHERN BAPTIST CONVENTION, INC.,
Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Mississippi
(1:17-cv-00080-GHD-DAS)

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in this amicus brief. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amicus Curiae*:

The Church of Jesus Christ of Latter-day Saints

**Counsel for *Amicus Curiae*:**

R. Shawn Gunnarson

Jarom Harrison

Donald N. Lundwall

Kirton McConkie

***Amicus Curiae*:**

The National Association of Evangelicals

**Counsel for *Amicus Curiae*:**

Carl Esbeck

***Amicus Curiae*:**

The Lutheran Church-Missouri Synod

**Counsel for *Amicus Curiae*:**

Sherri Strand

***Amicus Curiae*:**

The General Conference of Seventh-day Adventists

**Counsel for *Amicus Curiae*:**

Todd McFarland

***Amicus Curiae*:**

Catholic Diocese of Biloxi

**Counsel for *Amicus Curiae*:**

Christian J. Strickland

Schwartz, Orgler, Jordan & Williams

***Amicus Curiae*:**

Catholic Diocese of Jackson

**Counsel for *Amicus Curiae*:**

Stephen J. Carmody

Brunini, Grantham, Grower & Hewes

***Amicus Curiae*:**

The Jewish Coalition for Religious Liberty

**Counsel for *Amicus Curiae*:**

Howard Slugh

***Amicus Curiae*:**

The Islam and Religious Freedom Action Team, Religious Freedom Institute. Religious Freedom Institute is not represented by counsel on this brief.

Pursuant to FRAP 26.1, *amici* affirm that they have no parent corporations and issue no stock.

*/s/ R. Shawn Gunnarson*
R. Shawn Gunnarson
Counsel for *Amici*

December 7, 2023

iii

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

SUMMARY OF ARGUMENT ..................................................... 1

ARGUMENT ................................................................. 5

    I.    RELIGIOUS AUTONOMY OVER MINISTERIAL EMPLOYMENT IS A FIRMLY ESTABLISHED PRINCIPLE OF CONSTITUTIONAL LAW .......... 5

        A.    The Religious Autonomy Doctrine Reflects Both Religion Clauses of the First Amendment ....................................... 5

        B.    The Religious Autonomy Doctrine Protects a Religious Organization's Freedom to Select Religious Leaders ........ 9

        C.    The Religious Autonomy Doctrine Applies Regardless of a Faith Community's Form of Church Governance ............ 11

    II.    TORT CLAIMS REQUIRING A COURT TO ASSESS A RELIGIOUS ORGANIZATION'S ROLE IN A MINISTER'S REMOVAL ARE BARRED BY THE FIRST AMENDMENT .............................................. 12

        A.    Tort Claims Like McRaney's Are Subject to the Religious Autonomy Doctrine ............................................. 12

        B.    In the Alternative, the Ministerial Exception Should Apply When a Tort Claim Implicates a Religious Organization's Removal of a Minister ....................................... 18

        C.    The "Neutral Principles of Law" Approach Does Not Apply Here ................................................................. 25

    III.    FAITH COMMUNITIES NEED COURTS TO RESPECT A ROBUST CONCEPTION OF RELIGIOUS AUTONOMY ....................... 29

CONCLUSION ............................................................... 32

CERTIFICATE OF COMPLIANCE ........................................... 33

# TABLE OF AUTHORITIES

**Cases:**

*Agudath Israel of Am. v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020)............................................................ 30

*Bell v. Presbyterian Church (U.S.A.),*
   126 F.3d 328 (4th Cir. 1997) ................................... 10, 15, 16, 17, 18

*Bryce v. Episcopal Church in the Diocese of Colo.,*
   289 F.3d 648 (10th Cir. 2002) ...................................................... 8, 10

*Catholic Diocese of Jackson v. De Lange,*
   341 So. 3d 887 (Miss. 2022)............................................................. 15

*Conlon v. InterVarsity Christian Fellowship/USA,*
   777 F.3d 829 (6th Cir. 2015) .......................................................... 22

*El-Farra v. Sayyed,*
   226 S.W.3d 792 (Ark. 2006) ........................................................... 30

*Franco v. The Church of Jesus Christ of Latter-day Saints,*
   21 P.3d 198 (Utah 2001)................................................................... 30

*Gonzalez v. Roman Catholic Archbishop of Manila,*
   280 U.S. 1 (1929) ............................................................................ 10

*Himaka v. Buddhist Churches of Am.,*
   917 F. Supp. 698 (N.D. Cal. 1995) ............................................ 30–31

*Hosanna-Tabor Evangelical Church and Sch. v. EEOC,*
   565 U.S. 171 (2012) ................................................................ *passim*

*Hutchison v. Thomas,*
   789 F.2d 392 (6th Cir.1986) ........................................................... 27

*Jones v. Wolf,*
    443 U.S. 595 (1979) ........................................................ 25, 26, 28

*Kedroff v. St. Nicholas Cathedral of the Russ. Orthodox*
    *Church of N. Am.,*
    344 U.S. 94 (1952) ................................................................ *passim*

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ...................................................... 7, 8

*Kreshik v. Saint Nicholas Cathedral of the Russ. Orthodox*
    *Church of N. Am.,*
    363 U.S. 190 (1960) ...................................................................... 6

*Larson v. Valente,*
    456 U.S. 228 (1982) .................................................................... 12

*In re Lubbock,*
    624 S.W.3d 506 (Tex. 2021) ........................................................ 15

*McClure v. Salvation Army,*
    460 F.2d 553 (5th Cir. 1972) ...................................................... 19

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention,*
    966 F.3d 346 (5th Cir. 2020) ................................................... 3, 25

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention,*
    980 F.3d 1066 (5th Cir. 2020) ...................................... 3, 26, 27, 28

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention,*
    141 S. Ct. 2852 (2021) .................................................................. 3

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention,*
    2023 WL 5266356 (N.D. Miss. Aug. 15, 2023) ................... 3, 12, 18

*Our Lady of Guadalupe v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ........................................................... *passim*

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ........................................................ 20

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l*
    *Presbyterian Church,*
    393 U.S. 440 (1969) ................................................... 6, 29

*Puri v. Khalsa,*
    844 F.3d 1152 (9th Cir. 2017) .......................................... 22

*Rayburn v. Gen. Conf. of Seventh-day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) .......................................... 13

*Sanders v. Casa View Baptist Church,*
    134 F.3d 331 (5th Cir. 1998) ........................................... 14

*Scharon v. St. Luke's Episcopal Presbyterian Hosp.,*
    929 F.2d 360 (8th Cir. 1991) ........................................... 13

*Schmidt v. Bishop,*
    779 F. Supp. 321 (S.D.N.Y. 1991) .................................... 13

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich,*
    426 U.S. 696 (1976) .................................... 6, 8, 10, 11, 29

*Simpson v. Wells Lamont Corp.,*
    494 F.2d 490 (5th Cir. 1974) ........................................... 27

*Starkey v. Roman Catholic Diocese of Indianapolis, Inc.,*
    41 F.4th 931 (7th Cir. 2022)......................... 14, 22, 23, 24

*Tilton v. Marshall,*
    925 S.W.2d 672 (Tex. 1996)............................................ 15

*Tucker v. Faith Bible Chapel Int'l,*
    36 F.4th 1021 (10th Cir. 2022)....................................... 23

*United States v. Agofksy*,
516 F.3d 280 (5th Cir. 2008) .......................................................... 25

*United States v. Matthews*,
312 F.3d 652 (5th Cir. 2002) .......................................................... 25

*Watson v. Jones*,
80 U.S. (13 Wall.) 697 (1871) ........................................... 5, 6, 29, 31

*Williams on Behalf of J.E. v. Reeves*,
954 F.3d 729 (5th Cir. 2020) .................................................... 18–19

## Constitutional Provisions:

U.S. Const. amend. I ...................................................... *passim*

## Other Authorities:

Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 Federalist Soc'y Rev. 244 (2021).......................................................... 8

Richard W. Garnett, *Religious Liberty, Church Autonomy, and the Structure of Freedom*, *in* Christianity and Human Rights (John Witte Jr. ed., 2010) ............................................................................. 4

W. Cole Durham & Robert Smith, Religious Organizations and the Law (2d ed. 2022)...................................................................... 14

**IDENTITY AND INTEREST OF *AMICI CURIAE*[1]**

*Amici* are churches and faith communities with a profound and enduring interest in the constitutional autonomy of religious institutions to govern their own ecclesiastical matters. Some of us have participated in leading cases involving related issues under the First Amendment. *See, e.g., Our Lady of Guadalupe v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Church and Sch. v. EEOC*, 565 U.S. 171 (2012) (unanimous). We submit this brief in the belief that a robust understanding of religious autonomy is indispensable to the religious freedom of all faith communities.

**SUMMARY OF ARGUMENT**

The Constitution guarantees churches and other religious organizations the freedom to remove religious leaders without judicial oversight or interference. Will McRaney asks this Court to ignore that well-established principle by pursuing tort claims against the North American Mission Board of the Southern Baptist Convention (NAMB) for its role in

---

[1] Both parties have consented to the filing of this amicus brief. Pursuant to FRAP 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than amici or their counsel have made any monetary contributions intended to fund the preparation or submission of this brief.

his dismissal. His suit inescapably involves religious matters that the First Amendment jealously guards.

A summary of the procedural history puts the issues in context.

McRaney admits that this case involves "a battle of power and authority" between NAMB and the Baptist Convention of Maryland/ Delaware (State Convention) over the strategy for establishing new Southern Baptist churches. Pl. Response to Def. Mot. to Dismiss at 3, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 1:17-cv-00080-GHD-DAS (N.D. Miss. July 20, 2017), ECF No. 13. When he rejected a ministry partnership agreement proposed by NAMB, the State Convention's governing board resolved the impasse by removing him. Compl. at 3, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 1:17-cv-00080-GHD-DAS (N.D. Miss. May 18, 2017), ECF No. 2. He then sued NAMB—not his employer, the State Convention—alleging tortious interference with his employment contract, defamation, and intentional infliction of emotional distress. *Id.* at 6–7. These claims demand money damages from NAMB for participating in his removal. *Id.* at 7.

This is McRaney's second appeal. Last time, he opposed a motion to dismiss that the district court granted after ruling that his claims would

invade NAMB's religious autonomy, contrary to the First Amendment. *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 966 F.3d 346, 347 (5th Cir. 2020) (*McRaney I*). This Court reversed. It held that before discovery "it is not certain that resolution of McRaney's claims will require the court to interfere with matters of church government, matters of faith, or matters of [religious] doctrine." *Id.* at 351. NAMB petitioned for rehearing *en banc*, which the Court denied by a single vote. *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 980 F.3d 1066 (5th Cir. 2020). NAMB petitioned for Supreme Court review, which was also denied. *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 141 S. Ct. 2852 (2021) (Mem.). Discovery proceeded on remand, at the end of which NAMB moved for summary judgment, which the district court granted. *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 2023 WL 5266356, *1 (N.D. Miss. Aug. 15, 2023). Summary judgment was required, the court explained, because each claim would entail "interpret[ing] and decid[ing] matters of church government as well as those of faith and doctrine." *Id.* at *5. This appeal followed.

The district court rightly applied the doctrine of religious autonomy, which holds that the First Amendment bars civil courts from

deciding matters of religious doctrine, church government, or ecclesiastical authority. Like the separation of powers and federalism, the doctrine of religious autonomy divides power to secure liberty. *See* Richard W. Garnett, *Religious Liberty, Church Autonomy, and the Structure of Freedom*, *in* CHRISTIANITY AND HUMAN RIGHTS 276 (John Witte Jr. ed., 2010).

That doctrine applies with special force when a lawsuit challenges a religious organization's removal of a minister or other religious leader. Preserving the Constitution's division of church and state requires courts to dismiss claims like McRaney's that would interject judicial power into the removal of a religiously significant employee. Tort claims can have that effect no less than claims of employment discrimination. The religious autonomy doctrine amply supports the district court's decision. Even if not, this Court should join other circuits in holding that the ministerial exception applies when tort claims challenge the conditions of a minister's dismissal.

Preserving the First Amendment's barrier dividing the powers of church and state secures the autonomy of diverse religious organizations to develop their own doctrine, form their own communities, and run their

own institutions without governmental interference. That barrier is crucial when a religious organization chooses to remove a minister. Unless that choice can be made without judicial oversight, churches and faith communities will lose a vital aspect of the religious freedom guaranteed by the Constitution.

## ARGUMENT

### I. RELIGIOUS AUTONOMY OVER MINISTERIAL EMPLOYMENT IS A FIRMLY ESTABLISHED PRINCIPLE OF CONSTITUTIONAL LAW.

#### A. The Religious Autonomy Doctrine Reflects Both Religion Clauses of the First Amendment.

Soon after the Civil War, the Supreme Court introduced religious autonomy as a principle of federal law in a case engaging pro- and anti-slavery factions of the Presbyterian Church in a battle for control of church property. *Watson v. Jones* famously held that civil courts possess "no jurisdiction" to decide any matter that is "ecclesiastical in its character." 80 U.S. (13 Wall.) 697, 733 (1871). Applying that principle, the Court deferred to "the highest judicatory" of the Presbyterian Church in favor of the anti-slavery faction. *Id.* at 734.

Religious autonomy became a principle of constitutional law in *Kedroff v. St. Nicholas Cathedral of the Russ. Orthodox Church of N. Am.*, 344 U.S. 94 (1952). Relying on *Watson*, the Court held that the First

Amendment guarantees religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 116. Citing that principle, the Court voided a state law purporting to authorize an American branch of the Russian Orthodox Church to select an archbishop for New York City. *See id.* at 121. By intervening in the issue of religious authority, the statute "prohibit[ed] the free exercise of an ecclesiastical right, the Church's choice of its hierarchy." *Id.* at 119.

A line of decisions following *Kedroff* stress that courts may not adjudicate disputes concerning ecclesiastical matters. *See, e.g.*, *Kreshik v. Saint Nicholas Cathedral of the Russ. Orthodox Church of N. Am.*, 363 U.S. 190, 191 (1960) (per curiam); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 447 (1969); *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 721–22 (1976); *Hosanna-Tabor*, 565 U.S. at 186–87; *Our Lady of Guadalupe*, 140 S. Ct. 2060, 2061.

The doctrine of religious autonomy reflects the combined force of both Religion Clauses of the First Amendment. *See Hosanna-Tabor*, 565 U.S. at 182–85 (recounting the historical background of the Religion

Clauses). The Establishment Clause prohibits the government from telling a church how to govern itself in ecclesiastical matters. *See id.* at 180. And the Free Exercise Clause prohibits the government from thwarting the church's free choice in such matters. *See id.* As the Seventh Circuit explained, "[t]his dimension of religious liberty has a foothold in both Religion Clauses … and is perhaps best understood as marking a boundary between two separate polities, the secular and the religious, and acknowledging the prerogatives of each in its own sphere." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013).

Matters within the religious autonomy doctrine include (1) the development, teaching, and interpretation of religious doctrine; (2) a faith community's form of church government, including administrative actions taken by a recognized ecclesiastical authority; (3) the appointment and removal of clergy and other employees who perform religious functions; (4) the determination of who is admitted or expelled from membership in a faith community; and (4) communications by religious authorities about these matters. *See, e.g., Kedroff*, 344 U.S. at 116 (the First Amendment guarantees "freedom for religious organizations" to determine "matters of church government as well as those of faith and

doctrine."); *Milivojevich*, 426 U.S. at 710 (religious autonomy covers "church disputes over church polity and church administration."); *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (the doctrine "protect[s] [religious organizations'] autonomy with respect to internal management decisions that are essential to the institution's central mission."); *id.* (discussing the right to select clergy and other "individuals who play certain key roles."); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 n.2 (10th Cir. 2002) (religious autonomy applies to communications between a minister and parishioners). *See generally* Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 FEDERALIST SOC'Y REV. 244, 248 (2021) (summarizing the areas of religious autonomy).

Within the zones covered by the religious autonomy doctrine, two principles control. "First, civil authorities have no say over matters of religious governance; and second, secular judges must defer to ecclesiastical authorities on questions properly within their domain." *Korte*, 735 F.3d at 678. When a lawsuit involves issues of religious autonomy, "the mere adjudication" of a matter of religious governance runs the risk of "a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall

mission." *Hosanna-Tabor*, 565 U.S. at 206 (Alito, J., concurring). Courts properly shun such intrusion.

### B.  The Religious Autonomy Doctrine Protects a Religious Organization's Freedom to Select Religious Leaders.

The religious autonomy doctrine entitles a religious organization to select or remove an employee who carries out religiously significant responsibilities. Ministers and other religious leaders are the primary examples of employees who "personify" a faith community's beliefs. *Id.* at 188. Prohibiting a suit challenging a minister's dismissal reflects the First Amendment guarantee that religious organizations possess the freedom "to decide for themselves, free from state interference, matters of church government." *Kedroff*, 344 U.S. at 116.

Although the freedom to select religious leadership is a discrete exercise of religious autonomy, that choice touches on other zones covered by the religious autonomy doctrine. Choosing a certain religious leader (or removing one) will often reflect particular religious doctrines, arise from the faith community's form of church government, or grow out of administrative actions taken by the community's accepted ecclesiastical leadership. Hobbling or penalizing that choice will undercut a faith community's self-governance. *Kedroff* established the guiding principle long

ago. "Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as part of the free exercise of religion against state interference." *Id.* at 116.[2]

Lower courts have embraced the same principle. In *Bryce*, 289 F.3d at 648, a church employee sued under Title VII, alleging that church officials' statements opposing her same-sex union constituted sex discrimination. *Id.* at 651–53. The Tenth Circuit held that the "broader church autonomy doctrine" encompasses "personnel decision[s]" "rooted in religious belief." 289 F.3d at 656–58 & n.2. Other courts have agreed. *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) ("the decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts").

---

[2] The only "improper" methods of clergy selection mentioned in *Kedroff* involved fraud, collusion, or arbitrariness. 344 U.S. at 116 n.23 (citing *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16–17 (1929)). The Supreme Court later overruled the arbitrariness exception, *Milivojevich*, 426 U.S. at 713, and it has not discussed the other two exceptions since the 1970s.

### C.    The Religious Autonomy Doctrine Applies Regardless of a Faith Community's Form of Church Governance.

An amicus brief for McRaney argues that the religious autonomy doctrine has no force here. *See* Br. Amici Curiae Current and Former Baptist Leaders at 9, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, No. 23-60494 (5th Cir. Nov. 7, 2023), ECF No. 24 ("Principles of ecclesiastical abstention do not apply because this is not an internal dispute of "the Baptist Church.") (emphasis omitted).

That is wrong. Under the First Amendment, it makes no difference that NAMB and the State Convention are separate legal entities when both are tasked with serving Southern Baptist churches. Nor does it matter that Southern Baptist churches are autonomous rather than organized hierarchically. Questions of ecclesiastical authority within the Southern Baptist community stand "at the core of ecclesiastical affairs" protected by the religious autonomy doctrine. *Milivojevich*, 426 U.S. at 721. Courts must defer to how such questions are resolved by a faith community's own institutions.

Giving NAMB less deference because of the Baptist form of church governance than if NAMB and the State Convention belonged to a hierarchical organization offends both Religion Clauses. Discriminating

11

against NAMB because of Baptist beliefs about church polity defies "[t]he clearest command of the Establishment Clause." *Larson v. Valente*, 456 U.S. 228, 244 (1982). It likewise burdens Southern Baptists because of their chosen form of church governance, contrary to the Free Exercise Clause. *See Kedroff*, 344 U.S. at 116 (acknowledging that the right of free exercise encompasses "matters of church government").

## II. TORT CLAIMS REQUIRING A COURT TO ASSESS A RELIGIOUS OR-GANIZATION'S ROLE IN A MINISTER'S REMOVAL ARE BARRED BY THE FIRST AMENDMENT.

### A. Tort Claims Like McRaney's Are Subject to the Religious Autonomy Doctrine.

The district court granted summary judgment for NAMB because adjudicating McRaney's tort claims would necessarily require second-guessing matters barred by the religious autonomy doctrine. *See McRaney*, 2023 WL 5266356, at *1. Both that conclusion and the court's reasoning are correct.

*Hosanna-Tabor* unanimously interpreted the First Amendment to mean that "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." 565 U.S. at 181. Behind this principle is a compelling rationale. "Requiring a church to accept or retain an unwanted minister, or punishing a church

for failing to do so … interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 188. *See also Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360, 363 (8th Cir. 1991) (adjudicating a religious organization's employment decision affecting clergy "would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made").

Tort law is not a sweeping exception to the religious autonomy doctrine. Churches "may be held liable for their torts," but that generality calls for nuance. *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). A religious organization is accountable for personal injuries that do not involve religious activities, as when a church employee acting within his duties negligently runs a red light and injures someone. *See Schmidt v. Bishop*, 779 F. Supp. 321, 327 (S.D.N.Y. 1991). But tort claims that delve into matters covered by religious autonomy collide with the Constitution's "special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189.

Scholars have described how "[t]he church autonomy guaranteed by the First Amendment erects a constitutional barrier shaping the tort law doctrines of duty, breach, liability, and relief. That barrier may substantially limit, or even bar, the availability of tort law to remedy alleged injuries by religious organizations when adjudicating a tort claim would interfere with a church's constitutionally protected autonomy." W. COLE DURHAM & ROBERT SMITH, 2 RELIGIOUS ORGANIZATIONS AND THE LAW § 21:13 (2d ed. 2022). Courts often dismiss tort claims that threaten to invade the province of religious autonomy. *See, e.g.*, *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 337 (5th Cir. 1998) ("Because the judiciary must abstain from ecclesiastical disputes involving questions of doctrine or practice, state courts have 'rejected uniformly' claims for 'clergy malpractice.'"). That same sensitivity to religious autonomy has guided other courts in dismissing claims like McRaney's. *See Starkey v. Roman Catholic Diocese of Indianapolis, Inc.*, 41 F.4th 931, 945 (7th Cir. 2022) (dismissing claims of interference with a contractual relationship and intentional interference with an employment relationship "because they litigate the employment relationship between the religious organization

14

and the employee"); *In re Lubbock*, 624 S.W.3d 506, 515 (Tex. 2021) (dismissing a defamation claim against a Catholic diocese because it would "cause a court to evaluate whether the Diocese properly applied Canon Law"); *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex. 1996) ("Adjudication of the claims for intentional infliction of emotional distress would necessarily require an inquiry into the truth or falsity of religious beliefs that is forbidden by the Constitution.") (citation omitted); *Catholic Diocese of Jackson v. De Lange*, 341 So. 3d 887, 896 (Miss. 2022) (dismissing wrongful termination and defamation claims under the ecclesiastical abstention doctrine).

Disputes—even acrimonious disputes—over the removal of a minister cannot be treated like a garden-variety personal injury. Religious organizations need broad leeway to remove ministers without judicial oversight or control. Tort claims like McRaney's raise a line-drawing question: which tort claims by a minister against a religious organization can be adjudicated and which are barred by the First Amendment?

Consider how the Fourth Circuit addressed that question in *Bell*, 126 F.3d at 328. A minister brought multiple tort claims against multiple religious organizations for terminating him as part of the winding down

of a financially troubled religious nonprofit, Interfaith Impact, where he had been executive director. He alleged that the organizations "(1) interfered with his contract, (2) intentionally inflicted on him emotional distress, (3) breached a covenant of good faith and fair dealing, (4) interfered with his prospective advantage, (5) wrongfully terminated him, and (6) that the religious organization defendants breached their pledge to contribute to Interfaith Impact on a yearly basis." *Id.* at 330. From its reading of *Kedroff* and other Supreme Court precedents the Fourth Circuit distilled this principle: "[T]he decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts." *Id.* at 331. When that principle applies, civil courts "must defer to the decisions of religious organizations." *Id.*

Pinpointing which of Bell's claims are constitutionally barred, the court explained, turns on "whether the dispute between Bell and the four national churches is an ecclesiastical one … or whether it is a case in which we should hold religious organizations liable in civil courts for 'purely secular disputes.'" *Id.* (citation omitted). Armed with that standard, the Fourth Circuit examined the complaint claim-by-claim. It found

that Bell's case "centers on the Presbyterian Church's withholding of funding and its consultation with the other constituent churches in effecting a complete reduction of force of Interfaith Impact." *Id.* at 331. That focus raises constitutional concerns because it invites a court to probe "how the constituent churches spend their religious outreach funds." *Id.* at 332. The court of appeals declined the invitation. "Resolution of such an accusation would interpose the judiciary into the Presbyterian Church's decisions, as well as the decisions of other constituent churches, relating to how and by whom they spread their message and specifically their decision to select their outreach ministry through the granting or withholding of funds." *Id.* Under the religious autonomy doctrine, judicial inquiry into these matters is prohibited. "Such a decision about the nature, extent, administration, and termination of a religious ministry falls within the ecclesiastical sphere that the First Amendment protects from civil court intervention." *Id.* at 332–33. Accordingly, the Fourth Circuit affirmed the district court's dismissal of the complaint. *Id.* at 333.

Factual similarities between *Bell* and this case are striking—as the district court understood. Citing *Bell* as "analogous," the district court

adopted *Bell*'s close focus on whether the elements of a legal claim compel a court to trespass into territory guarded by the First Amendment. *McRaney*, 2023 WL 5266356, at *5. The district court's guiding principle was that it is "simply impermissible under the Constitution and the ecclesiastical abstention doctrine" for a court to adjudicate cases when it would be "required to interpret and decide matters of church government as well as those of faith and doctrine." *Id.* As in *Bell*, the district court evaluated the complaint claim-by-claim, to see whether any of them could be entertained "without impermissibly delving into church matters in violation of the ecclesiastical abstention doctrine." *Id.* at *3. Each claim failed that test. The district court therefore concluded that no part of McRaney's complaint could be evaluated without violating the religious autonomy doctrine. *Id.* at *5. The decision is an impeccably correct application of the First Amendment and should be affirmed.

### B.   In the Alternative, the Ministerial Exception Should Apply When a Tort Claim Implicates a Religious Organization's Removal of a Minister.

Even if this Court doubts whether the religious autonomy doctrine entirely bars McRaney's tort claims, the ministerial exception offers an alternative ground to affirm. *See Williams on Behalf of J.E. v. Reeves*, 954

F.3d 729, 735 (5th Cir. 2020) (permitting the Court to "sustain its judg-ment on any ground that finds support in the record") (cleaned up). NAMB preserved the issue. *See* Answer at 2–3, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 1:17-cv-00080-GHD-DAS (N.D. Miss. May 18, 2017), ECF No. 3.

The ministerial exception is a "component" of the religious auton-omy doctrine. *Our Lady of Guadalupe*, 140 S. Ct. at 2060. "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious in-stitutions." *Id.* When the ministerial exception applies, a court must dismiss the employment-related claim against a religious organization. *Hosanna-Tabor*, 565 U.S. at 194; *accord Our Lady of Guadalupe*, 140 S. Ct. at 2061. This Court pioneered the ministerial exception in *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972) (applying Title VII "would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment"). Decades of succeeding precedent have added layers of analytical detail to the ministerial exception, much as the free speech jurisprudence developed under the public forum doctrine. *See,*

*e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009). But the core principle is simple—to bar employment discrimination claims challenging a religious organization's selection or removal of a minister.

No one disputes that McRaney's position as executive director of the State Convention is ministerial in the constitutional sense. The live question, instead, is whether tort claims like McRaney's fall within the ministerial exception. They do.

Neither *Hosanna-Tabor* nor *Our Lady of Guadalupe* resolves whether the ministerial exception applies as a defense to tort claims by a former minister contesting his removal. But *Hosanna-Tabor* reserved that issue. *See* 565 U.S. at 196 ("We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers."). The Court left the door open to consider "the applicability of the exception to other circumstances." *Id.*

Tort claims like McRaney's merit dismissal under the ministerial exception because they are merely elliptical ways of challenging clergy terminations—the very thing the ministerial exception exists to bar. The ministerial exception stands on the broad constitutional principle that

"[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id.* at 181. Such interference would offend both Religion Clauses. Forcing a religious group to accept "an unwanted minister infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.* at 188. On the other side of the coin, allowing the government "to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 189.

Given the breadth of the underlying constitutional rule, the ministerial exception should apply to a former minister's tort claims no less than to employment discrimination claims when the effect is the same— to impose an unwanted minister on a faith community. Adjudicating a tort suit with that effect "interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 188. The prospect of judicial interference in ecclesiastical matters, not the source of law fueling that interference, should be the decisive factor.

21

*Starkey*, 41 F.4th at 931, shows the way. The Seventh Circuit faced state-law tort claims brought by a former guidance counselor at a Catholic high school who was fired after she told the school's leadership that she was "in a same-sex union." *Id.* at 938. The counselor sued, raising federal civil rights claims under Title VII as well as tort claims under state law.

The school asserted the ministerial exception. At the first stage of the analysis, the counselor resisted the contention that she was a minister covered by the ministerial exception. But the Seventh Circuit readily found that the exception applies because she was "expected to carry out [the high school's] religious mission." *Id.* at 942.

At the second stage of the analysis, the Seventh Circuit addressed whether the counselor's claims of interference with contractual relationship and intentional interference with an employment relationship fell within the ministerial exception. Other circuits have applied the ministerial exception to state law claims. *See id.* at 943–44 (discussing *Conlon v. InterVarsity Christian Fellowship / USA*, 777 F.3d 829, 836 (6th Cir. 2015) (allowing the exception as "a defense against state law claims"); *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) (holding that the exception applies to "any state law cause of action that would otherwise impinge on

22

the church's prerogative to choose its ministers") (citation omitted); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1027 n.2 (10th Cir. 2022) (acknowledging as undisputed that the ministerial exception applies to state law claims). The *Starkey* Court embraced this broad consensus. "We hold that the ministerial exception applies to state law claims, like those for breach of contract and tortious conduct, that implicate ecclesiastical matters." 41 F.4th at 944. The court clarified, however, that the ministerial exception has no force when a former employee's state law claim has no bearing on religious matters. "A minister who commits a tort outside the scope of employment may still be subject to liability. The same is true for a breach of contract unrelated to an ecclesiastical matter." *Id.*

Under this rule, the Seventh Circuit determined that the counselor's tort claims were subject to the ministerial exception. "Each tort contains an element which requires either a valid relationship or a valid and enforceable contract. To evaluate either claim requires review of the Church's authority over the employer, the employer-employee relationship, and the contents of the employee's contract." *Id.* at 945. It followed that "Starkey was a minister because she was entrusted with communicating the Catholic faith to the school's students and guiding the school's

religious mission. The ministerial exception bars all her claims, federal and state." *Id.*

*Starkey* shows how the ministerial exception smoothly covers tort claims while remaining aligned with Supreme Court precedent. *See id.* at 944 ("This holding follows the Supreme Court's guidance and aligns with the decisions of other circuits to have considered this issue."). Applying the ministerial exception here would be equally straightforward. As in *Starkey*, McRaney's claims against NAMB "implicate ecclesiastical matters because they litigate the employment relationship between the [faith community] and the employee." *Id.* at 944–45.

Excluding the ministerial exception in tort cases like this would clash with the Supreme Court's religious autonomy decisions. Under McRaney's logic, a constitutional rule potent enough to bar discrimination claims under civil rights law, *see Hosanna-Tabor*, 565 U.S. at 196, cannot withstand ordinary tort claims. That result would be perverse.

This Court should join the Seventh Circuit and other courts in holding that the ministerial exception applies to tort claims like McRaney's that require a court to probe a religious organization's conduct related to its selection or removal of a minister.

C.     **The "Neutral Principles of Law" Approach Does Not Apply Here.**

Earlier in this case, a three-judge panel noted that McRaney's complaint "asks the court to apply neutral principles of tort law to a case that, on the face of the complaint, involves a civil rather than a religious dispute." *McRaney I*, 966 F.3d at 349 (citing *Jones v. Wolf*, 443 U.S. 595, 602 (1979)). But that suggestion was limited in scope. The panel stressed that "[o]n remand, if NAMB presents evidence of these [religious] reasons and the district court concludes that it cannot resolve McRaney's claims without addressing these reasons, then there may be cause to dismiss." *Id.* at 351. Because the district court reached that very conclusion on remand, the panel's reference to "neutral principles" no longer applies.

Nor is that reference binding as the law of the case. "Generally, the law of the case doctrine precludes reexamination by the appellate court on a subsequent appeal of an issue of law or fact decided on a previous appeal." *United States v. Agofksy*, 516 F.3d 280, 283 (5th Cir. 2008). The doctrine is discretionary and admits an exception when "the earlier decision is clearly erroneous and would work a manifest injustice." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). Applying the "neutral principles" approach to McRaney's tort claims would be clear error.

25

Judge Ho identified three reasons why the suit against NAMB is not subject to the "neutral principles of law" approach when dissenting from the denial of *en banc* review. *McRaney*, 980 F.3d at 1071 (Ho, J., dissenting). Each objection remains trenchant since McRaney continues to press his tort claims.

First, Judge Ho explained that the panel's reference to "neutral principles of law" misapprehends the Supreme Court's use of that term in *Jones*, 443 U.S. at 595. There, the Court approved a judicial approach using "objective, well-established concepts of trust and property law" to resolve disputes over church property. *Id.* at 603. But, as Judge Ho pointed out, "*Jones* is not an invitation to *courts* to decide all church property disputes—let alone all other manner of internal church disputes. Rather, it's an invitation to *churches*, where they deem it appropriate, to ask courts to assist them in resolving certain church property disputes." *McRaney*, 980 F.3d at 1071 (Ho, J., dissenting). He added that "[i]f an appeal to 'neutral principles of tort law' were all it took to sue a religious institution, it would be the exception that swallowed the rule." *Id.* at 1072. By misapplying the "neutral principles" method in that way, *Hosanna-Tabor* and *Our Lady of Guadalupe* would be a dead letter. A

dismissed minister could circumvent the First Amendment through the easy device of pleading wrongful termination or tortious interference rather than employment discrimination.

Second, Judge Ho emphasized that "the Supreme Court has never extended 'the neutral principles of law' approach beyond the context of church-property disputes." *Id.*; *accord Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir.1986) (The "neutral principles" method has "never been extended to religious controversies in the areas of church government, order and discipline"). To the contrary, "the Supreme Court and lower courts have invoked the church autonomy doctrine across a broad range of claims—up to and even including church property disputes." *McRaney*, 980 F.3d at 1072 (Ho, J., dissenting) (citation omitted).

Third, Judge Ho pointed out relevant circuit precedent that the panel overlooked. In *Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir. 1974), a dismissed minister contended that the court could decide his claim of racial discrimination on the view that religious autonomy could be narrowed to "differences in church doctrine." *Id.* at 493 (emphasis removed). As Judge Ho explained, the Court rejected "the pastor's crabbed

view of the church autonomy doctrine." *McRaney*, 980 F.3d at 1073 (Ho, J., dissenting).

We add an objection of our own. Failing to apply the religious autonomy doctrine in the name of the "neutral principles of law" method would illicitly extrapolate from the Supreme Court's silence while turning a blind eye to its recent decisions. While that Court has never suggested that a minister's tort suit can be decided under *Jones*, it has repeatedly expressed a powerful constitutional understanding of religious autonomy—specifically in the context of lawsuits brought by ministerial employees removed by their former religious employers. *See Hosanna-Tabor*, 565 U.S. at 188; *Our Lady of Guadalupe*, 140 S. Ct. at 2060–61. These decisions—not the uncertain scope of *Jones*—should decide this appeal.

Judge Ho is right. The "neutral principles of law" approach is an irrelevant distraction. McRaney's tort claims implicate NAMB's religious beliefs, practices, and religious judgments. As such, the First Amendment requires his claims to be dismissed.

## III.   FAITH COMMUNITIES NEED COURTS TO RESPECT A ROBUST CONCEPTION OF RELIGIOUS AUTONOMY.

Few rules of constitutional law hold greater intrinsic importance for churches and faith communities than the doctrine of religious autonomy. For them—for us—this principle is the keystone of religious freedom. Preserving the First Amendment's barrier dividing the great powers of church and state secures breathing space for religious organizations to develop their own doctrine, form their own communities, and operate their own institutions without governmental interference. Without these freedoms, faith communities could not flourish.

Notice how the Supreme Court's religious autonomy decisions have secured freedom for diverse faith communities. *See Watson*, 80 U.S. at 681 (Presbyterian); *Hull Church*, 393 U.S. at 441–42 (same); *Hosanna-Tabor*, 565 U.S. at 177 (Lutheran); *Our Lady of Guadalupe*, 140 S. Ct. at 2055 (Catholic); *Kedroff*, 344 U.S. at 95–96 (Russian Orthodox); *Milivojevich*, 426 U.S. at 698–99 (Serbian Eastern Orthodox). Religious autonomy, where respected, has given these and other faiths constitutional shelter.

Lower courts have respected religious autonomy too. The following decisions illustrate how respect for religious autonomy protects diverse faith communities:

- An Orthodox Jewish organization challenged New York's COVID-19 limits on religious gatherings. The Second Circuit cited religious autonomy as a reason for rejecting the state's generalizations about the health risks of religious worship. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633–34 (2d Cir. 2020) (quoting *Our Lady of Guadalupe*, 140 S. Ct. at 2055).

- An Islamic religious group defended against claims by an Imam who was dismissed for his "confrontational, controversial, and offensive behavior in his khutbas (sermons)." *El-Farra v. Sayyed*, 226 S.W.3d 792, 793 (Ark. 2006). The Arkansas Supreme Court dismissed the Imam's tort claims, even though he argued that his suit did "not involve ecclesiastical matters related to Islamic doctrine, but only interpersonal matters concerning his relationship with the Executive Committee" of the Islamic religious group. *Id.* at 795. Dismissal followed because "civil courts are not a constitutionally permissible forum for a review of ecclesiastical disputes." *Id.* at 794.

- A former member sued The Church of Jesus Christ of Latter-day Saints for alleged injuries arising from counseling she received from religious leaders. The Utah Supreme Court dismissed her claims of negligence and breach of fiduciary duty. Central to its reasoning was the principle that "civil tort claims against clerics that require the courts to review and interpret church law, policies, or practices in the determination of the claims are barred by the First Amendment." *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 203 (Utah 2001).

- An organization of Buddhist temples resisted a discrimination suit by its former national director, an ordained Buddhist minister. The district court dismissed the minister's retaliation claim under Title VII of the Civil Rights Act because adjudicating that claim would necessarily involve "judgments on matters of faith and doctrine, as

30

well as matters of general church governance." *Himaka v. Buddhist Churches of Am.*, 917 F. Supp. 698, 709 (N.D. Cal. 1995).

As these decisions show, the principle of religious autonomy articulated in *Watson v. Jones* has profoundly influenced American law: a Westlaw search reveals that it has been cited in over 1,100 decisions.

*   *   *

All faith communities stand to lose precious First Amendment freedoms unless claims like McRaney's are barred. Allowing such claims to proceed would threaten churches and faith communities with the prospect of intrusive, costly, and time-consuming litigation over internal religious matters. That prospect will burden and distort the exercise of religion. No faith community is free to govern itself if it must answer in court for why a minister was removed from his ministerial post or what administrative measures were taken against him. Forcing NAMB to litigate its ecclesiastical decisions defeats the purpose of the religious autonomy doctrine—to secure the "power to decide for [itself], free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116.

## CONCLUSION

For all these reasons, the Court should affirm.

December 7, 2023                    Respectfully submitted,

*/s/ R. Shawn Gunnarson*
R. Shawn Gunnarson
Jarom Harrison
Donald N. Lundwall
KIRTON | MCCONKIE
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
sgunnarson@kmclaw.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND STYLE REQUIREMENTS**

This document complies with the word limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,217 words.

This document complies with the typeface requirements of FRAP 29(a)(4)(A), FRAP 32(a)(5), and FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: December 7, 2023            */s/ R. Shawn Gunnarson*
                                    R. Shawn Gunnarson


                                    *Counsel for Amici Curiae*

33