**No. 23-60494**

# In the United States Court of Appeals for the Fifth Circuit

WILL MCRANEY,

*Plaintiff-Appellant,*

v.

THE NORTH AMERICAN MISSION BOARD OF THE
SOUTHERN BAPTIST CONVENTION, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Mississippi
No. 1:17-cv-00080-GHD-DAS

**BRIEF AMICUS CURIAE OF
THE BECKET FUND FOR RELIGIOUS LIBERTY
IN SUPPORT OF DEFENDANT-APPELLEE**

DANIEL H. BLOMBERG
  *Counsel of Record*
ADÈLE A. KEIM
AMANDA G. DIXON*
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006
dblomberg@becketlaw.org

* Not a member of the D.C. Bar;
admitted only in North Carolina.
Supervised by licensed D.C. Bar
members.

*Counsel for Amicus Curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Under Fifth Circuit Rule 29.2, undersigned counsel supplements Appellant and Appellee's Certificates of Interested Parties to fully disclose all persons with interest in this amicus brief. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. Counsel of record certifies that the following persons and entities as described Fifth Circuit Rule 29.2 have an interest in the amicus brief.

The Becket Fund for Religious Liberty, amicus curiae

Daniel H. Blomberg, counsel for amicus curiae

Adèle A. Keim, counsel for amicus curiae

Amanda G. Dixon, counsel for amicus curiae

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae the Becket Fund for Religious Liberty is a non-profit 501(c)(3) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

## TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS............i

CORPORATE DISCLOSURE STATEMENT...........................................i

TABLE OF AUTHORITIES....................................................... iii

INTEREST OF THE AMICUS CURIAE.................................... 1

STATEMENT OF THE CASE ................................................ 2

ARGUMENT ....................................................................... 5

I. Regardless of whether it is a jurisdictional defense, the church autonomy doctrine operates as a threshold constitutional limitation on civil interference in religion. .......................... 5

II. The church autonomy doctrine bars the claims in this case............. 11

    A. Pastor McRaney's lawsuit should be dismissed under the ministerial exception. ............................................. 12

        1. The ministerial exception protects non-employers. ................. 12

        2. The ministerial exception protects non-hierarchical religious groups from religious leadership lawsuits. ................ 16

    B. Pastor McRaney's lawsuit should be dismissed under church autonomy protections barring judicial interference in religious questions, deliberations, and polity. ....................................................... 20

CONCLUSION ...................................................................... 26

CERTIFICATE OF SERVICE.................................................... 27

CERTIFICATE OF COMPLIANCE ......................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bacharach v. Star K Certification,*
 No. 1142, 2022 WL 4299571 (Md. Ct. Spec. App.
 Sept. 19, 2022).................................................................23

*Bell v. Presbyterian Church (U.S.A.),*
 126 F.3d 328 (4th Cir. 1997).................................13, 14, 15

*Belya v. Kapral,*
 59 F.4th 570 (2d Cir. 2022)...........................................9, 24

*Belya v. Kapral,*
 45 F.4th 621 (2d Cir. 2023)..................................................9

*Brazauskas v. Fort Wayne-S. Bend Diocese,*
 796 N.E.2d 286 (Ind. 2003)................................................21

*Bryce v. Episcopal Church,*
 289 F.3d 648 (10th Cir. 2002)......................................passim

*Cannata v. Catholic Diocese of Austin,*
 700 F.3d 169 (5th Cir. 2012).............................................11

*Carson v. Makin,*
 596 U.S. 767 (2022) ...........................................................3

*Combs v. Central Tex. Ann. Conf.,*
 173 F.3d 343 (5th Cir. 1999)......................................passim

*Conlon v. InterVarsity Christian Fellowship,*
 777 F.3d 829 (6th Cir. 2015)......................................passim

*Dayner v. Archdiocese of Hartford,*
 23 A.3d 1192 (Conn. 2011)..............................................7, 8

*Demkovich v. St. Andrew the Apostle Parish,*
 3 F.4th 968 (7th Cir. 2021) ......................................passim

*In re Diocese of Lubbock,*
624 S.W.3d 506 (Tex. 2021) ........................................................ *passim*

*EEOC v. Catholic Univ.,*
83 F.3d 455 (D.C. Cir. 1996) .................................................... 8, 10, 25

*EEOC v. Harris Funeral Homes,*
884 F.3d 560 (6th Cir. 2018) ................................................................. 10

*El-Farra v. Sayyed,*
226 S.W.3d 792 (Ark. 2006) ......................................................23, 25-26

*Fitzgerald v. Roncalli High Sch.,*
No. 1:19-cv-4291, 2021 WL 4539199
(S.D. Ind. Sept. 30, 2021) ........................................................................ 7

*Fratello v. Archdiocese of N.Y.,*
863 F.3d 190 (2d Cir. 2017) ................................................................ 1, 7

*Grussgott v. Milwaukee Jewish Day Sch.,*
882 F.3d 655 (7th Cir. 2018) ................................................................. 18

*Heard v. Johnson,*
810 A.2d 871 (D.C. 2002) .............................................................. 23, 26

*Hiles v. Episcopal Diocese of Mass.,*
773 N.E.2d 929 (Mass. 2002) ......................................................... 23, 26

*Hosanna-Tabor Evangelical Lutheran Church
& Sch. v. EEOC,*
565 U.S. 171 (2012) ............................................................... *passim*

*Hutchison v. Thomas,*
789 F.2d 392 (6th Cir. 1986) ................................................... 15, 17, 25

*InterVarsity Christian Fellowship/USA v. Bd. of Governors
of Wayne State Univ.,*
534 F. Supp. 3d 785 (E.D. Mich. 2021) ......................................... 15, 16

*Kirby v. Lexington Theological Seminary,*
426 S.W.3d 597 (Ky. 2014) ..................................................................... 8

*Larson v. Valente*,
   456 U.S. 228 (1982) ............................................................... 19

*Lee v. Sixth Mount Zion Baptist Church*,
   903 F.3d 113 (3d Cir. 2018) ...............................1, 7-8, 10, 17

*Lewis v. Seventh Day Adventists Lake Region Conf.*,
   978 F.2d 940 (6th Cir. 1992) ................................................ 15

*McCarthy v. Fuller*,
   714 F.3d 971 (7th Cir. 2013) ......................................... 8-9, 10

*McClure v. Salvation Army*,
   460 F.2d 553 (5th Cir. 1972) .................................... 5, 10, 24

*McRaney v. NAMB*,
   966 F.3d 346 (5th Cir. 2020) .................................................. 6

*McRaney v. NAMB*,
   980 F.3d 1066 (5th Cir. 2020) ............................................. 11

*Natal v. Christian Missionary All.*,
   878 F.2d 1575 (1st Cir. 1989) .............................................. 17

*NLRB v. Catholic Bishop*,
   440 U.S. 490 (1979) .............................................................. 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S.Ct. 2049 (2020) .................................................. *passim*

*Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis*,
   193 N.E.3d 1009 (Ind. 2022) ............................................... 21

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3d Cir. 2006) .................................................. 6

*Phillips v. L. Brands Serv. Co.*,
   82 F.4th 291 (5th Cir. 2023) ................................................ 13

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) .............................................. 23

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
  426 U.S. 696 (1976) ............................................................................ 25

*Simpson v. Wells Lamont Corp.*,
  494 F.2d 490 (5th Cir. 1974) .................................................... 6, 10

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
  41 F.4th 931 (7th Cir. 2022) ................................. 1, 13, 15, 17

*Tomic v. Catholic Diocese of Peoria*,
  442 F.3d 1036 (7th Cir. 2006) ....................................... 8, 10

*Tucker v. Faith Bible Chapel*,
  36 F.4th 1021 (10th Cir. 2022) ............................................ 9

*Tucker v. Faith Bible Chapel*,
  53 F.4th 620 (10th Cir. 2022) .............................................. 9

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872) .............................................. 5

*Westbrook v. Penley*,
  231 S.W.3d 389 (Tex. 2007) ................................................. 8

*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018) ....................................... *passim*

## Other Authorities

Asma Afsaruddin, Shari'a and Fiqh in the United States,
  in The Oxford Handbook of American Islam
  (Yvonne Y. Haddad & Hane I. Smith eds., 2014) ............................... 3

*Chief Rabbinate*, Encyclopedia Britannica (Oct. 1, 2023) ....................... 4

*Do Jehovah's Witnesses Have a Paid Clergy?*, JW.org ............................ 16

Eleanor Nesbitt, *Sikhism and the third millennium, in
  Sikhism:* A Very Shory Introduction (2d ed. 2016) ............................ 4

*Lay Leadership: Volunteer Ministry of the Church*,
  ChurchofJesusChrist.org ...................................................... 16

Lael Weinberger, *Is Church Autonomy Jurisdictional?*,
    54 Loy. U. Chi. L. J. 471 (2022)..................................................7, 8, 10

## INTEREST OF THE AMICUS CURIAE[1]

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. Becket has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country. Becket represented the prevailing parties in both of the Supreme Court's ministerial exception decisions. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049 (2020). Becket has also represented prevailing parties in numerous other church autonomy cases. *See, e.g., Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018); *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931 (7th Cir. 2022); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc); *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113 (3d Cir. 2018); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017); *In re Diocese of Lubbock*, 624 S.W.3d 506 (Tex. 2021).

As a firm dedicated to religious liberty for all, Becket is especially concerned with the appellant's assertion that the Religion Clauses' protection for religious leadership decisions applies only to employers and only

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus, its members, or its counsel made a monetary contribution to fund the brief's preparation or submission. This brief has been submitted with a motion for leave to file it.

within hierarchical church polities. Br.12. Many influential religious leaders within a variety of faith groups are not formally "employed," and many religious groups in the United States eschew hierarchy—Baptist, Jewish, Sikh, Muslim and Native American religious communities among them. "The Constitution leaves it to the collective conscience of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith." *Hosanna-Tabor*, 565 U.S. at 202 (Alito, J., concurring). That is true whether the "collective conscience" is expressed through a centralized hierarchy or through a network of cooperating religious organizations of the same faith speaking to each other— and sometimes warning each other—about a religious leader's fitness for office.

## STATEMENT OF THE CASE

This case involves an ordained Baptist minister suing over the circumstances surrounding his Baptist employer's decision to let him go at the suggestion of a partner Baptist ministry. If Pastor Will McRaney had sued his former employer, the Baptist Convention of Maryland and Delaware (Baptist Convention), the district court would have barred his claims under the First Amendment at the outset. So Pastor McRaney instead sued the Baptist Convention's ministry partner, the North American Mission Board (Mission Board), for questioning his ministerial abilities both internally and to the Baptist Convention As a result, this case has dragged on for nearly seven years.

2

That should not have happened. Religious leaders fighting with their own faith groups over leadership decisions should not be allowed to entangle the federal courts in the dispute, even if their chosen defendant isn't their "employer." The First Amendment cannot be "reduced to a simple semantic exercise," and the protections of Religion Clauses should not be held to turn "on the presence or absence of magic words." *Carson v. Makin*, 596 U.S. 767, 784-85 (2022). The First Amendment's church autonomy doctrine—and its component protecting religious leadership decisions, the ministerial exception—should have led to the dismissal of this case at the threshold. Religious leadership decisions are no business of civil courts. Once the ecclesiastical subject of this case became clear, it should have been dismissed with prejudice.

Pastor McRaney asserts that his case is special because Baptists in the United States do not organize themselves under a central hierarchy. Br.12. But Baptists are not the only faith community in the United States that eschew centralized hierarchies. Many others also organize themselves in a non-hierarchical fashion. For example:

- "[T]here is no centralized religious hierarchy … in Sunni Islam," and "juridical authority" in Sunni Islam has been characterized as "diffusive[]."[2]

---

[2]    Asma Afsaruddin, *Shari'a and Fiqh in the United States*, in The Oxford Handbook of American Islam 174, 177 (Yvonne Y. Haddad & Hane I. Smith eds., 2014), https://perma.cc/DRL5-2LX9.

- "[T]here is no tidy, centralized hierarchy" within Sikhism.[3]

- Judaism "has had no central authority" for centuries and "technically speaking, the religious authority of all rabbis is equal."[4]

In other words, many religious groups in the United States make decisions through a process of sometimes-lively dialogue between co-religionists. Under Pastor McRaney's view, federal courts could be dragged into the middle of any these disagreements so long as the two disputing religious leaders do not have the same person signing their paycheck.

"The First Amendment outlaws" "any attempt by government to dictate or even to influence" these kinds of religious disputes. *Our Lady*, 140 S.Ct. at 2060. Yet in this case, Pastor McRaney used judicial power to compel two cooperative Baptist ministries through intrusive internal discovery about a leadership decision—including discovery against *each other.* The "very process of inquiry" has "impinge[d] on rights guaranteed by the Religion Clauses," teaching Baptists and other faith groups that they must handle religious decisions "with an eye to avoiding litigation or bureaucratic entanglement" if they want to avoid intrusive discovery, entangling judicial review, and expensive legal fees. *Demkovich*, 3 F.4th at 981, 983 (quoting *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979) and *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164,

---

[3]   Eleanor Nesbitt, *Sikhism and the third millennium, in* Sikhism: A Very Short Introduction 120, 134 (2d ed. 2016), https://perma.cc/5VJQ-EL6A.

[4]   *Chief Rabbinate*, Encyclopedia Britannica (Oct. 1, 2023), https://perma.cc/YC6X-QUP2.

1171 (4th Cir. 1985)). Allowing the litigation to proceed also transgressed the "structural" constitutional boundaries placed on civil courts. *Whole Woman's Health*, 896 F.3d at 368, 373. The "coercive effect" of such judicial intrusion on religious autonomy has long and rightly been rejected by this Court. *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972). Yet it was wrongly allowed to occur here.

The best time to dismiss Pastor McRaney's lawsuit was nearly seven years ago. The second-best time is now.

## ARGUMENT

### I. Regardless of whether it is a jurisdictional defense, the church autonomy doctrine operates as a threshold constitutional limitation on civil interference in religion.

The First Amendment's Religion Clauses guarantee a sphere of autonomy for religious institutions to make internal decisions without government interference. This structural protection "lies at the foundation of our political principles" and safeguards the "relations of church and state under our system of laws." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727-28 (1872). The "principle of church autonomy" is "broad," barring civil courts from interfering in matters of faith, doctrine, and "internal management decisions that are essential to [a faith group's] central mission." *Our Lady*, 140 S.Ct. at 2060-61. Because the bar forbids judicial intrusion generally, it is a threshold issue akin to an immunity that must be resolved at the earliest opportunity to prevent unconstitutional entanglement in religious issues. This ensures churches' Free Exercise rights, and

courts' Establishment Clause boundaries, are not transgressed by the process of litigation itself.

Pastor McRaney argues that the district court must be reversed because it treated church autonomy doctrine as jurisdictional. But he misunderstands the nature and function of the doctrine. Whether as a jurisdictional or affirmative defense, it fully bars Pastor McRaney's claims just the same. Accordingly, this Court can affirm the district court as reaching the correct outcome either way.[5]

Pastor McRaney makes three points in support of his jurisdiction argument. None help him.

*First*, he cites a recent law review article that directly contradicts him. Br.22. As the article explains, Pastor McRaney's jurisdictional distinction has little real-world impact here since the Religion Clauses operate the same either way: as a threshold immunity that must be resolved at the earliest possible opportunity to avoid civil interference in religious

---

[5] *See, e.g., Petruska v. Gannon Univ.*, 462 F.3d 294, 302-03 (3d Cir. 2006) (affirming district court's 12(b)(1) dismissal under 12(b)(6) because the "church autonomy doctrine" is "akin to a government official's defense of qualified immunity" in that it is a threshold "barrier to the success of a plaintiff's claims, but it does not affect the court's authority to consider them"); *Bryce v. Episcopal Church*, 289 F.3d 648, 654-55, 660 (10th Cir. 2002) (affirming dismissal on church autonomy grounds where district court converted 12(b)(1) motion to summary judgment); *cf. McRaney v. NAMB*, 966 F.3d 346, 348 n.1 (5th Cir. 2020) (noting "*Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 492, 495 (5th Cir. 1974) stat[ed] that '[t]he people of the United States conveyed no power to Congress to vest its courts with jurisdiction to settle purely ecclesiastical disputes' but affirm[ed] summary judgment rather than instructing the district court to dismiss for lack of jurisdiction"); *see also* ROA 3984-85 (evaluating motions under summary judgment standard).

matters. Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L. J. 471, 497-509 (2022).

For instance, regardless of whether church autonomy is jurisdictional, the application of the Religion Clauses must be resolved before reaching the merits of a minister's claim against a religious body, to avoid the "inherently coercive" effect of judicial "investigation and review" on internal religious matters. *Combs v. Central Tex. Ann. Conf.*, 173 F.3d 343, 347 (5th Cir. 1999) (quoting *McClure,* 460 F.2d at 560); *Bryce*, 289 F.3d at 654 n.1 (courts "resolv[e] the question of [church autonomy] doctrine's applicability early in litigation" to "avoid excessive entanglement in church matters"); *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192, 1199-1200 (Conn. 2011) ("the very act of litigating a dispute that is subject to the ministerial exception … mak[es] the discovery and trial process itself a [F]irst [A]mendment violation").

Similarly, as with both threshold jurisdictional defenses and affirmative defenses, church autonomy defenses should be resolved before merits-related discovery takes place. *Fratello*, 863 F.3d 190 (noting trial court rightly bifurcated discovery to resolve ministerial exception first); *Fitzgerald v. Roncalli High Sch.*, No. 1:19-cv-4291, 2021 WL 4539199, at *1 (S.D. Ind. Sept. 30, 2021) ("courts regularly bifurcate discovery in ministerial cases" to "avoid judicial entanglement in … religious institutions"). And, as with jurisdictional issues, courts will raise the church autonomy doctrine *sua sponte* to prevent entanglement. *See, e.g.*, *Sixth Mount Zion*,

903 F.3d at 118 & n.4; *EEOC v. Catholic Univ.*, 83 F.3d 455, 460 (D.C. Cir. 1996). Finally, when a district court denies application of church autonomy protection on legal grounds, that denial is subject to immediate appellate review. *Whole Woman's Health*, 896 F.3d at 368; *McCarthy v. Fuller*, 714 F.3d 971, 974-76 (7th Cir. 2013); *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 619 (Ky. 2014); *Dayner*, 23 A.3d at 1199. *See also* Weinberger, *supra,* at 500-05 (collecting cases addressing these features).

These core features are the same regardless of how the Religion Clauses are conceived because the doctrine is a "structural protection" against judicial interference writ large. *Whole Woman's Health*, 896 F.3d at 373. Church autonomy is "not only a personal [right]; it is a structural one that categorically prohibits federal and state governments from becoming involved in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015); *Sixth Mount Zion*, 903 F.3d at 118 n. 4 (doctrine is "rooted in constitutional limits on judicial authority"); *Westbrook v. Penley*, 231 S.W.3d 389, 397-98 (Tex. 2007) ("structural restraint on the constitutional power of civil courts"). Indeed, even when the parties might want a court to adjudicate religious matters, courts have an "independent" duty to refuse. *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006). And that duty arises regardless of whether the Religion Clauses are understood as jurisdictional or as an affirmative defense akin to an immunity. *McCarthy*,

714 F.3d at 976, 980; *Bryce*, 289 F.3d at 653, 660. Either way, the "constitution forbids [courts] to tread" in "the internal management of the church." *Combs*, 173 F.3d at 350.

*Second*, Pastor McRaney points to sharply divided recent decisions out of the Tenth and Second Circuits for support that his argument that the jurisdictional question is dispositive. Br.21 (citing *Tucker v. Faith Bible Chapel*, 36 F.4th 1021, 1029 (10th Cir. 2022), *cert. denied*, 143 S.Ct. 2608 (2023), and *Belya v. Kapral*, 59 F.4th 570, 584 (2d Cir.), *cert. denied*, 143 S.Ct. 2609 (2023)). But, as the nine judges who dissented from the denial of en banc rehearing explained, the jurisdiction issue was irrelevant to the outcome in both appeals. *See Belya*, 59 F.4th at 578 (Park, J., dissenting from denial of en banc rehearing); *Tucker v. Faith Bible Chapel*, 53 F.4th 620, 625 (10th Cir. 2022) (Bacharach, J., dissenting from the denial of en banc).

Regardless, those decisions split from this Court's precedent in both their analysis and their conclusions. The foundation of their analysis indicated that aspects of the Religion Clauses protect only against liability, not the burdens of litigation itself. *See Tucker*, 36 F.4th at 1037; *Belya v. Kapral*, 45 F.4th 621, 633 (2d Cir. 2022). But *Combs* expressly held otherwise, explaining that even "*investigating* employment discrimination claims by ministers against their church … would necessarily intrude into church governance in a manner that would be inherently coercive," and that this "independent" injury "*alone* is enough to bar the

involvement of the civil courts." 173 F.3d at 350 (emphasis added) (citing *Simpson*, 494 F.2d at 493-94); *McClure*, 460 F.2d at 560 (noting "coercive effect" of judicial "investigation and review"); *Hosanna-Tabor*, 565 U.S. at 187 ("inquiring into" ecclesiastical dispute was "unconstitutional[ ]"); *see also id.* at 205-06 (Alito, J., concurring) ("mere adjudication" of ministerial dispute "pose[s] grave problems for religious autonomy"); *Catholic Bishop*, 440 U.S. at 502 ("very process of inquiry" can violate Religion Clauses); *Catholic Univ.*, 83 F.3d at 466 (EEOC investigation into minister's claims violated Establishment Clause).

The Tenth and Second Circuits' flawed foundation led to an equally flawed conclusion: that the Religion Clauses do not allow interlocutory appeal. But this Court said the opposite in *Whole Woman's Health*, as have most other courts and scholars to consider the question. 896 F.3d at 373; *McCarthy*, 714 F.3d at 975-76; *see also* Weinberger, *supra*, at 504-05 (collecting cases and scholarly articles). *Tucker* and *Belya* are thus both irrelevant and barred by circuit precedent.

*Third*, Pastor McRaney claims that courts will be flooded if, as with jurisdictional defenses, the church autonomy doctrine cannot be waived. But the Third, Sixth, and Seventh Circuits don't allow waiver of church autonomy defenses. *Conlon*, 777 F.3d at 836; *Sixth Mount Zion*, 903 F.3d at 118 n. 4; *Tomic*, 442 F.3d at 1042. Again, this is due to the structural nature of the doctrine, which means that "the Constitution does not permit private parties to waive" it. *Conlon*, 777 F.3d at 836; *see also EEOC*

*v. Harris Funeral Homes,* 884 F.3d 560, 581 (6th Cir. 2018) (reaching ministerial exception to ensure non-entanglement even though defendant waived it). In any event, church autonomy cases make up a tiny fraction of the federal docket. Indeed, other than this case, this Court has only heard two significant church autonomy cases in the decade-plus since *Hosanna-Tabor*: *Whole Woman's Health,* 896 F.3d 362, and *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012). Preventing church-state entanglement won't break this Court's docket.

Thus, regardless of whether they're understood as jurisdictional or as an affirmative defense, a proper application of the Religion Clauses bar Pastor McRaney's claims.[6]

## II. The church autonomy doctrine bars the claims in this case.

Pastor McRaney's claims were "brought to protest his dismissal from church leadership." ROA.3987. But, as explained above, the Religion Clauses "categorically prohibit[] federal and state governments from becoming involved in religious leadership disputes." *Conlon*, 777 F.3d at

---

[6]  The district court used the term "ecclesiastical abstention." *See, e.g.*, ROA.3985. The Supreme Court has never used that term, but instead has used "church autonomy." *Our Lady*, 140 S.Ct. at 2061. So have many other federal appellate courts, *see Demkovich*, 3 F.4th at 975; *Bryce*, 289 F.3d at 654, and several judges on this court, *See McRaney v. NAMB*, 980 F.3d 1066, 1067, 1078 (5th Cir. 2020) (Ho, J. and Oldham, J., dissenting from denial of rehearing en banc). And "ecclesiastical abstention" risks obscuring the nature of the doctrine because the underlying right and restriction are not merely a discretionary abstention, but an autonomy that requires civil courts to "stay out" of religious disputes. *Our Lady*, 140 S.Ct. at 2060. "Church autonomy" is shorthand and its applicability extends beyond churches or any specific faiths, just as the ministerial exception extends beyond those individuals and faiths using the title "minister." *Id.* at 2064.

836. Thus, his suit should have been dismissed—at the outset—as violating the church autonomy doctrine twice over. First, it should have been dismissed under the ministerial exception, the "component" of the doctrine of that "outlaws" government interference in religious leadership decisions. *Our Lady*, 140 S.Ct. at 2060. Second, it should have been dismissed under the prohibition on judicial entanglement in religious questions, deliberations, and polity. Both violations have been clear since the day the lawsuit was filed. Pastor McRaney sought to have a court decide whether a Southern Baptist ministry's criticism of him to another Southern Baptist ministry was both unjustified and the proximate cause of his dismissal from his position of spiritual leadership. These are not only questions that a secular court isn't equipped to answer—they are questions that civil courts may not even entertain.

## A. Pastor McRaney's lawsuit should be dismissed under the ministerial exception.

### 1. The ministerial exception protects non-employers.

The district court agreed that Pastor McRaney was clearly a minister raising claims clearly barred by the ministerial exception, yet held that the ministerial exception didn't apply—solely because there was not an employment relationship between Pastor McRaney and the Mission Board. ROA.154-56. Pastor McRaney repeats that argument here. Br.26-27. This Court should affirm on the grounds that the ministerial

exception bars Pastor McRaney's suit. *Phillips v. L. Brands Serv. Co.*, 82 F.4th 291, 297 (5th Cir. 2023).

In his brief to this Court, Pastor McRaney fails to cite a single precedent supporting his argument. Nor could he. When courts have directly faced the argument, they have rejected it. For instance, in *Starkey v. Roman Catholic Archdiocese of Indianapolis*, the plaintiff sued both her school employer and the archdiocese that allegedly influenced the school's decision to let her go. 41 F.4th 931 (7th Cir. 2022). Like Pastor McRaney, she argued that the archdiocese was not protected by the ministerial exception because it was not her employer, and thus was liable under state tort law for interfering with her employment relationship with the school. Plaintiff-Appellant's Br. at 42-43, *Starkey*, 41 F.4th 931 (No. 21-2524), 2021 WL 5145858. The Seventh Circuit was unmoved, finding that adjudicating such torts would still interfere in religious leadership decisions and "result in excessive judicial entanglement in ecclesiastical matters." *Starkey*, 41 F.4th at 945. The court concluded that "[t]he ministerial exception bars all her claims, federal and state." *Id.*

Similarly, in *Bell v. Presbyterian Church (U.S.A.)*, the Fourth Circuit dismissed a case brought by a United Church of Christ pastor against Presbyterian, Methodist, and Baptist denominational entities that financially supported the religious nonprofit that employed him. 126 F.3d 328, 332-33 (4th Cir. 1997). The pastor was not employed by the defendants— nor was he even of the same denomination—and he sued them for their

role in interfering in his employment by ceasing their financial support. *Id.* at 329. There, as here, the pastor "characterize[d] this as a secular dispute between the [defendants] and a third party." *Id.* at 332. But the court held his claims still failed under the ministerial exception because resolving them "would interpose the judiciary into the Presbyterian church's decisions, as well as the decisions of the other [defendant] churches, relating to how and by whom they spread their message ... through the granting or withholding of funds." *Id.*

Pastor McRaney attempts to distinguish *Bell* on the grounds that the pastor in *Bell* "effectively" sued his employer when he sued his organization's four major funders. Br.27. But this gives the game away, because as Pastor McRaney claimed in his complaint, it was the Mission Board's decision to withdraw funding from the Baptist Convention that prompted his termination. ROA.1318-19. If suing the religious organizations that fund your employer is "effectively" suing your employer, then Pastor McRaney is "effectively" in the same spot as Pastor Bell, and his lawsuit should have long since been dismissed on the same grounds.

Indeed, even if employment relationship *were* the touchstone, Pastor McRaney's claims would qualify, because they are targeted at the circumstances surrounding his dismissal as a minister. By suing over matters related to his termination, he is chilling the Baptist Convention's right to make ministerial decisions on any grounds it chooses. That decision is the "church's *alone*." *Hosanna-Tabor*, 565 U.S. at 195 (emphasis added).

That means, at a minimum, that the Baptist Convention should be able to take into account the views of its formal ministry partners like the Mission Board when making decisions about spiritual leadership. Limiting the ministerial exception to employment disputes will allow other disgruntled ministers to dodge the ministerial exception by selectively suing their employers' ministry partners. The district court's unprecedented narrowing of the exception incentivizes creative pleading and ultimately undermines the exception's purpose.

In any event, courts have declined to treat formal employment as a necessary condition in a variety of ways. *See Starkey*, 41 F.4th at 945 *Bell*, 126 F.3d at 332; *see also Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940, 941-43 (6th Cir. 1992) (dismissing claims brought by former pastor's wife against her husband's church employer); *Hutchison v. Thomas*, 789 F.2d 392, 396 n.2 (6th Cir. 1986) (same); *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 797 (E.D. Mich. 2021) (ministerial exception applied to a religious group's part-time volunteer student leaders). And for good reason. Shrinking the right to employment alone would vastly reduce free exercise and expand judicial entanglement—allowing civil disputes by everyone from Sunday School teachers to deacons to monks who take vows of poverty. It would unfairly penalize religious groups like the Church of Jesus Christ of Latter-day Saints and Jehovah's Witnesses,

who for theological reasons have few to no paid clergy.[7] And it would al-
low the government to impose qualifications on religious leaders, simply
because they are volunteers—as is often the case with the religious lead-
ership of religious student groups on college campuses. *See Wayne State,*
534 F. Supp. 3d at 797 (barring that result).

### 2. The ministerial exception protects non-hierarchical religious groups from religious leadership lawsuits.

After his failed employment argument, Pastor McRaney pivots to a
grab-bag of other arguments seeking to limit the scope of the Religion
Clauses.

First, he argues that his case "does not involve an intra-church dis-
pute" or a dispute over "church governance" because neither the Mission
Board nor the Baptist Convention are "churches." Br.23-34. But "in order
to invoke the exception," a defendant "need not be a traditional religious
organization such as a church, diocese, or synagogue," but rather only be
an entity "whose 'mission is marked by clear or obvious religious charac-
teristics.'" *Conlon,* 777 F.3d at 834. For instance, *Hosanna-Tabor* and
*Our Lady* involved religious elementary schools. And *Conlon* held that

---

[7]   *Lay Leadership: Volunteer Ministry of the Church,* ChurchofJesusChrist.org,
https://perma.cc/982G-5Y69 ("The Church of Jesus Christ of Latter-day Saints func-
tions in large measure because of the unpaid volunteer ministry of its members. In
fact, this lay ministry is one of the Church's most defining characteristics."); *Do Je-
hovah's Witnesses Have a Paid Clergy?,* JW.org, https://t.ly/L4PlI (citation omitted)
("Jehovah's Witnesses have no clergy-laity division. All baptized Witnesses are or-
dained ministers … Spiritually mature men in each congregation serve as … elders.
They do so without being paid for their services.").

the ministerial exception applies to "multidenominational and nonde-nominational" religious organizations that are not churches. 777 F.3d at 834 (noting cases protecting Methodist hospital and Jewish nursing home).

Second, Pastor McRaney argues that the district court was wrong to rely on *Hosanna-Tabor*, because its holding does not apply to breach of contract or tort claims. Br.26. But *Hosanna-Tabor* was not setting a substantive limit on the ministerial exception—just explaining the scope of the case before it. 565 U.S. at 196. And other courts to consider the question have been clear that the ministerial exception bars *any* claims that would interfere with ministerial selection, termination, or control. *See Combs*, 173 F.3d at 350. That has long included contract and tort claims. *Hutchison*, 789 F.2d at 392-93, 396 n.2; *Natal v. Christian Missionary All.*, 878 F.2d 1575, 1576-78 (1st Cir. 1989). And it still does. *Starkey*, 41 F.4th at 944 (tort); *Sixth Mount Zion*, 903 F.3d at 123 (contract).

Third, Pastor McRaney tries to bar Baptists and other non-hierarchical faiths from protection by the ministerial exception. To this end, he cites Baptist historian Barry Hankins thirteen times in his brief, more than he cites *McClure, Hosanna-Tabor* and *Our Lady* combined. His statement of the case includes three pages of block-quotes from Dr. Hankins' expert report (Br.12-14), and Pastor McRaney takes both the district court and other Baptist organizations to task for failing to use certain theological terms to refer to Baptist polity. Br.6-7, 22-23, 36.

Pastor McRaney includes Dr. Hankins' opinion that, while the ministerial exception might apply to Catholics, Lutherans, and Episcopalians, it can never apply in a dispute between Baptist organizations, because of Baptists' strong belief in the spiritual autonomy of each congregation. Br.12-13. And he ends with Dr. Hankins' view that Pastor McRaney's "claims against [the Mission Board] are, from a First Amendment standpoint, no different than if he worked for a secular organization separate from [the Mission Board]," and that a ruling for the Mission Board would burden *Pastor McRaney's* Free Exercise rights. Br.14. All this confirms the Seventh Circuit's conclusion that it is the court's job, not any expert's, to decide the legal "ultimate question" of whether the ministerial exception applies. *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 662 (7th Cir. 2018).

Baptists in America are free to organize themselves as they wish. But their theological decision to operate autonomously does not change the structural constitutional prohibition against drawing secular courts into religious leadership disputes. The fact that the cooperation between the Baptist Convention and the Mission Board was, as a spiritual matter, voluntary does not make it any less real. And the fact that Pastor McRaney alleges the Mission Board and the Baptist Convention used words, rather than hierarchical authority, to persuade fellow Baptists to think twice before calling Pastor McRaney as a minister, inviting him to speak at a missions conference, or reading his book on evangelism does

not arm Pastor McRaney with tort law claims that ministers in hierarchical faiths do not have.

The favoritism that Pastor McRaney is arguing for is not only unconstitutional in its own right, *see Larson v. Valente*, 456 U.S. 228, 245 (1982), but would have perverse effects. Hierarchical churches would be free to warn their members against bad ministers, as in *Diocese of Lubbock*, 624 S.W.3d at 518, but independent churches would have no such ability. Baptist shepherds who prey on their flock would be allowed to leave one congregation and search for a new flock, and if sister churches asked the old church for information on pastoral fitness, the minister would be able to sue their old churches for saying anything negative about them. Other non-hierarchical faith groups, like the Muslim, Jewish, and Sikh communities identified above, would likewise be left unable to protect themselves against fallen imams, rabbis, and granthis.

That is not only unconstitutional, it is profoundly unwise. As the Supreme Court observed in *Our Lady*, "a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities" because "without that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Our Lady*, 140 S.Ct. at 2060-61. The district court's ruling on the ministerial exception would permit all of this, unless the religious leaders happened to be employed by the same organization.

19

This holding was wrong, and this Court should take the opportunity to correct it now.

*      *      *

Pastor McRaney has the ministerial exception backwards (Br.26-27): in reality his case is far easier than *Hosanna-Tabor* and *Our Lady*. In those cases, the federal courts were called to weigh the "undoubtedly important" protection that federal law provides for those facing invidious employment discrimination against the First Amendment's "special solicitude" for religious autonomy. *Hosanna-Tabor*, 565 U.S. at 189, 196. Each of those decisions concluded, correctly, that religious autonomy must prevail. But there is no such countervailing federal interest here, making the outcome even clearer. When a fired religious leader asks the courts to help him punish co-religionists for criticizing his religious performance, the answer must be no.

## B. Pastor McRaney's lawsuit should be dismissed under church autonomy protections barring judicial interference in religious questions, deliberations, and polity.

Pastor McRaney's claims also must be dismissed because they independently violate three other components of the church autonomy doctrine: the bans on judicial interference in religious questions, religious deliberations, or religious polity.

*First*, resolving Pastor McRaney's claims requires judicial entanglement in religious questions. The District Court held—and Pastor McRaney does not dispute—that his tortious interference claim requires

20

the court to decide whether the Mission Board acted "without right or justifiable cause," and whether the Mission Board's communications were the "proximate cause" of his damage. ROA.3987. Other courts have repeatedly rejected similar attempts to end-run the church autonomy doctrine with tortious interference claims. *Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis*, 193 N.E.3d 1009, 1015 (Ind. 2022); *Brazauskas v. Fort Wayne-S. Bend Diocese*, 796 N.E.2d 286, 294 (Ind. 2003).

The original disagreement between the Mission Board's leaders and Pastor McRaney centered around Pastor McRaney's execution of the Strategic Partnership Agreement between the Baptist Convention and the Mission Board, an "inherently religious doctrine-based document" "entirely focused on religious matters, including ministry priorities, religious purpose, and missionary personnel and funding." ROA.3988. The record shows that this agreement cannot be interpreted without understanding the Southern Baptist Convention's doctrinal statement and specific cited scriptures. ROA.1702-03; ROA.1801.

Thus, determining whether the Mission Board acted "without right or justifiable cause" would require the District Court to decide whether Mission Board's critical statements were "justified" by the terms of this religious agreement. ROA.3987. And ruling on the proximate cause element would require the District Court to "weigh in on [Pastor McRaney's] job performance as [the Baptist Convention's] Executive Missional Strategist"—a "clearly" ministerial role—and evaluate the Baptist

Convention's "internal policies, procedures, and decision-making, in order to determine if [the Mission Board] influenced" the Baptist Convention's decision to let him go. ROA.3988. Those are not things civil courts can do. In short, after nearly seven years of litigation, the district court was right not to let the judiciary be drawn yet further into this religious doctrinal dispute.

*Second*, Pastor McRaney's claims would require secular courts to interfere with, and thus chill, intra-Baptist communications about Pastor McRaney's fitness for religious leadership. Other courts have repeatedly declined invitations to do just that. In *Bryce*, the Tenth Circuit held that the church autonomy doctrine precluded claims brought by the wife of a minister, who was not a church member, over offensive statements made during congregational meetings. 289 F.3d at 658. The Tenth Circuit emphasized that "church autonomy doctrine is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely." *Id.* It accordingly held that "[t]he applicability of the doctrine does not focus upon the relationship between the church and [the non-member spouse]," but "on the right of the church to engage freely in ecclesiastical discussions with members and non-members." *Id.*

Similarly, in *Diocese of Lubbock*, the Texas Supreme Court dismissed claims brought by a minister against his former diocese over the diocese's publication of sexual abuse charges against him. 624 S.W.3d at 518. The Texas Supreme Court held that the diocese's public statements to non-

22

members were covered by the church autonomy doctrine, which "allows a religious institution to engage freely in ecclesiastical discussions with more than just its members." *Id.*; *accord El-Farra v. Sayyed*, 226 S.W.3d 792, 795-96 (Ark. 2006) (dismissing defamation claims regarding statements "made in the context of a dispute over [plaintiff's] suitability to remain as Imam"); *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 935-37 (Mass. 2002) (rejecting defamation claim "aris[ing] out of the church-minister relationship in the religious discipline context"); *Heard v. Johnson*, 810 A.2d 871, 880-82 (D.C. 2002) (same); *Bacharach v. Star K Certification*, No. 1142, 2022 WL 4299571, at *3 (Md. Ct. Spec. App. Sept. 19, 2022) (rejecting tortious interference with contract claim that required interpretation of disputed ecclesiastical issues). The same is true here: the Mission Board's communications with other Baptist organizations about Pastor McRaney's spiritual leadership abilities are protected by the First Amendment.

*Third*, Pastor McRaney's claims require judicial interference in Baptist polity. Even adjudicating his claims has taken a wrecking ball to sensitive First Amendment protections against church-state entanglement. Both the Mission Board's and the Baptist Convention's internal records regarding Pastor McRaney's termination were exposed to discovery, even though such intrusion to "probe the mind of the church" over ministerial decisions has long been recognized as unconstitutional. *Rayburn*, 772 F.2d at 1171; *see, e.g.,* ROA.862-64 (allowing discovery from the Baptist

23

Convention); *accord Combs*, 173 F.3d at 350; *McClure*, 460 F.2d at 560; *Hosanna-Tabor*, 565 U.S. at 194-95. The district court had properly foreclosed such intrusion at an earlier stage of this case, but it reversed that position on remand. ROA.864. This allowed depositions of other pastors and ministers, including Pastor McRaney's deposition of a fellow minister—the President of the Baptist Convention—about internal religious disputes and leadership decisions, precisely the kind of interference the en banc Seventh Circuit recently found off-limits. *See, e.g.,* ROA.862-64; *Demkovich*, 3 F.4th at 977-78. And that reversal also allowed *the Mission Board* to subpoena the Baptist Convention's internal deliberations. ROA.864. Turning Baptist institutions against each other to resolve a ministerial dispute is a harm that the Religion Clauses was meant to prevent.

Pastor McRaney responds to these three fatal defects in his case by asserting that his claims can be resolved under "neutral principles," without evaluating any religious questions. That is impossible in a case like this, where a religious leader is suing a religious group over a religious dispute. Ruling otherwise is "inconsistent with precedent" and would "eviscerate the church autonomy doctrine." *Belya*, 59 F.4th at 580 (Park, J., dissenting from denial of rehearing en banc).

Neutral principles can no more resolve Pastor McRaney's Mississippi tort claims than it could resolve Officer McClure's Title VII sex discrimination claims in *McClure v. Salvation Army*, or the Americans with

24

Disabilities Act claims brought by Lutheran and Catholic schoolteachers in *Hosanna-Tabor* and *Our Lady*. In each of these cases, there were of course some issues—wages and work assignments, performance evaluations and evidence of pretext—that federal courts routinely evaluate. But in each case, this Court and the Supreme Court resisted the siren song of neutral principles in religious leadership disputes and refused to be drawn in. *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 721 (1976) (explaining that "the First and Fourteenth Amendments forbid" applying "neutral principles" in a way that allows secular courts to review the internal religious decisions of churches).

Other courts agree. The Sixth Circuit, rejecting a minister's defamation claim, squarely held that the "neutral principles" approach "applies only to cases involving disputes over church property" and is "simply not applicable" where a minister's claim relates to a dispute over his "status and employment as a minister of the church." *Hutchison*, 789 F.2d at 396. Similarly, in *Catholic University*, the D.C. Circuit explained that "neutral principles" refers to "trust and property law," and rejected the argument that a ministerial Title VII dispute "can be resolved without entangling the Government 'in questions of religious doctrine, polity, and practice' by invoking 'neutral principles of law.'" 83 F.3d at 465-66; *Demkovich*, 3 F.4th at 977-78 (rejecting usage of "neutral principles" to adjudicate minister's Title VII claim). *Accord Diocese of Lubbock*, 624 S.W.3d at 516 ("neutral principles" inapplicable to defamation claim); *El-Farra*, 226

S.W.3d at 795-96 (rejecting "neutral principles" approach); *Hiles*, 773 N.E.2d at 935-37 (rejecting adjudicating church-minister defamation disputes under "the established rules of common law"); *Heard*, 810 A.2d at 880-82 ("neutral principles" inapplicable to minister's defamation claim).

## CONCLUSION

Pastor McRaney's claims should have been dismissed under the ministerial exception in 2017. Nearly seven years later, the inherently religious nature of his dispute with the Mission Board over his fitness to start Baptist churches, speak at Baptist missions conferences, lead Baptist churches, and sell books on evangelism to other Baptists is even clearer. This Court should affirm the judgment below.

Dated: December 7, 2023

Respectfully submitted,

/s/ Daniel H. Blomberg

DANIEL H. BLOMBERG
  *Counsel of Record*
ADÈLE A. KEIM
AMANDA G. DIXON*
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, D.C. 20006
dblomberg@becketlaw.org

* Not admitted to the D.C. Bar; admitted only in North Carolina. Supervised by licensed D.C. Bar members.

*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

On December 7, 2023, this brief was served via CM/ECF on all regis-
tered counsel and transmitted to the Clerk of the Court. Counsel further
certifies that: (1) any required privacy redactions have been made in com-
pliance with Fifth Circuit Rule 25.2.13; and (2) the electronic submission
is an exact copy of the paper document in compliance with Fifth Circuit
Rule 25.2.1.

/s/ Daniel H. Blomberg
Daniel H. Blomberg

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,174 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).

/s/ Daniel H. Blomberg
Daniel H. Blomberg