# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 23-60494

WILL McRANEY,

*Plaintiff-Appellant,*

v.

THE NORTH AMERICAN MISSION BOARD
OF THE SOUTHERN BAPTIST CONVENTION, INCORPORATED,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI, ABERDEEN IN NO. 1:17-CV-80,
HONORABLE GLEN H. DAVIDSON, U.S. DISTRICT JUDGE

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

Scott E. Gant
Boies Schiller Flexner LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
sgant@bsfllp.com
*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-60494

Will McRaney,

*Plaintiff-Appellant*,

v.

The North American Mission Board of the Southern Baptist Convention, Inc.,

*Defendant-Appellee*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Will McRaney – Plaintiff
Sandy McRaney – Plaintiff's Spouse
Boies Schiller Flexner LLP – Counsel for Plaintiff
Scott E. Gant – Counsel for Plaintiff
Victoria Scordato – Counsel for Plaintiff
William Harvey Barton, II – Counsel for Plaintiff
The North American Mission Board of the Southern Baptist Convention, Inc. – Defendant
Butler Snow LLP – Counsel for Defendant
Kathleen Ingram Carrington – Counsel for Defendant
Joshua J. Wiener – Counsel for Defendant
Wilmer Cutler Pickering Hale & Dorr LLP – Counsel for Defendant
Matthew T. Martens – Counsel for Defendant
Timothy Jeffrey Perla – Counsel for Defendant
Joshua Aisen Vittor – Counsel for Defendant

       s/ Scott E. Gant       

Counsel of Record for Plaintiff-Appellant

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .........................................................i

TABLE OF AUTHORITIES ...........................................................................iv

ARGUMENT ...............................................................................................1

   I.     NAMB is Wrong About Subject Matter Jurisdiction.................................1

   II.    The First Amendment Does Not Preclude McRaney's Claims .................3

       A.     NAMB Inaccurately Portrays this Case as a "Religious" or "Spiritual" Dispute ............................................................3

           1.    Whether McRaney Breached the SPA as Alleged by NAMB Is Not a Religious Question..............................................3

           2.    Bill Warren's Deposition Testimony on His Own Behalf Does Not Transform this Case into a Religious or Spiritual Dispute................................................................4

           3.    NAMB's Contrived Portrait of a Religious Dispute Ignores Counts IV-VI ..................................................5

       B.    NAMB is Wrong About First Amendment Law.................................6

           1.    NAMB Rejects or Ignores *McRaney I*..........................................6

           2.    NAMB Relies Heavily on *Bell* After Telling the Supreme Court *Bell* Conflicts with Fifth Circuit Law..................................6

           3.    NAMB's Argument for Expanding the Ministerial Exception Should Be Rejected ..................................................7

           4.    NAMB's Arguments Threaten Religious Liberty ........................7

   III.   NAMB's Alternative Arguments for "Affirmance" Are Wrong ..............8

       A.    This Court Cannot Affirm Summary Judgment on Alternative Grounds Because There Was No Proper Entry of Summary Judgment ................................................................................8

       B.    McRaney's Claims Were Not Released.............................................10

      1.     NAMB Was Not a "Supporting Organization" of BCMD ..........10

      2.     Under Maryland Law NAMB is Not Entitled to Enforce the Separation Agreement ...................................................................13

      3.     The Separation Agreement's Mandatory Forum Selection Provision Forecloses NAMB's Release Defense in the District Court ..............................................................................14

  C.    The Record Shows Genuine Disputes Over Material Facts, Which Should Be Presented to a Jury .................................................16

CONCLUSION ........................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Bank of Am., N.A.*,
    933 F. Supp. 2d 716 (D. Md. 2013) ............................................................. 14

*Atlantic Marine Construction Co., Inc. v.*
    *United States District Court for the Western District of Texas*,
    571 U.S. 49 (2013) ................................................................................. 14-15

*Bell v. Presbyterian Church (U.S.A.)*,
    126 F.3d 328 (4th Cir. 1997) ................................................................. 6, 7

*Credible Behavioral Health, Inc. v. Johnson*,
    220 A.3d 303 (Md. 2019) ..................................................................... 10, 11

*CR–RSC Tower I, LLC v. RSC Tower I, LLC*,
    56 A.3d 170 (Md. 2012) ............................................................................ 14

*Cushman & Wakefield of Maryland, Inc. v. DRV Greentec, LLC*,
    203 A.3d 835 (Md. 2019) ........................................................................... 14

*CX Reinsurance Co., Ltd. v. Levitas*,
    207 F. Supp. 3d 566 (D. Md. 2016) ..................................................... 13-14

*Expo Properties, LLC v. Experient, Inc.*,
    956 F.3d 217 (4th Cir. 2020) ..................................................................... 10

*Harris v. Nelson*,
    394 U.S. 286 (1969) ..................................................................................... 8

*In re Lloyd's Register North America, Inc.*,
    780 F.3d 283 (5th Cir. 2015) ..................................................................... 15

*In re Shell Oil Co.*,
    932 F.2d 1518 (5th Cir. 1991) ..................................................................... 2

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) ................................................................................... 20

*Long v. Welch & Rushe, Inc.*,
    28 F. Supp. 3d 446 (D. Md. 2014) ............................................................. 19

*Metro. Life Ins. Co. v. Promenade Towers Mut. Hous. Corp.*,
    581 A.2d 846 (Md. 1990) ........................................................................... 11

iv

*Mitchell v. Craft,*
  211 So. 2d 509 (Miss. 1968)..........................................................20

*Perna v. Health One Credit Union,*
  983 F.3d 258 (6th Cir. 2020) ............................................... 2, 8, 9

*Price v. Litton Systems, Inc.,*
  784 F.2d 600 (5th Cir. 1986) .......................................................20

*Roe v. Cypress-Fairbanks Independent School District,*
  53 F.4th 334 (5th Cir. 2022) .......................................................16

*Shepard v. Nabb,*
  581 A.2d 839 (Md. Ct. Spec. App. 1990)....................................19

*Spivey v. Chitimacha Tribe of Louisiana,*
  79 F.4th 444 (5th Cir. 2023) .....................................................1, 2

*Stewart Organization, Inc. v. Ricoh Corp.,*
  487 U.S. 22 (1988)........................................................................16

*Viridis Corp. v. TCA Global Credit Master Fund, LP,*
  721 Fed. App'x 865 (11th Cir. 2018) ..........................................20

*Weber v. PACT XPP Technologies, AG,*
  811 F.3d 758 (5th Cir. 2016) .......................................................15

*Williams v. Liberty Mut. Ins. Co.,*
  741 F.3d 617 (5th Cir. 2014) .......................................................20

**Constitutional Provisions, Statutes & Rules:**

U.S. Const., Amend. I ......................................................................6

26 U.S.C. § 509(a)(3).....................................................................11

28 U.S.C. § 1404(a) ................................................................. 15, 16

28 U.S.C. § 1447 .................................................................. 1, 2, 26

Fed. R. Civ. P. 12 ........................................................................8, 9

Fed. R. Civ. P. 12(h)(3)..................................................................8

Fed. R. Civ. P. 56 ...........................................................................8

Fed. R. Evid. 401 ..........................................................................13

Fed. R. Evid. 403 ..........................................................................13

**Other Authorities:**

Bruce R. Hopkins, Nonprofit Law Dictionary 416 (2015) .....................................11

Philanthropy Dictionary | Philanthropy Terms | NPTrust ......................................11

Restatement (Second) of Conflict of Laws (1971) ..................................................20

Supporting organization (charity) - Wikipedia.......................................................11

Supporting Organizations - Requirements and Types | Internal Revenue Service
   (irs.gov) ...........................................................................................................11

## ARGUMENT

## I.    NAMB is Wrong About Subject Matter Jurisdiction

NAMB did not argue at summary judgment that the District Court lacks subject matter jurisdiction.  Opp. 12.  On appeal, however, NAMB adopts the District Court's position.  Opp. 18 & n.10.  For the reasons explained, the ecclesiastical abstention doctrine cannot strip a district court of subject matter jurisdiction.  *See* Opening Br. 20-22.  And because the doctrine does not strip a federal court of subject matter jurisdiction, dismissal here was improper.

NAMB is also wrong in defending the District Court's view that it could decline to remand to state court if subject matter jurisdiction were absent.  Congress has directed in the statute governing removal that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded" to state court.  28 U.S.C. § 1447(c).  This Court recently held that statute does not vest a court with discretion or provide for any exceptions. *Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 448 (5th Cir. 2023).  Faced with this controlling precedent, NAMB calls for this Court to overrule *Spivey*.  Opp. 21.  Among the problems with NAMB's suggestion is that it ignores important federalism principles.  A district court has no authority to make legal determinations for, or impose its view of the ecclesiastical abstention doctrine on, a state court. Federalism requires remand to let the state court decide that question for itself—

1

subject to oversight by the Supreme Court of the United States regarding any determination of federal law.  *See* Opening Br. 36-39.  NAMB failed to even address this point, let alone successfully refute it.

Rather than engage the clear statutory language or important federalism principles, NAMB advances the frivolous argument that McRaney "waived" remand.  Opp. 19.  A threshold problem with that argument is NAMB did not argue at summary judgment that subject matter jurisdiction was absent.  NAMB does not (and cannot) explain how McRaney could have waived a response to an argument not made by NAMB.  Moreover, NAMB's waiver theory collides with the language of Section 1447, which directs what district courts must do.  The requirement for remand when subject matter jurisdiction is absent does not depend on a party requesting it.[1]

---

[1]  NAMB cites *In re Shell Oil Co.*, 932 F.2d 1518, 1523 (5th Cir. 1991), which concerned plaintiffs' untimely request for remand to state court in the face of a 30-day statutory limit.  Here, McRaney is not initiating remand—it is required if the District Court lacks subject matter jurisdiction.  NAMB also relies on the futility analysis in *Perna v. Health One Credit Union*, 983 F.3d 258 (6th Cir. 2020), which is no longer good law after *Spivey.* 79 F.4th at 447-48 (5th Cir. 2023).

2

## II.    The First Amendment Does Not Preclude McRaney's Claims

### A.    NAMB Inaccurately Portrays this Case as a "Religious" or "Spiritual" Dispute

The foundation of NAMB's brief is its contention that this case is a "religious" or "spiritual" dispute.  Opp. 5, 8, 17, 38.  NAMB's effort to recast this case is contrived, and based on a series of misleading or inaccurate assertions.[2]

#### 1.    Whether McRaney Breached the SPA as Alleged by NAMB Is Not a Religious Question

NAMB describes the SPA as a "joint ministry agreement" (Opp. 4)—a term the SPA itself does not employ.  It also describes the SPA as a "religious document." Opp. 25, 51.  These labels are efforts at misdirection.

NAMB's December 2014 letter to BCMD accused McRaney of "breach"—a well-recognized civil law term, not a religious concept.  NAMB's choice of the word breach is unsurprising since the SPA clearly is a contract, as NAMB's then-Executive Vice President and Chief Financial Officer testified at his deposition. ROA.2966.  NAMB's own counsel referred to the SPA as a "contract" when objecting to a deposition question.  ROA.3064.  And NAMB's Opposition Brief in this Court refers to NAMB's *contractual* rights" under the SPA.  Opp. 45 n.20.

---

[2]  The Becket Fund's amicus brief misapprehends the facts and nature of the case.  For example, it erroneously asserts: NAMB "question[ed] [McRaney's]"ministerial abilities"; "criticiz[ed] his religious performance"; and disputed "his fitness to start [and lead] Baptist churches." ECF No. 57-2 at 2, 20, 26.

NAMB's letter made *no* reference to a religious dispute because there was none.   ROA.2232.   NAMB's primary charge against McRaney concerns his supposed failure to consult with NAMB when hiring for positions partially funded by NAMB.   According to then-NAMB Vice President, Steve Davis, the breach of the SPA was that "protocol had not been followed by McRaney in hiring of two key staff positions . . . .   NAMB was supposed to be involved in the process and wasn't." This was NAMB's "simple" and "primary concern" with McRaney.   ROA.3290.

Whether McRaney failed to abide by the SPA's terms when filling positions is not a religious or spiritual question.   Accordingly, when BCMD was evaluating NAMB's allegation of SPA breaches by McRaney, it asked its outside counsel— secular lawyers—to evaluate the charge.   They concluded there was no breach. ROA.2018-2020.

### 2.    Bill Warren's Deposition Testimony on His Own Behalf Does Not Transform this Case into a Religious or Spiritual Dispute

Lacking support in NAMB's own contemporaneous documents or testimony for the notion that this a religious or spiritual dispute which cannot be adjudicated, NAMB leans on snippets of deposition testimony from Bill Warren, a former BCMD President, who testified in his individual capacity (not on behalf of BCMD). ROA.1963, 1965.   But Warren's testimony does not substantiate NAMB's portrayal of the case.

- NAMB quotes Warren's response to a leading question from NAMB's counsel a "dispute between 'two members within the Body of Christ.'" Opp. 5. But that quotation reflects only Warren's personal characterization of a dispute between McRaney and Kevin Ezell, and does not establish anything about the litigation itself, nor bear on the legal question of whether this case is justiciable.

- NAMB repeatedly cites Warren's testimony to establish why BCMD terminated McRaney—trying to insulate NAMB from Counts I-III. But these citations are disingenuous. Warren was only one of 37 participants in this decision, and he made clear during his deposition that he did not speak for the 36 others or "the entire BCMD." ROA.1818, 1836. For example, Warren testified: "It's possible" that the other 36 members of the GMB who voted to terminate McRaney "may have been influenced by allegations or belief that he violated the SPA." ROA.2043.

- NAMB falsely states Warren testified that "lack of a 'humble spirit,' an element of Christ-like character, was the *primary* reason for [McRaney's] termination." Opp. 23 (emphasis added). In addition to making clear that he spoke only for himself—about the vote to terminate and generally— Warren cited a different *primary* reason for voting to terminate McRaney: to retain staff who purportedly threatened to leave, ROA.1938, 2024, and based on his treatment of staff, who supposedly complained about his "heavy-handed, middle of the night emails that were censorious in nature." ROA.1906.

- NAMB conveniently overlooks Warren's clear statement: ***"McRaney was not terminated by BCMD due to differences over theology or doctrinal issues."*** ROA.2088 (emphasis added).

### 3.    NAMB's Contrived Portrait of a Religious Dispute Ignores Counts IV-VI

Neither the District Court nor NAMB adequately explain why the causes of action concerning *post*-termination conduct (Counts IV-VI) are foreclosed by the First Amendment. As discussed in more detail below, *after* McRaney's termination, NAMB told people outside NAMB that McRaney was a "liar," "delusional," "a

5

nutcase," and "has no integrity," and took steps to make McRaney "untouchable" as he searched for new employment. There can be no serious argument that this and other conduct underlying Counts IV-VI constitutes religious or spiritual conduct, or will mire the Court in the resolution of ecclesiastical questions.

### B.    NAMB is Wrong About First Amendment Law

NAMB's legal arguments about the First Amendment are wrong.

#### 1.    NAMB Rejects or Ignores *McRaney I*

In *McRaney I*, this Court made clear the ecclesiastical abstention doctrine "recognizes that the Establishment Clause of the First Amendment precludes judicial review of claims that require resolution of '*strictly* and *purely* ecclesiastical' questions." 966 F.3d 346, 348 (5th Cir. 2020) (emphasis added). Like the District Court, NAMB quotes the "strictly and purely" language in passing, but fails to take it seriously. While NAMB's portrayal of *any* aspect of this case as a religious or spiritual dispute is strained, at best, NAMB makes no effort to explain how this case will require the resolution of "*strictly* and *purely* ecclesiastical" questions. There are no such questions at issue.

#### 2.    NAMB Relies Heavily on *Bell* after Telling the Supreme Court *Bell* Conflicts with Fifth Circuit Law

NAMB relies heavily on *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997), without acknowledging it told the Supreme Court that *Bell* and this Court's decision in *McRaney I* stand "in stark contrast" with one

another.  Opening Br. 28.  *Bell* is unavailing for NAMB both because it is inapposite and because it is not authoritative in this Court.

### 3.    NAMB's Argument for Expanding the "Ministerial Exception" Should Be Rejected

Early in this case NAMB sought dismissal in the District Court on the basis of the "ministerial exception," but that motion was denied.  On appeal, NAMB dropped its reliance on the ministerial exception, with this Court noting "[b]oth parties agree" "the ministerial exception is not before us."  *McRaney I*, 966 F.3d at 350 n.3.  But NAMB has changed its mind, arguing that the ministerial exception applies here.  NAMB is incorrect.  Neither the Supreme Court nor this Court have applied the ministerial exception to cover claims asserted by a person unrelated to employment or prospective employment by the defendant.

### 4.    NAMB's Arguments Threaten Religious Liberty

NAMB erroneously suggests McRaney's arguments would relegate Baptists to second-class status.  Opp. 36-37.  As Professor Hankins explained, accepting NAMB's (and the District Court's) version of the First Amendment would "undermine religious liberty rather than safeguard it."  ROA.683-84.  That view is shared by former and current Baptist leaders who filed an amicus brief in support of McRaney.  *See* ECF No. 24 at 13-16.    Notably, *no* Baptist group or leaders unaffiliated with NAMB sought to file an amicus brief supporting NAMB's position.

Not even BCMD filed a brief in support of NAMB.[3]

## III.    NAMB's Alternative Arguments for "Affirmance" Are Wrong

### A.    This Court Cannot Affirm Summary Judgment on Alternative Grounds Because There Was No Proper Entry of Summary Judgment

Once the District Court believed jurisdiction was absent it lacked authority to rule on summary judgment. *See Perna v. Health One Credit Union*, 983 F.3d 258, 272-73 (6th Cir. 2020) ("Because we lack subject matter jurisdiction . . . we cannot consider [plaintiff's] merits arguments."); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

NAMB mistakenly contends the District Court's error was "harmless," calling it a "labeling error." Opp. 19, 21. The District Court *dismissed* for lack of subject matter jurisdiction; it did not adjudicate the merits. Rule 12 and Rule 56 serve different purposes. The Court should reject NAMB's suggestion to conflate rules of civil procedure, and treat a dismissal as a ruling under Rule 56. Courts "have no power to rewrite the Rules by judicial interpretations." *Harris v. Nelson*, 394 U.S. 286, 298 (1969).

---

[3] BCMD did not object to an order denying its motion to quash a document subpoena from NAMB (ROA.1363-64), and then complied with document subpoenas served by both NAMB and McRaney.

NAMB suggests *Perna*, 973 F.3d 258, authorizes treating dismissal as summary judgment. Opp. 19-21. In *Perna*, the district court rendered merits rulings after finding jurisdiction lacking, improperly entering summary judgment rather than dismissing under Rule 12. On appeal, this Court was able to modify the judgment to dismissal because it agreed with the lower court's determination that it lacked jurisdiction. Here, if this Court agrees with McRaney that there is subject matter jurisdiction, this Court cannot merely modify the District Court judgment. Summary judgment is a "ruling on the merits," 973 F.3d at 273-74, and the District Court never rendered any such ruling.

Moreover, the District Court's "labeling error" was not harmless. If the District Court had jurisdiction over the case, it should have addressed the merits, including separately considering *each* of McRaney's causes of action. *See* Opening Br. 33-34. Jurisdiction is binary; the merits are not.

Because there was no proper entry of summary judgment for NAMB, procedurally there can be no *alternative* affirmance of summary judgment. In addition, even if this Court had authority to consider the merits when reviewing the District Court's jurisdictional order, this Court should decline to do so. The merits should be considered, in the first instance, by the District Court.[4]

---

[4]  On remand, the case should be reassigned to a different judge in the Northern District of Mississippi. *See* Opening Br. 18 n.8.

9

**B.    McRaney's Claims Were Not Released**

Following BCMD's decision to terminate McRaney, he and BCMD entered into a Separation Agreement.  NAMB was not a signatory or party to the Agreement; played no role in the negotiation or drafting of the Agreement; never received a draft of the Agreement; and was unaware of the Agreement until after it was fully executed.  NAMB nevertheless contends it was released by the Agreement.  Opp. 49-51.  But NAMB has it backwards: it is McRaney who was entitled to summary judgment with respect to NAMB's Separation Agreement defenses.  *See* ROA.2831, 2887, 3366.

**1.    NAMB Was Not a "Supporting Organization" of BCMD**

The Separation Agreement must be "construed and governed in accordance with the laws of the State of Maryland."  ROA.2889.  Maryland uses the objective interpretation of contracts, focusing on the four corners of the agreement.  *See Expo Properties, LLC v. Experient, Inc.*, 956 F.3d 217, 224 (4th Cir. 2020).  If the language is unambiguous, courts interpret the contract "based on what a reasonable person in the position of the parties would have understood the language to mean and not 'the subjective intent of the parties at the time of formation.'"  *Credible Behavioral Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019).

Only "[w]here a court determines contractual language to be ambiguous, [do] the narrow bounds of the objective approach give way, and the court is entitled to

10

consider extrinsic or parol evidence to ascertain the parties' intentions." *Credible*, 220 A.3d at 311.  If the extrinsic evidence presents disputed factual issues bearing upon the ambiguity, "construction of the contract must await resolution of that dispute by a factfinder, which may be a court or jury." *Id*. at 96-97.

Under Maryland law, an undefined contractual term should be ascribed its ordinary meaning, "best done" by referring to dictionary definitions, and other similar authoritative sources about its meaning.  *Metro. Life Ins. Co. v. Promenade Towers Mut. Hous. Corp.*, 581 A.2d 846, 854 (Md. 1990).

While the term "supporting organization" is undefined in the Agreement, its ordinary meaning is clear.  "A supporting organization, in the United States, is a public charity that operates under the U.S. Internal Revenue Code in 26 USCA 509(a)(3).").  *See* Supporting organization (charity) - Wikipedia; *see also* Philanthropy Dictionary | Philanthropy Terms | NPTrust ("To be a supporting organization, a charity must meet one of three complex legal tests that assure, at a minimum, that the organization being supported has some influence over the actions of the supporting organization."); Bruce R. Hopkins, Nonprofit Law Dictionary 416 (2015); Supporting Organizations - Requirements and Types | Internal Revenue Service (irs.gov).

The Declaration of Charles Lindsay and expert report of Dr. Sharp further confirm the propriety of this interpretation of the term "supporting organization."

ROA.2893.  Their opinions were unrebutted by NAMB, which did not file or serve any expert reports.

Because NAMB concedes it is not a supporting organization of BCMD within the meaning of the Internal Revenue Code, ROA.2902, its Separation Agreement defenses fail.

*    *    *

Discovery further demonstrated that NAMB was not a supporting organization of BCMD.  For example:

- NAMB's Chief Accounting Officer and Controller used the term supporting organization in NAMB correspondence as employed in connection with the Internal Revenue Code.  ROA.2894.

- NAMB's Consolidated Financial Statements and Report of Independent Certified Accountants for 2010 and 2011 used the term supporting organization as employed in connection with the Internal Revenue Code.  ROA.2894.

- In the same Report, NAMB is described as a support*ed* organization— the opposite of a support*ing* organization.  ROA.2894.

- NAMB's 30(b)(6) witness was unable to provide any facts to dispute or disprove that NAMB is classified as a support*ed* organization.  ROA.2894.

- NAMB's Vice President, Steve Davis, who had responsibility for NAMB's relationship with BCMD at the time McRaney was terminated and the Separation Agreement was executed, testified he did not recall ever hearing the term "supporting organization" used when he worked at NAMB.  ROA.2895.

- Davis also testified he did not recall ever hearing anyone "describe NAMB as a supporting organization of BCMD."  ROA.2895.

12

- BCMD Foundation's public tax filings demonstrate BCMD used the term supporting organization as employed in connection with the Internal Revenue Code. ROA.3379-3442.

- During the years Plaintiff was employed by BCMD (*i.e.*, 2013 to 2015), BCMD provided more financial support to NAMB than NAMB provided to BCMD. ROA.2895.

Taking account of these facts, it is apparent that NAMB's Executive Vice President of Public Relations, Mike Ebert, said the quiet part out loud when admitting in emails that NAMB's claim it is a "supporting organization" of BCMD was conjured up for this matter alone, stating that defense is "limited to the facts of this specific case . . . ."[5] ROA.2873, 2875.

### 2. Under Maryland Law NAMB is Not Entitled to Enforce the Separation Agreement

"Maryland law is *quite restrictive* on the issue of whether one may be considered a third-party beneficiary" permitted to enforce a contract. *CX Reinsurance Co., Ltd. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016), *aff'd*, 691

---

[5] NAMB fails to counter any of *this* evidence. Instead, it directs the Court to a pair of irrelevant statements. Opp. 50. First, NAMB cites a sentence fragment in ROA.2698, where McRaney wrote that "NAMB's role" was to "provid[e] support" to BCMD. In the District Court McRaney filed an evidentiary objection on this point, observing the document is irrelevant, and inadmissible under Federal Rule of Evidence 401 with respect to whether NAMB was a "supporting organization" of BCMD. McRaney did not use the term "supporting organization" in that document, let alone use it to describe NAMB's relationship to BCMD. ROA.3337, 3372-73. Second, NAMB quotes a BCMD motion filed after this lawsuit began (ROA.238), in which BCMD wrote: "McRaney has brought suit instead against one of the Convention's primary supporting organizations." As McRaney explained in his evidentiary objection, BCMD's motion in the midst of this litigation is inadmissible under Federal Rules of Evidence 401 and 403, and is hearsay to which no exception applies. ROA.3350-51.

F. App'x 130 (4th Cir. 2017) (emphasis added). "A person is a third-party beneficiary only where the promise sought to be enforced was intended for that person's benefit and the parties intended to recognize that person as the primary party in interest with respect to that promise." *Cushman & Wakefield of Maryland, Inc. v. DRV Greentec, LLC*, 203 A.3d 835, 838 (Md. 2019). The "crucial fact" for determining whether a party can enforce a contract as a third-party beneficiary is "whether the pertinent provisions in the contract were 'inserted ... to benefit' the third party." *Allen v. Bank of Am., N.A.*, 933 F. Supp. 2d 716, 726 (D. Md. 2013) (quoting *CR–RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (Md. 2012)). Here, there is no evidence that the term "supporting organization" was included in the Separation Agreement *for the purpose* of releasing McRaney's claims *against NAMB*. ROA.3374-75.

### 3. The Separation Agreement's Mandatory Forum Selection Provision Forecloses NAMB's Release Defense in the District Court

NAMB fails to mention the Separation Agreement contains a mandatory forum selection clause ("FSC"), which provides: "All suits, proceedings and other actions *relating to*, arising out of or *in connection with* this Agreement **shall** be brought **exclusively**" in state or federal court in Maryland. *See* ROA.228 (emphasis added).

The Supreme Court has made clear that "[w]hen parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily

14

disrupt the parties' settled expectations." *Atlantic Marine Construction Co., Inc. v. United States District Court for the Western District of Texas*, 571 U.S. 49, 66 (2013). This Court, "in keeping with Supreme Court precedents, applies a strong presumption in favor of the enforcement of mandatory FSCs." *Weber v. PACT XPP Technologies, AG*, 811 F.3d 758, 773 (5th Cir. 2016); *id*. at 768 ("A mandatory FSC affirmatively requires that litigation arising from the contract be carried out in a given forum."). This presumption has no less force when a FSC appears in an agreement applied to a non-signatory. *See*, *e.g.*, *In re Lloyd's Register North America, Inc.*, 780 F.3d 283 (5th Cir. 2015) (finding district court erred by not applying forum selection clause to non-signatory).

NAMB (baselessly) asserts it was released by the Separation Agreement. ROA.1366-67. Yet NAMB flouted the clear, mandatory FSC of the Agreement by making its arguments in the Northern District of Mississippi, rather than in the forum required by the Agreement. NAMB could have brought an action in Maryland seeking a declaratory judgment that it was released by the Separation Agreement. It failed to do so. NAMB also could have sought to transfer this case to federal court in Maryland—relief often granted by courts to enforce a valid forum selection clause. *See*, *e.g.*, *Atlantic Marine*, 571 U.S. at 59 (Section 1404(a) "provides a mechanism for enforcement of forum-selection clauses that point to a particular

federal district."); *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988) (applying §1404(a) to forum selection clause dispute). It failed to do that either.

## C.    The Record Shows Genuine Disputes Over Material Facts, Which Should Be Presented to a Jury

"Summary judgment is appropriate only when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law." *Roe v. Cypress-Fairbanks Independent School District*, 53 F.4th 334, 340 (5th Cir. 2022). The record demonstrates there are genuinely disputed material facts which preclude the entry of summary judgment.

\*      \*      \*

NAMB told BCMD and others that McRaney had engaged in "serious and persistent disregard" and "multiple failures . . . to abide by" the SPA between BCMD and NAMB. On appeal, NAMB inaccurately contends McRaney "offered no evidence" that he did not breach the SPA. Opp. 52. At summary judgment McRaney presented evidence showing:

- BCMD conducted "a careful and thorough exploration of [NAMB's] claims against [McRaney] in regards to the [SPA]" and told NAMB "we are confident that our Executive Director and our Network have not breached the agreement." BCMD added that NAMB's "false accusations" against McRaney were "unfounded and highly inflammatory." ROA.3340.

- Following NAMB's accusation of breaches by McRaney, BCMD's General Mission Board unanimously voted for a resolution of support of McRaney. ROA.3344.

16

- In February 2015, BCMD's outside law firm conducted a review of NAMB's allegation that McRaney had breached the SPA, concluding there had been no breach, "either technically or of the spirit of the agreement." ROA.3340-41.

- NAMB's claim that McRaney "unilaterally offered a missionary position to Joel Rainey without first consulting NAMB" is false. *See* ROA.3341 (citing June 21, 2014 email from McRaney to NAMB's Jeff Christopherson, stating: "I would like to schedule time to talk with you by phone," and listing among the topics: "Staffing possible change around Joel Rainey, considering him for SDOE position"); *id.* (citing July 15, 2014 email from NAMB's Jeff Christopherson, stating: "Will McRaney would like to move Joel Rainey from a Church Planting Catalyst position within BCMD to become their SDOE . . . I would wholeheartedly endorse Joel . . . ."); *id.* (citing NAMB testimony admitting it does not know what McRaney told Rainey about NAMB's role in the approval process).

- NAMB's claim that McRaney hired Michael Crawford as State Director of Missions "without consulting NAMB" is false. *See* ROA.3342 (citing December 3, 2014 email from McRaney to NAMB's Jeff Christopherson, following up about their discussion of Crawford's candidacy, and describing actions to "give you ample time to consider him and engage him in whatever ways are consistent with NAMB's approval process."); *id.* (citing minutes from BCMD's Board meeting, noting that hiring requires "NAMB's final approval."); *id.* (citing NAMB testimony admitting it does not know what McRaney told Crawford about NAMB's role in the approval process).

NAMB next suggests there is no evidence supporting Count I—tortious interference leading to McRaney's termination from BCMD. Opp. 53. This too is wrong:

- After sending the December 2014 letter, NAMB continued to disparage McRaney, making false accusations of misconduct ***directly to BCMD leadership***, including members of BCMD's Board. *See* ROA.3319-20.

- Two witnesses provided sworn testimony supporting McRaney's allegation that his termination was significantly influenced by NAMB's financial threats and inducements. *See* ROA.3661 (Scott Declaration: reporting firsthand on a meeting with BCMD leaders, during which it was admitted that "Kevin Ezell and the withholding of funds was a significant factor for Will McRaney's termination"); ROA.3658-59 (Wolverton Declaration: "Dr. [Bill] Warren stated that Dr. Ezell had convinced him that NAMB was going to withhold funding from BCMD for as long as Dr. McRaney remained Executive Director. Dr. Warren said that he had relayed this information to BCMD's General Mission Board and that the organization would lose funding, and thus resources and staff, if Dr. McRaney remained in his position. After hearing this, the Board voted to terminate Dr. McRaney."); ROA.3262 (Wolverton: "Warren told me that he did not feel he could risk losing the funding" from NAMB "so he did what he felt like he had to do"); *see also* ROA.3702 (Barker: with Ezell, "[i]t was his way or the highway").

- NAMB and BCMD were communicating and coordinating in advance about McRaney's dismissal. For example, a June 1, 2016 email from NAMB Vice President Steve Davis to NAMB President Kevin Ezell says about scheduling a meeting with McRaney that Davis was "trying to hold off *as asked by Bill Warren*, but also *not wanting to tip Will off that something else is causing the delay*." ROA.3250 (emphasis added). The "something else" was McRaney's removal, as the remainder of the email makes clear: "[I]f he is removed, we can change the funding back to our original proposal." *Id*. Later that afternoon, in the same email chain about restoring funding to BCMD after McRaney is removed, Ezell wrote to Davis: "We want to be cautious *until we know who the new guy will be*." ROA.3253-57 (emphasis added).

- Former NAMB employee Bill Barker "learned from the people within the Maryland/Delaware Convention" that "Kevin [Ezell], behind the scenes, manipulated it so" BCMD Board dismissed McRaney because he "did not cooperate with Kevin in what Kevin wanted done." ROA.3742-43.

- Soon after Plaintiff was terminated by BCMD, NAMB restored its relationship with BCMD. In fact, one day after Plaintiff was terminated by BCMD, on June 9, 2015, Steve Davis—NAMB's Northeast Regional Vice President in 2015—sent an email to NAMB President

18

Ezell noting that he had "refigured the 100% plan for MD/DE based on resignation of Will McRaney, and moving forward." ROA.3258.

- After BCMD terminated Plaintiff, NAMB rewarded BCMD by enhancing NAMB's financial contributions to BCMD beyond the levels during or prior to Plaintiff's tenure at BCMD. ROA.3258.

- NAMB referred to its then-rescinded threat that it would sever relations with BCMD if it did not get its way as the "Maryland/Delaware disciplinal process." ROA.3226.

NAMB mistakenly contends Count II (defamation leading up to termination by BCMD) is time-barred. Opp. 54. Mississippi choice of law rules suggest Maryland law applies to Count II. While Maryland has a one-year limitations period for defamation, "each separate defamatory statement itself constitutes a separate and distinct cause of action." *Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 457 (D. Md. 2014). If the defamatory statement is repeated by a third party, an author can be liable for the republication of a prior defamatory statement if the republication of the statement by a third party is "the natural and probable consequence" of his original act of publishing the defamatory statement. *Shepard v. Nabb*, 581 A.2d 839, 844-45 (Md. Ct. Spec. App. 1990).[6]

With respect to Count III (pre-termination emotional distress), NAMB claims its conduct was insufficiently outrageous. Opp. 55. But NAMB ignores the full body of evidence about its conduct. Moreover, McRaney submitted a verified

---

[6] For the same reasons discussed above, NAMB is wrong that McRaney "failed to proffer any evidence that the allegedly defamatory statements . . . were false." Opp. 54.

19

interrogatory response, testifying that he "suffered from stress, anxiety, difficulty sleeping, and weight gain as a result of Defendant's conduct, and consulted primary care medical professionals and a cardiologist in connection with those conditions." ROA.2811. NAMB adduced no evidence in discovery contradicting that testimony, and elected not to ask about it during McRaney's deposition.

NAMB does not have much to say about Counts IV-VI, which concern NAMB's conduct after McRaney's termination by BCMD.[7] But the little NAMB does say is wrong. Its threshold error is ignoring most of the *actual* allegations related to the post-termination Counts in McRaney's Supplemental Pleading. NAMB suggests these Counts "turn" on only the allegation about McRaney being disinvited as a speaker from one conference, and the posting of his photo at the

---

[7] A federal court with diversity jurisdiction over state law claims applies the choice of law test of the forum state when deciding which State's law to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). But "courts are to undertake a separate choice-of-law analysis for each claim." *Viridis Corp. v. TCA Global Credit Master Fund, LP*, 721 Fed. App'x 865, 875 n.11 (11th Cir. 2018); *see also Price v. Litton Systems, Inc.*, 784 F.2d 600, 603, 606 (5th Cir. 1986) (claim-specific choice of law analysis). Applying Mississippi's choice of law test to each Plaintiff's six causes of action, it is obvious that neither Maryland nor Mississippi law apply to Plaintiff's Counts IV-VI, which concern NAMB's conduct and injuries *after* McRaney was terminated by BCMD. Mississippi has adopted the "most significant relationship test" from the Restatement (Second) of Conflict of Laws (1971). *Mitchell v. Craft*, 211 So. 2d 509 (Miss. 1968). Under that test, for tort claims, relevant factors include "the place where the injury occurred" and "the domicile . . . of the parties." *Williams v. Liberty Mut. Ins. Co*., 741 F.3d 617, 622 (5th Cir. 2014). While McRaney worked for BCMD, he and his wife maintained a home in Florida, where they lived before taking the job with BCMD. ROA.3154. They moved back to Florida almost immediately after the termination. ROA.3156. McRaney resided in Florida during the entire period he has suffered post-termination injuries as a result of NAMB's misconduct. Moreover, some of the specific acts alleged in the Supplemental Pleading occurred in Florida. RE-40-42. Thus, Florida law should apply to Counts IV-VI.

security desk at NAMB's headquarters.  Opp. 55.  But NAMB disregards other evidence supporting McRaney's allegations that after his termination NAMB interfered with his prospective business relationships with third parties, injured his professional and personal reputation, and caused emotional distress.

Under oath during depositions in this case, NAMB witnesses described McRaney as: "intelligent"; "hard working"; "talented"; having "great vision"; having "courage"; "not afraid to tackle hard issues"; "a man of integrity"; "and a man of truth."  ROA.3328.  But, following his ouster from BCMD, NAMB continued to disparage McRaney, telling people outside NAMB that he was a "liar," "delusional," "a nutcase," and "has no integrity."  ROA.3332-33.  NAMB tries to pass off these attacks on McRaney as "hyperbole" (Opp. 57), but both common sense and the testimony of NAMB witnesses demonstrate the potential harm of such accusations.  Former NAMB Executive Vice President and Chief Financial Officer, Carlos Ferrer, acknowledged that calling someone a liar is a serious accusation, which can harm someone's reputation. ROA.2959.  Former NAMB Board of Trustees Chair, Danny de Armas, testified that being told by a trusted source that someone lied or was a liar would adversely impact his view of the accused's character. ROA.2990.  NAMB's Steve Davis testified he would not hire a job candidate if told by a colleague that the candidate had lied.  ROA.2975-76.  Davis also testified he would not hire a candidate described as "delusional" or a "nutcase"

by a trusted source.  ROA.2975.

NAMB tried to make McRaney "untouchable" as he searched for new employment after this termination.  It was widely known that hiring McRaney would incur the wrath of Kevin Ezell and NAMB.  For example, in the summer of 2015 Scott Thomas—the President of Safari Christian Business Alliance (SCBA)—was looking to hire an "expert in the field of ministry who could work to advance the mission and objectives of SCBA."  Thomas discussed with SCBA's Executive Director the possibility of hiring McRaney for this role; they both "agreed that [Plaintiff] was the strongest person we knew for the job and possessed the experience and attributes SCBA needed in an executive leader of SCBA earning multiple six figures and up."  However, Thomas noted, "the perception portrayed by NAMB among SBC leaders was that McRaney was a trouble maker with NAMB as the Executive Director of Maryland/Delaware Baptist Convention."  As a result, Thomas testified that the SCBA "regrettably determined that in spite of our personal relationship with and professional support for McRaney, we could not hire McRaney because SCBA could not afford the perception problems and potential hurt to SCBA with NAMB and SBC leaders."  ROA.3325.

In a separate example, about a year after McRaney's termination, Jimmy Crosby—President of Jacksonville Baptist Theological Seminary (JBTS)—declined to hire McRaney for similar reasons.  Crosby testified: "[a]fter meeting McRaney

[in October 2016] and talking with more trusted friends, I was impressed with his academic and ministry credentials."  Crosby noted that "[a]s the President of JBTS, I am always looking to upgrade the quality of teaching and training we seek to provide to our students, and quickly began considering ways to incorporate McRaney into the life of JBTS in several leadership roles."  However, "[a]fter learning from various SBC leaders in Florida that NAMB leadership was not pleased with McRaney," Crosby "made the decision in late 2016 that I could at that time not hire McRaney in fear of damage to JBTS and backlash from some SBC leaders."  ROA.3325-26.

NAMB has also deployed other arms of the SBC in its campaign against Plaintiff.  For instance, the SBC's Baptist Press told a prominent journalist who had previously worked as a freelancer, that she might get future work if she "would stop writing about Will McRaney."  ROA.3327.

NAMB's conduct also impeded McRaney's opportunities as a speaker and presenter at conferences and meetings—opportunities which enhanced his professional profile; gave him forums to promote, and sometimes sell, his books and publications; and were a source of personal enjoyment and satisfaction.  For example, McRaney was scheduled to speak at a large event in Louisville, Winston County, Mississippi on October 23, 2016, but was uninvited after Rob Paul—who had extended the invitation—had a phone call with then-NAMB Board of Trustees

member, Danny Wood, during which Wood told Paul that it "makes sense" for Paul to uninvite McRaney. Wood made this statement to Paul approximately one month after Wood declared in an email to NAMB's President, Kevin Ezell, that Wood was ready to "go to battle" with Ezell against McRaney. McRaney later learned that Paul had replaced him with Ed Litton (who became the SBC President), the husband of NAMB employee Kathy Ferguson Litton. ROA.3326.

The foregoing evidence is more than sufficient to preclude summary judgment for NAMB regarding Counts IV-VI.[8] But NAMB is also wrong that its posting of McRaney's photo at the reception desk of NAMB's headquarters does not support these Counts. The undisputed evidence shows the purpose of posting the photo was to deny McRaney entry to the building, as the NAMB document memorializing the task explicitly stated. ROA.3323 ("no entry in building"); ROA.2971 ("Kevin [Ezell] had told us that he posted – had posted a picture down there for the receptionist to make sure that if he came to the building, not to let him in").

This no-entry-photo was visible to NAMB personnel and visitors,[9] and kept

---

[8]  There are grounds for the jury to doubt the credibility of key NAMB witnesses, which is yet another reason why NAMB is not entitled to summary judgment. ROA.3334-35.

[9]  The desk was a circular shape, with people "able to circulate freely 360 degrees around" it. ROA.3146; ROA.2972. NAMB falsely claims McRaney's photo was "out of public view." Opp. 56. Both photographic evidence and NAMB's own testimony prove otherwise. *See* ROA.2972 (Ezell confirming that "anyone in the lobby…could have potentially seen the photograph."); ROA.1561 (photo of McRaney's picture posted at desk taken by visitor to NAMB headquarters).

up for at least many months in 2016, and perhaps longer. The no-entry-photo communicated that McRaney was not to be trusted and an enemy of NAMB.

Numerous NAMB witnesses confirmed that McRaney *alone* received the treatment of having his photograph posted at NAMB's reception desk for the purpose of denying him entry. ROA.2962, 2985, 3006, 3148, 3587. The posting of the photo was discussed at a NAMB Board meeting, but NAMB refused to let the witness testify about the Board's discussion of the photo. ROA.3007-8. Former NAMB Executive Vice President, Carlos Ferrer, testified it is not unreasonable for McRaney to believe that NAMB's posting of his photograph at the NAMB reception desk injured his reputation. ROA.2964.

NAMB maintains the photo was posted based on a "reasonable concern" that McRaney posed a security threat. Opp. 56. That is nonsense. No NAMB witness identified any facts supporting the notion that McRaney posed a danger. ROA.3324. The NAMB employee responsible for posting the photo testified the photo was *not* posted "out of concern about security or a risk of violence posed by McRaney." ROA.3348. Only Kevin Ezell suggested he "felt that it was a possibility" McRaney might pose a physical threat, but at his deposition, he admitted no one ever told him McRaney posed a threat to him or anyone else at NAMB, and Ezell was unable to identify "an actual threat that McRaney made to [his] physical well-being." ROA.3348.

\*    \*    \*

As detailed in his Interrogatory responses, McRaney made considerable efforts to find work in his field, to no avail. *See* ROA.2812-13. As a result, after years of diminished income, he started his own organization. His actual economic harm is estimated in the expert report of Dr. Sharp. ROA.3329.

## CONCLUSION

The District Court's order should be vacated, and the case remanded to the District Court to adjudicate the fully briefed motions for summary judgment. But if this Court determines subject matter jurisdiction is absent, the District Court's Order must be vacated, and the District Court instructed to remand the case to state court, as required by 28 U.S.C. § 1447(c).

Respectfully submitted,

 s/ Scott E. Gant
_____

Scott E. Gant
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
sgant@bsfllp.com

*Counsel for Plaintiff-Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2023, a true and correct copy of the foregoing was served via electronic filing with the Clerk of Court and all registered ECF users.  Upon acceptance by the Court of the e-filed document, paper copies will be filed with the Court within the time provided in the Court's rules via Federal Express.


December 21, 2023                    s/ Scott E. Gant

## **CERTIFICATE OF COMPLIANCE**

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 6,493 words.


December 21, 2023                          s/ Scott E. Gant